Case No. 15-2080

---

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

**AFFINITY LABS OF TEXAS, LLC,**

*Plaintiff-Appellant,*

**v.**

**AMAZON.COM INC., AMAZON DIGITAL
SERVICES, INC.,**

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Western District of Texas
In Case No. 15-CV-0029, Walter S. Smith Jr.

---

**OPENING BRIEF FOR APPELLANT
AFFINITY LABS OF TEXAS, LLC**

---

Ronald J. Schutz
Cyrus A. Morton
Patrick M. Arenz
Brenda L. Joly
Benjamen C. Linden
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Tel.: (612) 349-8500

*Attorneys for Plaintiff-Appellant
Affinity Labs of Texas, LLC*

December 18, 2015

**Form 9**

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Affinity Labs of Texas, LLC _____ v. Amazon.com Inc., et al. _____

No. 15-2080 _____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Affinity Labs of Texas, LLC ____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Affinity Labs of Texas, LLC

---

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

The party named in the caption is the real party in interest.

---

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

---

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robins Kaplan LLP: Ronald J. Schutz, Cyrus A. Morton, Patrick M. Arenz, Daniel R. Burgess, Shira T. Shapiro, Kristine A. Tietz, Brenda L. Joly, and Benjamen C. Linden. Naman Howell Smith & Lee, PLLC: John P. Palmer

---

| 12/18/2015 | /s/ Ronald J. Schutz |
|---|---|
| Date | Signature of counsel |
| | Ronald J. Schutz |
| | Printed name of counsel |

Please Note: All questions must be answered

cc: All Counsel _____

---

# Table of Contents

Statement of Related Cases.........................................................................1

Jurisdictional Statement ..........................................................................2

Statement of the Issues.............................................................................3

Statement of the Case ..............................................................................4

    A. The Inventions in the '085 Patent...............................................4

    B. The Patent Infringement Action..................................................6

        1. The Magistrate Judge's Report and
            Recommendation to Dismiss the Action.............................6

        2. The District Court's Order Adopting the Magistrate
            Judge's Report and Recommendation and
            Dismissing the Action..........................................................11

Summary of Argument ..........................................................................13

Standard of Review ...............................................................................17

Argument ...............................................................................................18

I.  The Claims of the '085 Patent are Directed to a Concrete and
    Tangible Invention, Not an Abstract Idea......................................19

    A. The district court erred by creating a new and extremely
       broad category of abstract idea it called "well-known,
       longstanding, commercial practices." ......................................20

    B. The district court failed to conduct a proper analysis even
       under its erroneous longstanding commercial practice
       standard because the district court eviscerated the claimed
       invention by focusing on the purpose of the invention after
       a "quick look" at the claims. .....................................................25

C.  The district court erred by finding under any test or standard that an inherently concrete and tangible network-based media delivery system is "abstract." ............................ 29

II. The District Court Erred in Finding that the Claims of the '085 Patent Lacked an Inventive Concept. .............................................. 31

A.  The district court erred in its analysis and application of an unprecedented "technological arts" test. ................................. 31

B.  The claims of the '085 patent include an inventive concept under a proper analysis of step two. ........................................ 34

1.  The hardware and software elements individually and as a whole do not represent generic, well-understood, routine, or conventional activity in March of 2000. ........................................................ 34

2.  Under the machine-or-transformation test and this Court's decision in *DDR*, the claims include an inventive concept. ............................................... 38

C.  The facts, when viewed in the light most favorable to Affinity Labs, demonstrate that there is no risk of preempting the district court's "abstract idea." ...................... 41

III. The District Court Erred in Granting a Motion to Dismiss Based on Unsupported Factual Findings Outside the Record. .. 46

A.  General historical observations are not appropriate because determining the preemptive scope of the claims-in-suit and whether the claim limitations were generic, routine or conventional is not legislative fact-finding. .......... 49

B.  The district court's adjudicative fact finding also does not meet the requirements for use of judicial notice ..................... 53

C.  The district court erred in striking and not considering Affinity Labs' expert declaration offering evidence to rebut the court's unsupported fact findings ...................................... 56

Conclusion .............................................................................................. 61

# Table of Authorities

**Page(s)**

**Cases**

*ABC, Inc. v. Aereo, Inc.,*
134 S. Ct. 2498 (2014) .......................................................... 52

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.,*
728 F.3d 1336 (Fed. Cir. 2013)................................... 17, 42, 52

*Alice Corp. v. CLS Bank Int'l,*
134 S. Ct. 2347 (2014) .................................................. *passim*

*Ameritox, Ltd. v. Millennium Health, LLC,*
No. 13-cv-832-WMC, 2015 U.S. Dist. LEXIS 53818
(W.D. Wis. Apr. 24, 2015) ................................................. 52

*Amgen Inc. v. Hoechst Marion Roussel,*
314 F.3d 1313 (Fed. Cir. 2003).......................................... 44

*Amgen Inc. v. Sandoz Inc.,*
794 F.3d 1347 (Fed. Cir. 2015).......................................... 17

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.,*
788 F.3d 1371 (Fed. Cir. 2015).......................................... 42

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
365 U.S. 336 (1961) ......................................................... 26

*Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.,*
306 F.2d 862 (5th Cir. 1962)............................................. 57

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.,*
687 F.3d 1266 (Fed. Cir. 2012).......................................... 17

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ......................................................... 17

iv

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ...................................................................... *passim*

*Cal. Inst. of Tech. v. Hughes Commc'ns, Inc.*,
    59 F. Supp. 3d 974 (C.D. Cal. 2014)................................. 18, 47, 51, 52

*Certified Measurement, LLC v. Centerpoint Energy Houston*
    *Elec. LLC*,
    No. 14-CV-627-RSP, 2015 U.S. Dist. LEXIS 39821
    (E.D. Tex. Mar. 29, 2015) .............................................................. 52, 56

*CLS Bank Int'l v. Alice Corp.*,
    717 F.3d 1269 (Fed. Cir. 2013).......................................... 36, 42, 46, 53

*Colonial Leasing Co. v. Logistics Control Grp. Int'l*,
    762 F.2d 454 (5th Cir. 1985)................................................................. 59

*Content Extraction & Transmission LLC v. Wells Fargo*
    *Bank, N.A.*,
    776 F.3d 1343 (Fed. Cir. 2014).......................................................... 21

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011).......................................................... 30

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)............................................... 32, 38, 42

*Dennison Mfg. Co. v. Panduit Corp.*,
    475 U.S. 809 (1986) ............................................................................ 51

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ............................................................................ 35

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ............................................................................ 52

*Dunagin v. City of Oxford, Miss.*,
    718 F.2d 738 (5th Cir. 1983)................................................................ 50

*Fairfield Indus., Inc. v. Wireless Seismic, Inc.*,
No. 4:14-cv-2972, 2014 U.S. Dist. LEXIS 176599
(S.D. Tex. Dec. 23, 2014) ..................................................... 26

*Gentilello v. Rege*,
627 F.3d 540 (5th Cir. 2010) ............................................... 54

*Gottschalk v. Benson*,
409 U.S. 63 (1972) ....................................................... 20, 24

*Guidry v. American Public Life Ins. Co.*,
512 F.3d 177 (5th Cir. 2007) ............................................... 17

*Hardy v. Johns-Manville Sales Corp.*,
681 F.2d 334 (5th Cir. 1982) ............................................... 54

*Holloway v. Lockhart*,
813 F.2d 874 (8th Cir. 1987) ............................................... 55

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) (en banc), *aff'd on other
grounds*, 561 U.S. 593 (2010) ............................................... 32

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) ............................................. 21

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) ............................................. 21

*Kenexa Brassring, Inc. v. HireAbility.com, LLC*,
No. 12-10943-FDS, 2015 U.S. Dist. LEXIS 56156
(D. Mass. Apr. 28, 2015) .............................................. 52, 54

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ..................................................... 23, 35

*Le Roy v. Tatham*,
55 U.S. 156 (1853) ......................................................... 24

*Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,*
    969 F.2d 1384 (2d Cir. 1992) ................................................................ 55

*Lovelace v. Software Spectrum Inc.,*
    78 F.3d 1015 (5th Cir. 1996) ................................................................ 47

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
    132 S. Ct. 1289 (2012) ...................................................... 34, 36, 37, 42

*Microsoft Corp. v. i4i Ltd. P'ship,*
    131 S. Ct. 2238 (2011) ........................................................................ 46

*Park v. Booth,*
    102 U.S. 96 (1880) ............................................................................... 23

*Parker v. Flook,*
    437 U.S. 584 (1978) ............................................................................. 20

*Planet Bingo, LLC v. VKGS LLC,*
    576 Fed. App'x. 1005 (Fed. Cir. 2014) ......................................... 21, 30

*SiRF Tech., Inc. v. Int'l Trade Comm'n,*
    601 F.3d 1319 (Fed. Cir. 2010) ..................................................... 39, 40

*Soley v. Star & Herald Co.,*
    390 F.2d 364 (5th Cir. 1968) ................................................................ 59

*Taylor v. Charter Med. Corp.,*
    162 F.3d 827 (5th Cir. 1998) ................................................................ 55

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
    135 S. Ct. 831 (2015) ..................................................................... 15, 51

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk
    Contractors USA, Inc.,*
    617 F.3d 1296 (Fed. Cir. 2010) ........................................................... 33

*Ultramercial, Inc. v. Hulu, LLC,*
    722 F.3d 1335 (Fed. Cir. 2013), *vacated and remanded,*
    134 S. Ct. 2870 (2014) ................................................................. *passim*

*Ultramercial, Inc. v. Hulu, LLC,*
   772 F.3d 709 (Fed. Cir. 2014) ...................................................... *passim*

*United States v. Coney,*
   689 F.3d 365 (5th Cir. 2012) ........................................................ 17, 57

*United States v. Jones,*
   29 F.3d 1549 (11th Cir. 1994) ........................................................... 55

## Statutes

28 U.S.C. § 1295(a)(1) ................................................................................ 2

28 U.S.C. § 1331 ........................................................................................ 2

28 U.S.C. § 1338(a) .................................................................................... 2

35 U.S.C. § 101 ................................................................................ *passim*

35 U.S.C. § 102 ................................................................................ *passim*

35 U.S.C. § 103 ................................................................................ *passim*

35 U.S.C. § 112 ................................................................................ *passim*

35 U.S.C. § 112(a) .................................................................................... 33

35 U.S.C. § 282 ........................................................................................ 46

## Rules

Fed. Cir. R. 47.5 ........................................................................................ 1

Fed. R. Civ. P. 12 ........................................................................... 35, 56, 58

Fed. R. Civ. P. 12(b)(6) ...................................................................... 51, 58

Fed. R. Civ. P. 12(c) ........................................................................ *passim*

Fed. R. Civ. P. 12(d) ................................................................................ 59

Fed. R. Civ. P. 52(a) ................................................................................ 51

Fed. R. Civ. P. 56................................................................................ 59

Fed. R. Civ. P. 201(a)........................................................................ 50

Fed. R. Evid. 201 .................................................................... *passim*

Fed. R. Evid. 201(a) ......................................................................... 50

Fed. R. Evid. 201(b) .......................................................................... 53

Fed. R. Evid. 201(e) .......................................................................... 59

## Statement of Related Cases

Pursuant to Federal Circuit Rule 47.5, appellant provides as follows:

(a)   There have been no previous appeals in this case.

(b)   Plaintiff-Appellant Affinity Labs of Texas, LLC ("Affinity Labs") is not aware of any cases pending in this or any other court that will directly affect or be directly affected by this Court's decision on this appeal.

# Jurisdictional Statement

The district court had jurisdiction over the patent infringement action underlying this appeal pursuant to 28 U.S.C. §§ 1331 and 1338(a). The district court entered a final judgment and order dismissing the case pursuant to Fed. R. Civ. P. 12(c) on September 23, 2015, in favor of Defendants-Appellees Amazon.com Inc. and Amazon Digital Services, Inc. ("Amazon"). A1. Affinity Labs timely filed a notice of appeal on September 24, 2015. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(1).

# Statement of the Issues

Whether the district court erred when it granted Amazon's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) for failure to claim patentable subject matter under 35 U.S.C. § 101, including when it:

1)    held any patent whose "purpose" relates to a "longstanding commercial practice" is a patent-ineligible abstract idea under step one of the *Alice* framework instead of determining whether the claims of the asserted patent as a whole are directed to tangible and concrete inventions;

2)    found that claims reciting concrete and tangible software/hardware elements determined to be novel by the United States Patent and Trademark Office were nonetheless "routine, conventional, or well-known," and insufficient to provide an inventive concept under step two of the *Alice* framework; and/or

3)    granted a motion to dismiss on the pleadings after it made unsupported factual findings contrary to the allegations in the complaint, and struck the expert declaration submitted by Affinity Labs that contradicted its unsupported factual findings.

# Statement of the Case

## A.   The Inventions in the '085 Patent

The patent-in-suit, U.S. Patent No. 8,688,085 (the '085 patent) is generally directed to solving problems related to accessing, managing, and communicating digital audio and video content. *See* A79 at ¶ 15. The '085 patent claims one aspect of a media ecosystem originally disclosed in a comprehensive patent application, No. 09/537,812 (the '812 Application), filed by inventors Kevin Imes and Russell White with the United States Patent and Trademark Office ("PTO") on March 28, 2000. *Id*. at ¶ 17. At the center of this media ecosystem solution is a portable electronic audio device. *Id*. at ¶ 15.

In 2000, access and management of media content on a portable handheld device over a streaming connection was not routine, conventional, or well-known. No viable options for accessing libraries of music or video on-the-go existed. CD players were the device of choice for consumers. *See* A551 at ¶ 7. Music libraries were not digital, but rather physical cases and sleeves of compact discs. *See id*. The first generally available portable MP3 player, the Rio PMP300, was released in 1998. *Id*. at ¶ 8. But the MP3 player simply moved the compact discs from an external case or sleeve to an internal memory of the device. *See id*. at ¶ 7. As such, a

user's library was still carried around by the user and constrained in quantity by the available memory on the device. *Id*. at ¶¶ 7-8.

To access the vast libraries of media on the Internet, a wired connection to facilitate streaming on, for instance, a home computer was required. *Id*. at ¶ 7. The wide-scale delivery of streaming media to a mobile device was still years away. Apple iTunes was only launched in 2003, *see* A79 at ¶16; *see also* A551 at ¶ 9; and Apple did not offer mobile access to a music library until 2007. *Id*. Amazon's own dedicated application for a portable electronic device that could receive media content was not released until 2008. *Id*. at ¶ 9. Three years later, Amazon released the Android Cloud Player. *Id*.

In the pre-iPhone, iTunes, and Amazon Cloud Player world, the inventors conceived of a media management and distribution system that allowed streaming of a rich collection of media to a user, so that the user can access and play that media on a mobile device. *See e.g.*, A65 at 18:23-47, A66 at 19:22-42, *id*. at 20:6-24. Thus users were no longer tethered to their home computers, or limited by the storage capacity of their portable devices. *See* A60 at 7:20-25; *see also generally* A552 at ¶ 14. Mr. White and Mr. Imes's invention further incorporated a customized user interface to provide consumers a consistent "look and feel" whether they were accessing their media library through a website or through a software application loaded on their device. A65 at 18:23-47, A66 at 19:22-42, *id*. at 20:6-24.

The PTO recognized the novelty and non-obviousness of the inventions when it issued the '085 patent on April 1, 2014. A40. The '085 patent includes three independent claims (1, 8, and 14). All three independent claims address a media management and distribution system for distributing media using an application for execution on a wireless handheld device that includes a customized user interface. A65-66.

## B.   The Patent Infringement Action

Affinity Labs sued Amazon for infringement against the www.amazon.com website and the Amazon Music application for tablets and smartphones. A82. Amazon brought a Rule 12(c) motion to dismiss under  35 U.S.C. § 101. A12. The magistrate judge granted the motion in a report and recommendation. A12-39. Over the objections of Affinity Labs, the district court judge adopted the report and recommendation and issued its own order dismissing the case. A2-A11.

### 1.   The Magistrate Judge's Report and Recommendation to Dismiss the Action

Without a stipulation from the parties on a representative claim, the magistrate judge's report and recommendation dismissing the case focused on claim 14 of the '085 patent. A13-14.

Claim 14 recites:

A media system, comprising:

a network based media managing system that maintains a library of content that a given user has a right to access and a customized user interface page for the given user;

a collection of instructions stored in a non-transitory storage medium and configured for execution by a processor of a handheld wireless device, the collection of instructions operable when executed: (1) to initiate presentation of a graphical user interface for the network based media managing system; (2) to facilitate a user selection of content included in the library; and (3) to send a request for a streaming delivery of the content; and

a network based delivery resource maintaining a list of network locations for at least a portion of the content, the network based delivery resource configured to respond to the request by retrieving the portion from an appropriate network location and streaming a representation of the portion to the handheld wireless device.

A66. The magistrate judge found all claims of the '085 patent, including all the dependent claims, ineligible subject matter under the *Alice* framework. A12-39.

At the first step of the framework—instead of looking to the claim language as a whole—the magistrate judge identified a "purpose" of the invention recited at a "reasonably high level of generality." A22. Declining to adopt either parties' characterization of the invention, the magistrate judge found that the purpose of the '085 patent was "delivering selectable media content and subsequently playing the selected content on a portable device." A23. To determine whether the claims were directed to an unpatentable abstract idea, the magistrate judge then went beyond any test

previously adopted by this Court or the Supreme Court, and asked whether the purpose he had unilaterally chosen encompassed a "longstanding commercial practice[.]" A26. After indicating that the transistor radio and portable televisions embodied the "longstanding commercial practice" he had defined, the magistrate judge determined that the claims had to be directed to an abstract idea. *Id*.

At the second—"inventive concept"—step of the *Alice* framework, the magistrate judge dissected the claim into four partial claim limitations and finding that each individually was generic and routine, concluded that the claim as a whole must be unpatentable as well. A29-32. For the first three partial claim limitations, the magistrate judge determined that, individually, "network based media managing system," "non-transitory storage medium," and "network based delivery resource" failed the machine-or-transformation test and thus were routine and generic. A29-31.

As to the fourth partial claim limitation—the "customized user interface," the magistrate judge adopted and applied the "technological arts" test articulated in Judge Mayer's concurrence in the third *Ultramercial* decision. A29-31. To pass the technological arts test, the magistrate judge required that the "claims must 'not only [1]] describe a technological objective, but [2]] set out a precise set of instructions for achieving it.'" A31 (citing *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 721-22 (Fed. Cir. 2014) (Mayer, J., concurring) ("*Ultramercial III*")) (edits in original). In the magistrate judge's estimation, the Federal Circuit required courts to ask

"whether the inventive concept has a 'specific functionality' or explains the 'how' as to the manner in which the inventive concept performs." A31-32. Applying this test to the "customized user interface," the magistrate judge found that the customized user interface was not an inventive concept. A32. He did not look to the specification or try to properly construe the language of the claims. Instead, he decided that the claim limitation, when considered in a vacuum, "d[id] not identify any specific functionality or explain 'how' this customization is to be achieved." A32. In sum, "[t]he claim [was] devoid of any specific technology or instructions that explain how the device can do what it purports to do or direct the practitioner how to carry out the claims." *Id*. At no point did the magistrate judge consider whether the hardware and software components as a whole satisfied either the machine-or-transformation test or Judge Mayer's technological arts test. *See generally* A29-34.

The magistrate judge then conducted a preemption inquiry. A36. The magistrate judge found that "[a]llowing the claims to survive would curb any innovation related to implementation of [delivering selectable media content and subsequently playing the selected content on a portable device] on potentially any portable device that utilizes the Internet." A38. In making that finding, the magistrate judge made unstated and inherent claim construction findings broadening the claim scope, compared this broad claim scope to a narrower concept than the "purpose" advanced at

9

step one, and disregarded evidence and argument submitted by Affinity Labs addressing preemption. A541-43.

The magistrate judge's report and recommendation relied on numerous factual findings. At the outset, the magistrate judge acknowledged that the legal issue of invalidity under § 101, "may contain underlying factual issues." A21 (citation omitted). He also indicated that § 101 "eligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions." A20 n.5. To the extent factual issues arose, the magistrate judge agreed to apply a clear and convincing evidence standard. A21. The magistrate judge's factual findings included determinations of what was "well-known and longstanding" or "routine and generic." A21-29; A29-36; *see also* A36-38. In some circumstances, the magistrate judge relied on the decisions of other courts to find limitations in the '085 patent "generic" or non-inventive. A32-33, A35 (citations omitted). At the same time the magistrate judge made these factual findings, he struck—in a footnote—a declaration from Affinity Labs' expert, Dr. Kevin Almeroth. A21 n.6. The magistrate judge, therefore, disregarded expert evidence from one of skill in the art proffered by Affinity Labs relevant to those very findings, contending that "no factual issues are present." *Id*.

### 2. The District Court's Order Adopting the Magistrate Judge's Report and Recommendation and Dismissing the Action

The district court adopted the magistrate judge's report and recommendation and issued an explanatory order overruling Affinity Labs' objections. A2-11. The district court agreed that the independent claims were directed to an abstract idea because "delivering selectable media content and subsequently playing the selected content on a portable device" — was a "longstanding commercial practice." A6.

The district court also summarily dismissed Affinity Labs' objections to the magistrate judge's application of step two of the *Alice* framework. A7-11. Like the magistrate judge, the district court's analysis never addressed the claims as a whole, and instead affirmed the magistrate judge's analysis under the machine or transformation test and Judge Mayer's technological arts test. A7, A9. In addressing the substantive discussion of the '085 dependent claims, the district noted that "[a] court's § 101 analysis of dependent claims that fail to add an inventive concept are generally briefly addressed." A10.

The district court implicitly acknowledged that the magistrate judge made factual findings regarding what was conventional, routine, or well-known at the time of the invention, but overruled Affinity Labs' objections to that end. A8. The district court noted that this Court has made "general historical observations in ruling on a similarly analyzed 12(b)(6) motion."

*Id*. No analysis was conducted of whether the particular fact findings in *this* case were supported or contrary to inferences that must be drawn in non-movant Affinity Labs' favor. The court ultimately reasoned that making fact findings regarding what is conventional or routine at the time of an invention when determining the legal question of patent eligibility under § 101 must always be acceptable. *See id.*

The district court also agreed with the magistrate judge's preemption analysis, A10, agreeing with Amazon that "the '085 Patent would prohibit anyone from playing media on a portable device 'without risking an infringement suit by Affinity.'" *Id*.

Finally, the district court affirmed the magistrate judge's order striking the declaration of Affinity Labs' expert, Dr. Kevin C. Almeroth. A11.

# Summary of Argument

The Supreme Court treaded carefully when expanding its § 101 jurisprudence to include some business methods, and cautioned against a broad application of this judicially-created exception lest it swallow all of patent law. Nevertheless, the district court adopted an analysis that would result in finding an abstract idea in most if not all patents, and would completely confuse § 101 with §§ 102, 103 and 112. That approach dictated the result as the district court found, on a 12(c) motion, that claims to a novel media management and distribution system, also known as a "machine" under § 101, are ineligible patent subject matter. The district court's decision was in error and should be reversed for at least three reasons.

First, the '085 patent claims are not directed to an abstract idea as understood by the Supreme Court. The claims are not directed to mathematical equations or to fundamental economic concepts. Nor are the claims similar to those found ineligible by this Court in any of its decisions since *Alice*.

To reach its erroneous conclusion, the district court first broadened the abstract idea exception to encompass any "longstanding commercial practice." A26. The court compounded the error by ignoring the claimed invention and focusing instead on a "quick look" at the claims. A22. The court referred to this as identifying "the purpose" of the claims. *Id*. It then

asked whether its "purpose" related to a longstanding commercial practice. A26. According to the district court, if the purpose of a patent relates to a commercial industry, the claimed invention is an abstract idea.

This approach guarantees an abstract idea will be found in almost every patent. The court should have found the '085 patent claims eligible, because they are directed to an inherently concrete and tangible media management system.

Under step two, the claims as a whole recite a combination of software and network elements, including a customized graphical user interface as part of an application for execution on a wireless handheld device, such that implementation of what the district court found to be an abstract idea is to a new and useful end. There is no evidence in the record that a customizable user interface as part of an application for execution on a wireless handheld device ever existed, let alone was conventional computer technology as of 2000. Quite the opposite: Affinity Labs submitted expert opinion that in 2000 it was not routine, conventional, or well-known for handheld wireless devices to have preloaded applications or applications for download that provided a customized graphical user interface as claimed by the '085 patent. The district court erred in disregarding this evidence and in applying a "technological arts" test absent from any Supreme Court or Federal Circuit precedent. The application of the technological arts test imparted additional requirements, such as enablement within the claims, which is improper for a threshold

14

§ 101 inquiry. In addition, the district court misapplied the Supreme Court's case law on what it means for limitations to represent well-known, routine, or conventional activity by asking whether partial claim elements were in the "prior art" rather than whether the limitations were necessary or incidental to implementing the abstract idea in a computing environment. The district court never properly analyzed the complete claim limitations or claims as a whole. The district court's faulty analysis at step two was underscored by preemption findings based on unstated and inherent claim constructions and contrary to the evidence of record.

Finally, the district court erred throughout its analysis by making explicit factual findings that failed to comport with the requirements of either legislative fact-finding or judicial notice under Federal Rule of Evidence 201. The district court's practice in this regard ran afoul of Fifth Circuit—and other Circuit courts—procedural law and allowed it to make unsupported and unrebutted findings while ignoring Affinity Labs' evidence to the contrary. Specifically, the magistrate judge made factual findings regarding preemption and what was conventional, routine, or well-understood at the time of the invention. The only justification offered for these findings was a courts' power to make historical findings when deciding purely legal questions. The Supreme Court in *Teva*, however, dispensed with the notion that legislative fact finding is appropriate in the patent context. And even if judicial notice of certain facts were appropriate at the pleading stage, the magistrate judge failed to give proper notice of its

15

findings under Federal Rule of Evidence 201 and in any event made findings subject to reasonable dispute.

# Standard of Review

The Federal Circuit reviews orders granting motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) under the law of the regional circuit. *Amgen Inc. v. Sandoz Inc.*, 794 F.3d 1347, 1350 (Fed. Cir. 2015) (citation omitted). In the Fifth Circuit, a Rule 12(c) motion for judgment on the pleadings is reviewed *de novo*. *Guidry v. American Public Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). Patent eligibility under § 101 presents a question of law that is reviewed *de novo*. *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013) (citing *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012)). The legal conclusion "may contain underlying factual issues." *Id.* (citing *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013) ("*Ultramercial II*"), *vacated and remanded*, 134 S. Ct. 2870 (2014)). Well-pleaded factual allegations in the complaint must be construed in the light most favorable to Affinity Labs. *See Guidry*, 728 F.3d at 180 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A district court's ruling on a motion to strike is reviewed for abuse of discretion. *United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012).

# Argument

This case is emblematic of district court decisions that are dramatically expanding the § 101 doctrine too far and too wide and with no sound justification. All of the typical errors are present including finding an "abstract idea" with no rational basis for understanding what makes any non-business method idea abstract, hopelessly conflating § 101 with §§ 102, 103 and 112, and making numerous factual findings on a 12(c) motion that are actually contrary to the limited record available to the court. Given the recent explosion of the § 101 issue in the court system, it is to be expected that there is little guidance yet on these issues. That explains why district court after district court, including the one below, has noted that there is no clear test, no real definition of an "abstract idea" at the appellate court level, and no guidance as to how much of the written description apparently must now be in the claims to show "how" the invention works. *See, e.g., Cal. Inst. of Tech. v. Hughes Commc'ns, Inc.*, 59 F. Supp. 3d 974, 980, 986, 990 (C.D. Cal. 2014). Affinity Labs asks this Court to address these issues in this case, and correct the errors made below.

This should not be a § 101 case because the claims recite a "machine" under § 101. As the Supreme Court noted in *Alice*, "[t]here is no dispute that a computer is a tangible system (in § 101 terms, a "machine"), or that many computer-implemented claims are formally addressed to patent eligible subject matter." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358-59

18

(2014). In this case, the claims are computer implemented, and recite a concrete implementation of a media management system with a number of software and network components including a customizable user interface as part of an application for execution on a wireless handheld device for solving technical shortcomings in the prior art. It is not a business method, not merely a mathematical formula, not merely sets of data, not a method of organizing human activity or managing legal obligations, and it cannot be done with a pencil and paper. In short, it is not abstract.

Even if there were an abstract idea embedded somewhere in the claims, the customizable user interface as part of an application for execution on a wireless handheld device as claimed was not routine or conventional computer technology by the year 2000, and there is zero evidence in the record to suggest otherwise. Accordingly, Affinity Labs seeks reversal of the district court decision, and a remand so that this patent can be addressed as it should be, under the more traditional questions of obviousness and written description, and based upon a complete record.

## I.   The Claims of the '085 Patent are Directed to a Concrete and Tangible Invention, Not an Abstract Idea.

The Supreme Court "tread[s] carefully in construing th[e] exclusionary principle lest it swallow all of patent law." *See Alice*, 134 S. Ct. at 2354. This is because "[a]t some level, all inventions embody, use, reflect, rest upon, or

apply laws of nature, natural phenomena, or abstract ideas." *Id*. (quotation and alterations from original omitted). The district court plainly ignored these words of warning when it created a new and broad category of abstract ideas, looked only to a generalized purpose of the claims, and ignored the inherent concrete and tangible nature of the invention.

### A.    The district court erred by creating a new and extremely broad category of abstract idea it called "well-known, longstanding, commercial practices."

A proper step one analysis begins with the Supreme Court's precedent, and then this Court's precedent. The Supreme Court has found two—and only two—types of claims abstract under § 101 – mathematical algorithms and some business methods directed to fundamental economic practices. *See Gottschalk v. Benson*, 409 U.S. 63 (1972); *Parker v. Flook*, 437 U.S. 584 (1978); *Bilski v. Kappos*, 561 U.S. 593, 612 (2010); *Alice*, 134 S. Ct. at 2356. The Supreme Court in *Bilski* expressly declined to say that all business methods are abstract because new business methods may be patentable. *See Bilski*, 561 U.S. at 612 ("Today, the Court once again declines to impose limitations on the Patent Act that are inconsistent with the Act's text."). Instead, the *Bilski* Court said that *some* fundamental economic practices like risk hedging are abstract. *Id*. at 611-12. And in *Alice*, the Supreme Court said it "need not labor to delimit the precise contours of the 'abstract ideas' category" because the patent at issue fell squarely within

20

the fundamental economic practice category first recognized in *Bilski*. *Alice*, 134 S. Ct. at 2357. Nothing in these decisions supports the creation of additional categories, as opposed to further refinement of the fundamental economic practice category.

While this Court has decided a number of § 101 cases since *Alice* finding several patent ineligible claims, none of the cases stand for the proposition that the Supreme Court intended to create a category called "longstanding commercial practices." Nor do they stand for the proposition that claims are abstract if the "purpose" of the patent as a whole is one that relates to improving or solving problems that plague an old or established industry.[1] Old is not coextensive with abstract. The district court erred in creating this new test and analysis.

_____

[1] What exactly made the claims abstract in these cases is not easily defined and no express category of abstract idea was created. Some seem to relate to mental steps that could be performed on paper or perhaps the general accumulation and storage of data in any form. *See, e.g.*, *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. App'x. 1005 (Fed. Cir. 2014) (invalidating patent directed to managing the game of bingo because the concept "consists solely of mental steps which can be carried out by a human using pen and paper" (citing district court)); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (finding claims directed to "the idea of retaining information in the navigation of online forms" to be abstract); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (finding claims directed to "tailoring content based on [a] viewer's location or address" to be ineligible subject matter); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (finding as unpatentable claims "drawn to the abstract idea

The "purpose" and "longstanding commercial practice" test applied by the district court suffers from two fatal flaws. First, the district court's expansion of the abstract idea exception violates the Supreme Court's emphatic teaching that courts "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354. Indeed, the Court has always held that "Congress plainly contemplated that the patent laws would be given wide scope." *Bilski*, 561 U.S. at 601 (quoted authority omitted). For this reason, "§ 101 patent-eligibility is *only* a threshold test." *Id*. at 602 (emphasis added). The Patent Act sets forth more stringent standards for patentability beyond § 101, such as § 102 (novelty), § 103 (non-obviousness), and § 112 (particularly described). *Id*.[2] Thus, the abstract ideas exception is a doctrine of restraint.

The district court's new "longstanding commercial practice" exception fails to respect this restraint. In fact, this new test would risk characterizing all inventions as abstract under step one. The Supreme Court has always recognized that innovation occurs through incremental improvements to

---

of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory").

[2] Courts have taken the "threshold" statement out of context repeatedly. For instance, some courts now rely on this quote to suggest that § 101 is a threshold issue to be determined at the start of litigation. But that is not what the Supreme Court said in *Bilski*, as the full quote makes clear. *See* 561 U.S. at 602. Instead, *Bilski* underscored that patent eligibility was a less stringent standard than §§ 102, 103, and 112. The timeliness of the district court's decision is addressed fully in Section III below.

longstanding or conventional technologies. *See, e.g., KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."); *Park v. Booth*, 102 U.S. 96, 102 (1880) ("Modern inventions very often consist merely of a new combination of old elements or devices, where nothing is or can be claimed except the new combination."). If the question is whether a patent relates to a longstanding commercial practice, then that inquiry will encompass virtually all patents. Inventions in the telecommunications, automotive, aerospace, or medical device arts—all concrete and tangible but mature arts—would be characterized as "abstract" under step one in the district court's new category.

For example, companies have manufactured and sold artificial heart valves for over fifty years. And yet, under the district court's new exception, an improvement to an artificial heart valve in the 21st Century would somehow become "abstract" under step one of the *Alice* test just because medical device companies have a "longstanding commercial practice" of manufacturing and selling these valves. Indeed, whether such improvements are patentable should be determined by § 102 and § 103, not the threshold inquiry of § 101. Nothing in Supreme Court precedent supports the district court's broad expansion.

The second fatal flaw in the district court's new "longstanding commercial practice" exception is that the inquiry is a non sequitur. This

Court has defined an abstraction as "an idea, having no particular *concrete* or *tangible* form." *Ultramercial III*, 772 F.3d at 715 (emphasis added); *see also Alice*, 134 S. Ct. at 2354 (quoting *Gottschalk*, 409 U.S. at 93) (explaining that the "abstract idea" exception embodies "the longstanding rule that an idea of itself is not patentable" (alternation in original omitted)); *Le Roy v. Tatham*, 55 U.S. 156, 175 (1853) ("A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right."). Such ephemeral "inventions" are not concrete or tangible and therefore unpatentable. The "longstanding commercial practice" category advanced by the district court, however, is untethered to this basic inquiry of whether the claimed invention is concrete and tangible, or alternatively abstract. Once again, examples are limitless of concrete and tangible products in our modern economy that would be declared "abstract" under the district court's new test. For instance, magnetic resonance imaging (MRI) machines, and methods for using those machines, have been commercially used for decades. But there can be no dispute that advancements in MRI machines are concrete and tangible. The fact that they also pertain to a "well-known, longstanding commercial practice" should not factor into whether a patent on a MRI machine is "abstract" under step one of the *Alice* test. In fact, every patented improvement to a MRI machine would be an abstract idea under the district court's analysis, because "diagnosing patients" has been practiced for thousands of years.

24

This example—one of many—underscores the extreme over-breadth of the district court's new category, and similarly reflects why this Court should not adopt a "longstanding commercial practice" exception to the two types of "abstract ideas" recognized by the Supreme Court.

The claimed inventions of the '085 patent are a new and novel media management and distribution system for distributing media in connection with an application for execution on a wireless handheld device that includes a customized user interface. Additional limitations vary across the three independent claims. These claims are neither mathematical algorithms nor fundamental economic practices, nor are they in any other way ephemeral. This Court should reverse the district court's expansion of the Supreme Court's precedent on step one of the *Alice* test.

## B. The district court failed to conduct a proper analysis even under its erroneous longstanding commercial practice standard because the district court eviscerated the claimed invention by focusing on the purpose of the invention after a "quick look" at the claims.

The district court failed to consider the claimed invention in its analysis of step one. An analysis under step one must be grounded in the claim language. *See Ultramercial III*, 772 F.3d at 714 ("We first examine the *claims* because claims are the definition of what a patent is intended to cover." (emphasis added)). Instead of focusing on the claim language and limitations as a whole, the district court conducted only a "quick look" at

the claims to determine the "purpose" of the patent in his analysis. *See* A21-23. The district court erred in this approach.

The Supreme Court has long rejected the suggestion that a claimed invention can be reduced to an "essential element," "gist" or "heart." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345 (1961). But a general "purpose" analysis tries to do just that, and will almost always result in an "abstract idea" without almost any connection to the claim language. *See, e.g.*, *Fairfield Indus., Inc. v. Wireless Seismic, Inc.*, No. 4:14-cv-2972, 2014 U.S. Dist. LEXIS 176599, at *11 (S.D. Tex. Dec. 23, 2014) (recognizing that "any claim, described at a certain level of generality, can be challenged as directed to an abstract idea"). That is what happened in this case.

The district court's determination of the purpose of the invention was so generic and without connection to the claim language that it eviscerated the claimed inventions and introduced concepts not recited in the claims. Specifically, the district court broadly determined that "the purpose of the '085 Patent is delivering selectable media content and subsequently playing the selected content on a portable device." A23. This broad purpose-based analysis eviscerated the claimed invention and included limitations like "playing" media content. For example, the following limitations from claim 14 are excluded and added from the district court's purpose:

14. A media system, comprising:

26

~~a network based media managing system that maintains a library of content that a given user has a right to access and a customized user interface page for the given user;~~

~~a collection of instructions stored in a non-transitory storage medium and configured for execution by a processor of a handheld wireless device, the collection of instructions operable when executed: (1) to initiate presentation of a graphical user interface for the network based media managing system; (2) to facilitate a~~ user selection of content included in the library; ~~and (3) to send a request for a streaming delivery of the content;~~ and

~~a network based delivery resource maintaining a list of network locations for at least a portion of the content, the network based delivery resource configured to respond to the request by retrieving the portion from an appropriate network location and streaming~~ **[delivering media content]** ~~a representation of the portion~~ to the handheld wireless device **[and playing the selected content on the portable device]**.

The district court, thus, did not consider any reference to the application for execution on a wireless handheld device that includes a *customized* user interface under step one. Nor did the district court consider the network based media management system with an access-controlled library of content and a customized user interface page.

These omissions are critical and contrary to the Supreme Court's analysis in *Alice* and *Bilski* where the claims were drawn, and indeed described *as a whole*, to the unpatentable concepts of risk hedging and

intermediated settlement. *See Bilski*, 561 U.S. at 599, 611; *Alice*, 134 S. Ct. at 2352 n.2, 2356. Nowhere in these two decisions is a "purpose" even mentioned in the same sentence as "abstract idea." The word "purpose" does not appear at all in the *Alice* opinion.

The omission of the application for execution on a wireless handheld device that includes a customized user interface was particularly critical because Affinity Labs proffered evidence to the district court that this technological limitation was new and novel, A552 at ¶ 14, and allowed at least some of the benefits over the prior art. For example, the application allowed the interface of a wireless handheld device to correspond to the customization on the website, making the customized media library portable and consistent over multiple platforms and devices. This is discussed generally in the specification. *See, e.g.*, A61 at 10:10-23, A62 at 11:20:35.

The district court's failure to consider the claim language compounded its error of identifying a new "longstanding commercial practice" category to the abstract idea doctrine. A25-26. The analysis ended up, and will always end up, as a tautology. For instance, if a court generalizes a patent to the degree that it omits any consideration of elements that were found to overcome prior art, then the generalization of the patent will always relate to some well-known and longstanding commercial practice. The end result, if the district court's "quick look" of the "purpose" of a patent is adopted,

is that all patents will fail step one of *Alice*. That is not what the Supreme Court held or suggested in any of its jurisprudence on § 101.

## C.  The district court erred by finding under any test or standard that an inherently concrete and tangible network-based media delivery system is "abstract."

The claimed inventions of the '085 patent are fundamentally different than business methods in *Alice* and its progeny. The invention and purpose of the invention can only be performed through the use of structural components. There is no way to deliver selectable media content and subsequently play the selected content on a portable device without concrete and tangible structures. If Amazon wishes, it may argue that the claimed inventions of the '085 patent were not new and novel under § 102 and § 103 (despite the PTO's examination of over 600 prior art references to the contrary, A40-48), but there cannot be a dispute that the claimed inventions—or even the district court's broad purpose of the patent—are a "machine" as set forth in § 101. *See* 35 U.S.C. § 101; *see also Alice*, 134 S. Ct. at 2359 ("There is no dispute that a computer is a tangible system (in § 101 terms, a 'machine'), or that many computer-implemented claims are formally addressed to patent-eligible subject matter."). Thus, while at times it may seem that the analysis of what is an abstract idea is similar to Justice Potter's famous "I know it when I see it" expression, the case law of the Supreme Court and this Court is actually much closer to "I know it when I

*don't* see it." In other words, you do not see mathematical algorithms, economic practices, or ineligible business methods because they are not physical or tangible. But you can see the servers, mobile devices, receivers, and the claimed media systems in the '085 patent. The claimed inventions are not abstract in any way, and, therefore, are patent eligible.

This Court's alternative tests further compel the conclusion that claims directed to tangible and concrete concepts are patentable. This Court has recognized that methods performable in the human mind or on pen and paper are directed to unpatentable mental processes. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011); *see also Planet Bingo*, 576 Fed. App'x. at 1007 (finding patent directed to managing the game of bingo unpatentable because the concept "consists solely of mental steps which can be carried out by a human using pen and paper"). Here, there is no dispute between the parties that delivering selectable media content and subsequently playing the selected content on a portable device *cannot be performed* in the human mind alone or using only a pen and paper. Nor did the district court make any conclusions to the contrary. These facts underscore that the inventions claimed in the '085 patent are tangible, concrete, and above all else, patentable.

## II. The District Court Erred in Finding that the Claims of the '085 Patent Lacked an Inventive Concept.

The claims of the '085 patent are patentable under step two of the *Alice* framework because the claims apply the district court's contention of an abstract concept to a new and useful end. *See Alice*, 134 S. Ct. at 2354. At the second *Alice* step, the Court must "consider the elements of each claim both individually and as an ordered combination to determine whether the elements transform the nature of the claim into a patent-eligible application" of the abstract idea or whether the claim elements merely state the abstract idea while adding the words "apply it." *Id.* at 2355, 2357 (internal quotations omitted). The district court's analysis of step two cannot stand on appeal because it failed to consider the claims as a whole and applied an unprecedented technological arts test. A29-34. The district court ignored the novelty of technological elements in the claims, expert opinion from one of skill in the art, erroneously found other elements conventional, routine, or well-known, and erred in its preemption analysis.

### A. The district court erred in its analysis and application of an unprecedented "technological arts" test.

The district court's analysis of step two was tainted from the start because it applied an incorrect standard. The center point for the district court's step two analysis was a "technological arts" test, which the district court borrowed from a concurring opinion in *Ultramercial III. See* A31-32. "[N]o such test has ever been explicitly adopted by the Supreme Court,

[the Federal Circuit], or [its] predecessor court…." *In re Bilski*, 545 F.3d 943, 960 (Fed. Cir. 2008) (en banc), *aff'd on other grounds*, 561 U.S. 593 (2010). Since at least the *en banc* decision in *Bilski*, Judge Mayer has urged adoption of this test. *See Bilski*, 561 U.S. at 600 ("[Judge Mayer] urged the adoption of a technological standard for patentability.'"). He continued this appeal, for instance, in his concurrence in *Ultramercial III*, *see* 772 F.3d at 721-22 (Mayer, J., concurring), and dissent in *DDR Holdings, LLC v. Hotels.com, L.P.* 773 F.3d 1245, 1265 (Fed. Cir. 2014) (Mayer, J., dissenting). Yet no precedential authority has adopted this "technological arts" test. Indeed, those words are not even mentioned in *Alice*—and for good reason. The Supreme Court has consistently refused to invalidate all business method patents, despite objections from a minority of justices. *See Bilski*, 561 U.S. at 657 (Stevens, J., concurring); *Alice*, 134 S. Ct. at 2360-61 (Sotomayor, J., concurring).

The district court's adoption and application of the technological arts test is more than just semantics. The district court explained that "[i]n order to satisfy the technological arts test, *claims* must 'not only [1)] describe a technological objective, but [2)] set out a precise set of instructions for achieving it.'" A31 (quoting *Ultramercial III*, 772 F.3d at 721-22 (Mayer, J., concurring) (emphasis added). The district court's analysis, therefore, focused on what the claims described and enabled. For instance, the district court determined:

> The *claim* is devoid of any specific technology or instructions that explain how the device can do what it purports to do or direct the practitioner how to carry out the claims.

A32 (emphasis added). But § 112 requires the patent holder to describe and enable its claimed inventions *in the specification*, and not the claims. 35 U.S.C. § 112(a); s*ee also Bilski,* 561 U.S. at 620 ("[C]laim specification is covered by § 112, not § 101; and if a series of steps constituted an unpatentable idea merely because it was described without sufficient specificity, the Court could be calling into question some of our own prior decisions.") (Stevens, J., concurring) (citations omitted).[3]

The technological arts test and analysis applied by the district court is at fundamental odds with the Patent Act, and incompatible with the Supreme Court's explanation that § 101 is "only a threshold test," with more stringent requirements set forth later, including § 112. *See Bilski*, 561 U.S. at 602. The district court erred in its step two analysis.

---

[3] If the magistrate judge's technological arts test is correct, then it would at a minimum involve fact issues, especially from the perspective of one of ordinary skill in the art. For instance, it is black letter law that whether claims meet the enablement requirement "is a question of law with underlying questions of fact regarding undue experimentation." *See, e.g., Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010). Questions of enablement, thus, should not ordinarily be decided on the pleadings. *See id.* at 1307.

## B.    The claims of the '085 patent include an inventive concept under a proper analysis of step two.

The '085 patent claims embody an inventive combination of hardware and software elements: an application for execution on a wireless handheld device that includes a customized user interface. In combination with a networked library of selectable media content and a website with a customized user interface, these specific claim elements claim a narrower application, not the broad purpose of delivering selectable media content and subsequently playing the selected content on a portable device.

### 1.    The hardware and software elements individually and as a whole do not represent generic, well-understood, routine, or conventional activity in March of 2000.

The district court's determination that the claims—including the application for execution on a wireless handheld device that includes a customized user interface—recite only generic, well-understood, or routine activity was in error. The claim limitations do not recite routine or conventional activity either individually or as a whole.

At step two, a court must consider the elements in the claims "both individually" and "*as an ordered combination*." *See Alice*, 134 S. Ct. at 2355 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012)) (emphasis added). This follows from the fact that "inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be

34

combinations of what, in some sense, is already known." *KSR*, 550 U.S. at 418-19. As a result, "[i]t is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis." *Diamond v. Diehr*, 450 U.S. 175, 188 (1981).

Here, the district court erred in subjecting certain partial claim limitations individually to its machine-or-transformation test, *see generally* A29-34, and other limitations to its heightened "technological arts" test. *See supra*, II.A. The district court's approach failed to account for the inventive combination needed to address problems in prior art media management systems, including lack of true on-the-go accessibility, *see e.g.*, A58 at 4:20-24, A60 at 7:20-25, A551 at ¶ 7, limited storage capacity, *see id.*, and customized user interfaces with a consistent "look and feel" across multiple platforms and devices, *see generally*, A61 at 10:10-23, A62 at 11:20:35. The claimed combination of software and network elements, including a customized graphical user interface as part of an application for execution on a wireless handheld device, address these and other problems and was not generic, well-known, routine, or conventional as of March 2000. *See* A552 at¶¶ 12-14. At the very least, such a determination would be a factual issue inappropriate for a Rule 12 motion.

Moreover, whether the complete claim limitations individually or the claims as a whole recite more than well-understood, routine, or conventional computing elements is not a question of novelty, but one of necessity. This follows from two principles. First, abstract ideas are not

rendered eligible by simply stating the abstract idea and including the words "apply it" in a claim. *Alice*, 134 S. Ct. at 2358; *Cf. Mayo*, 132 S. Ct. at 1294. Second, abstract ideas are not patentable by simply "limiting the use of an abstract idea to a particular technological environment." *Alice*, 134 S. Ct. at 2358 (quotation omitted). In the case of computer-implemented inventions, "[s]tating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result." *Id*. Thus the question, at step two, is whether the additional limitations are necessary or incidental to implementing an abstract idea in a given technological environment. *See id*. at 2360 ("As a result, none of the hardware recited by the system claims 'offers a meaningful limitation beyond generally linking the use of the method to a particular technological environment, that is, implementation via computers.'" *Id*. (quoting *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1291 (Fed. Cir. 2013)) (internal quotation marks and alterations in original omitted).

Unlike *Mayo* and *Alice*, the limitations of the '085 patent are not merely necessary or incidental to implementing a media management or delivery system in a computing environment. Nor were the limitations generic or routine implementations in March 2000. For example, the application for execution on a wireless handheld device that includes a customized user interface recited in the '085 patent claims is not required, by necessity, to implement the district court's alleged abstract idea. Put another way, the claimed customized user interface page or customized website with the

specific claimed features enabling streaming of user-specified media content—while it may be the most efficient and user friendly implementation—is not the only way to deliver selectable media content and subsequently play the selected content on a portable device. *See infra*, II.C (discussing scope of preemption). While the application is central to the claimed invention, it is not a central and necessary part of "delivering selectable media content and subsequently playing the selected content on a portable device" in a computing or Internet environment.

Rather than generic or routine, the combined hardware and software elements of the '085 patent were novel in March of 2000. While the inventive concept test is not coextensive with the test for novelty in § 102, courts recognize that the two tests overlap. *See Mayo*, 132 S. Ct. at 1304 ("We recognize that, in evaluating the significance of additional steps, the § 101 patent eligibility inquiry and, say, § 102 novelty inquiry might sometimes overlap."); *Ultramercial III*, 772 F.3d at 715 ("[A]ny novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis.") Here, the claims of the '085 patent were allowed over 600 prior art references, many of which related to computer or Internet-centric technologies. *See* A40-48, A552 at ¶ 12. The application with a customized user interface as recited in the claims was anything but generic computer technology; the record in this case makes clear that it did not exist in March 2000. *See* A40-48, A552 at ¶ 14. This fact was confirmed with expert opinion. A552 at ¶ 14. Thus the implementations claimed are

37

by no means necessary or incidental to applying a pre-Internet business process—*e.g.* process of "delivering selectable media content and subsequently playing the selected content on a portable device"—in a computing or Internet environment. The system with a customized graphical user interface as fully claimed in the '085 patent is at least an inventive concept and a hallmark of novelty in this case—much more than what is required by *Alice*.

### 2. Under the machine-or-transformation test and this Court's decision in *DDR*, the claims include an inventive concept.

The claims of the '085 patent further evidence an inventive concept for the same reasons set forth by this Court in *DDR*. In that case, this Court concluded that "these claims stand apart [from other computer-related claims] because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR*, 773 F.3d at 1257. With respect to the '085 patent, the application for execution on a wireless handheld device that includes a customized user interface and the network based media management system with an access-controlled library of content and a customized user interface page similarly set forth a

non-conventional (and novel) network-based media management system that did not exist in March 2000. A552-53; *see also* A40-48. The inventors claimed a technical solution (a media management system using particular cellular and network/software technology) to address problems specifically arising in the realm of media management (*e.g.* storage limitations on mobile devices, non-mobile collections limitations, shortcomings of land lines, satellite, and conventional terrestrial technology for broadcasts to mobile devices), *see e.g.*, A58 at 4:20-24, A60 at 7:20-25, A551 at ¶ 7, through new and novel systems using customized user interfaces across multiple platforms and devices. *See generally*, A61 at 10:10-23, A62 at 11:20:35.

The claims of the '085 patent are also patentable under the machine-or-transformation test—a test that this Court has endorsed at step two. *Ultramercial III*, 772 F.3d at 716 (the test "can provide a 'useful clue' in the second step of the *Alice* framework.") (citations omitted). The test is satisfied if a process is "tied to a particular machine or apparatus." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332 (Fed. Cir. 2010). For a machine to "impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed." *SiRF Tech.*, 601 F.3d at 1333. The inability of a human alone to perform the claimed invention is one strong indicator that the claims are meaningfully tied to a machine such that they do not pre-empt an abstract idea. *See id.*

Here, claims 1, 8, and 14 all include software and hardware elements that play a significant part in managing and distributing digital multimedia to mobile devices. The "network based media managing system" is necessary to at least maintain a library of content. *See* A66 at 20:7-8. A "network based delivery resource" maintains a list of network locations for multimedia content and streams multimedia content to a wireless device. *Id*. at 20:19-20. And a software application that includes a customized user interface stored in a "non-transitory storage medium" for execution on a handheld wireless device is a necessary and functioning part the claimed system. *Id*. at 20:10-12. Simply put, the invention would be meaningless without these specific structural hardware and software components. There is no evidence that the network based media managing system, network based delivery resource, and application for execution on a wireless handheld device that includes a customized user interface "function solely as . . . obvious mechanism[s] for permitting a solution to be achieved more quickly." *See SiRF Tech*, 601 F.3d at 1333. Indeed, neither the district court nor Amazon has contested this fact.

The district court's failure to properly consider the complete limitations of the independent claims was further compounded by its conclusory and incorrect analysis of the '085 patent dependent claims. *See*, *e.g.*, A36 (generalizing claim 15—directed to detecting network characteristics and managing download rates—as merely "sending and receiving information over a network" and accordingly "not even arguably

40

inventive"); *see also id.* at 35-36 (describing claims 2 and 18 —without reference to any claim language—as "generic computing equipment or functions [that] do not contain an inventive concept"). Neither Amazon's attorney argument, nor the magistrate judge's conclusory analysis is clear and convincing evidence that the dependent claims are patent ineligible. Indeed, the networking techniques claimed in dependent claim 15 are a technical solution directed to a technological problem, *i.e.*, transmitting high quality multimedia information based on the network and connection of the device. *See* A59:6-13. The district court's analysis of the dependent claims improperly shifted the burden to Affinity Labs, at the pleading stage.

### C. The facts, when viewed in the light most favorable to Affinity Labs, demonstrate that there is no risk of preempting the district court's "abstract idea."

The fundamental policy underlying § 101 is the concern that a patent on an abstract idea will preempt "building blocks of human ingenuity." *Alice*, 134 S. Ct. at 2354. The Supreme Court, in *Alice*, specifically considered preemption as part of its two-step framework. *See id.* at 2358 ("This conclusion accords with the pre-emption concern that undergirds our §101 jurisprudence."). This Court has inconsistent cases on the role of preemption as applied to the *Alice* and *Mayo* frameworks. *See DDR*, 773 F.3d at 1259 (preemption analysis concluding "the claims at issue do not

41

attempt to preempt every application of the idea of increasing sales by making two web pages look the same, or of any other variant suggested by NLG" played significant role in finding claims not abstract); *Accenture*, 728 F.3d at 1341 ( "[I]n the case of abstractness, the court must determine whether the claim poses 'any risk of preempting an abstract idea'" (quoting *CLS Bank*, 717 F.3d at 1282)); *cf. Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378-79 (Fed. Cir. 2015) (finding separate preemption analysis unnecessary).

Like in *Alice* and *DDR*, Affinity Labs submits that preemption should be considered, and that consideration in this case underscores the district court's error in its step two analysis. The district court erred in its preemption consideration for three main reasons.

First, the district court's preemption analysis was inconsistent with its analysis of the alleged abstract idea under step one. At step one, the magistrate judge found that the '085 patent was directed to the abstract idea of disseminating "delivering selectable media content and subsequently playing the selected content on a portable device." A23. This broad characterization thus suited the magistrate judge's abstract idea test at step one as it cited transistor radios from the 1940s and portable televisions from the 1980s and 1990s as evidence of the "longstanding commercial practice." A26. Yet when subsequently measuring the preemptive footprint of the '085 patent, the magistrate judge found only that the "claims preempted the implementation of the abstract idea *on*

42

*potentially any portable device that utilizes the Internet*." A38 (emphasis added). Thus, the district court used a narrower concept of media management and delivery than in step one. This inconsistent approach ensured that the district court's analysis would be unfavorable to Affinity Labs under both steps.

Had the district court instead considered whether the claimed inventions preempt the same abstract idea it found to be a longstanding commercial practice, it would have been forced to recognize that the claims do not cover many implementations for achieving its identified abstract idea. The claims do not even cover, for example, the transistor radio and portable television examples the district court cited in its step one analysis, as the manner in which they receive and use media content does not meet the claim language. *See* A65 at 18:23-A66 at 20:64.

Applying inconsistent characterizations of the "abstract idea," even if part of a "baked-in" preemption inquiry, is error as it causes courts to ignore the actual claim limitations and never examine whether the actual claims truly pre-empt every implementation of what is the alleged abstract idea. Yet, ignoring the actual claim limitations to find only an abstract idea is precisely what happened in this case.

Second, any fulsome preemption analysis requires claim construction. Whether a product falls within the scope of a claim necessarily implicates claim construction. It is elementary that the scope of the claims in a patent must be the same for infringement (patent holder's burden) as it is for

43

invalidity (accused infringer's burden). *See, e.g.*, *Amgen Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313, 1330 (Fed. Cir. 2003). That is relevant here because Amazon asserted an affirmative defense of non-infringement in its answer. A98. Yet the district court refused to formally address the issue of claim construction for purposes of this motion. A6, A18-19.

The district court and Amazon cannot have it both ways. Amazon cannot maintain that the claims of the '085 patent are so broad as to preempt all, or substantially all, systems delivering selectable media content and subsequently playing the selected content on a portable device,[4] while also maintaining that its products—which indisputably deliver selectable media content for subsequent playing on a portable device—are *not* covered by the claims of the '085 patent. *See* A94-97; A95 at ¶ 36. The district court's refusal to address this inconsistency demonstrates error in its preemption analysis, and reinforces that the motion was premature in the first place.

Third, where, as in this case, a district court does in fact engage in claim construction, it should do so in the light most favorable to the non-movant, Affinity Labs. Here, the district court found that the claims would "curb any innovation related to the implementation of [delivering selectable media content and subsequently playing the selected content on a portable device] on potentially any portable device that uses the

---

[4] Amazon made similar expansive arguments in their motion. *See* A493 n.1 ("any method of playing mobile media allegedly infringes").

Internet." A37-38. As explained above, this necessarily required interpretation of claim terms, including, for instance, "handheld wireless device."

Affinity Labs, however, presented argument and expert opinion from one of skill in the art that the claimed inventions of the '085 patent do not preempt future innovations in numerous portable devices (with and without the Internet), including portable DVD players, portable televisions, CD players, traditional MP3 players (including numerous generations of the iPod, which arose after the claimed inventions in this case), laptops, or the Walkman, which all either store media locally (i.e., via a download) or play media from a locally-stored medium, like a CD or cassette. *Cf.* A552 at ¶ 10 (characterizing scope of playing media on a portable device). Nor do the claims cover all modes of streaming media. For instance, the claims do not cover streaming media to a traditional personal computer. In fact, the claims do not even claim all modes of streaming media to handheld wireless devices. For instance, Amazon is free to stream media to a mobile device without the use of an application presenting the user customizations available through a website, such as customized play lists and media libraries. Indeed, Amazon has admitted that its music application is designed to present a graphical user interface, but specifically denies that the interface "includes at least a portion of the customized website[.]" A95 at ¶ 36; *see also* A82 at ¶ 36. The district court acknowledged these arguments, A37, yet nonetheless found that the claims would "curb any

45

innovation related to the implementation of the abstract idea on potentially any portable device that uses the Internet." A37-38.

The only way the district court could have arrived at this conclusion was to conduct its own inherent claim construction analysis and once again ignore critical limitations in the claims. The district court's implicit adoption of unsupported and unfavorable claim construction positions was in error.

### III.  The District Court Erred in Granting a Motion to Dismiss Based on Unsupported Factual Findings Outside the Record.

The motion to dismiss was in error because the district court made independent fact findings unsupported by the record without affording Affinity Labs the opportunity to rebut those findings. The '085 patent is presumed valid by law, subject to clear-and-convincing evidence of invalidity. *See CLS Bank*, 717 F.3d at 1284 (citing 35 U.S.C. § 282 and *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011)); *id*. at 1304-05; *Ultramercial II*, 722 F.3d at 1338. The lower court's § 101 inquiry relied on subsidiary factual issues related to preemption and what is routine, well-known, and conventional at the time of the invention. *See* A6-7, A8, A10, A30-32, A34-36, A38. "Normally, in deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir.

46

1996). "However, courts may also consider matters of which they may take judicial notice." *Id*. at 1017-18.

In his report and recommendation, the magistrate judge did not identify any public record of which he was taking judicial notice. Rather, he stated that "'[c]ourts frequently make findings when deciding purely legal questions. Eligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions.'" A20 n.5 (quoting *Hughes*, 59 F. Supp. 3d at 978 n.6). Although he acknowledged "that the legal analysis under § 101 can contain underlying factual issues," he concluded that "in the instant case, … no factual issues are present, and the Court has adequately resolved the threshold matter of patent eligibility by examining the patent on its face, without considering materials outside of the pleadings." A21. However, he then made numerous factual findings regarding preemption and what was routine, generic, well-understood, or conventional. *See, e.g.,*

- A30: "Although Affinity alleges the components in Claim 14 are specialized, the Court finds the claim merely sets forth routine and generic processing and storing capabilities of computers generally."

- *Id.*: "claim described a 'network based media managing system,' in other words a generic database"

- A31: rejecting Affinity's arguments that the type of customized user interface claimed, or the claims as a whole, were not well-known, conventional or routine as of March 2000

- A32: "The claim … is a generic computer component …"

- *Id.*: "this Court finds that the 'graphical  user interface' is a generic computer component"

- A34: "Defendants allege the dependent claims of the '085 Patent add only trivial limitations insufficient to confer patentability. The Court agrees."

- *Id.*: "Claims 6, 7, 9, 10, and 15 recite generic network systems that stream or deliver audio or video content using generic computing functions and only limit the claims to a particular technological environment."

- A35: "claims 2, 12, and 13 merely apply the abstract idea to a wireless device with a conventional display or a generic software application"

- A36: "claims only include generic computing equipment or functions"

- *Id.*: "the dependent system and method claims, considered with Claims 1, 8, and 14, either individually or as an ordered combination, all describe conventional, well known and routine concepts, accomplished using computer hardware and software recited in 'purely functional and generic' terms"

48

- A38: "asserted claims of the '085 patent preempt delivering selectable media content and subsequently playing the selected content on a portable device …".

The lower court cited nothing in the record to support these findings regarding what was well-known, routine and generic as of March 2000. *See* A30-36. Nor did it cite anything to justify its conclusion that the claims preempt every technical solution that achieves the general purpose of delivering selectable media content and subsequently playing the selected content on a portable device. *See* A38. Nor could it, as the claims are limited to a specific application involving specialized software and network components not found in pre-2000 media delivery and portable device systems. *See* sections II.B-C, *supra*.

Neither Rule 201, governing judicial notice, nor courts' practice of making general historical observations in deciding purely legal questions justifies the unsupported factual findings made in this case regarding adjudicative facts.

## A. General historical observations are not appropriate because determining the preemptive scope of the claims-in-suit and whether the claim limitations were generic, routine or conventional is not legislative fact-finding.

General historical observations or fact-finding done without record support or without compliance with Federal Rule of Evidence 201

regarding judicial notice is appropriate only in the context of "legislative" fact-finding. *See* Fed. R. Evid. 201(a) and its 1972 advisory committee notes. Legislative fact-findings are those which have only "relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body" but which are *not* "simply the facts of the particular case." Fed. R. Civ. P. 201(a) 1972 advisory committee notes. A legislative fact question "is not a question specifically related to this one case or controversy; it is question of social factors and happenings …." *Dunagin v. City of Oxford, Miss.*, 718 F.2d 738, 748 n.8 (5th Cir. 1983).

Thus, the interpretation of the '085 patent at issue along with prior art in order to determine what was conventional and routine at the time of filing the '085 patent, and also the scope of preemption, cannot be justified as the determination of a legislative fact because it involves inquiry into specific technical matters at the heart of the particular patent dispute. Indeed, the Supreme Court recently rejected the notion that legislative fact finding has any place in the determination of factual findings underlying other "legal" patent issues such as claim construction and obviousness:

> Neither do we find factfinding in this context sufficiently similar to the factfinding that underlies statutory interpretation. Statutes, in general, address themselves to the general public; patent claims concern a small portion of the public. Statutes typically (though not always) rest upon congressional consideration of general facts related to a reasonably broad set of social

> circumstances; patents typically (though not always) rest upon consideration by a few private parties, experts, and administrators of more narrowly circumscribed facts related to specific technical matters.

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840 (2015); *see also Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810-11 (1986) ("the scope and content of the prior art" and "differences between the prior art and the claims at issue" are just some of the subsidiary facts underlying ultimate legal question of obviousness that must be made in accordance with Fed. R. Civ. P. 52(a)).

Similarly, this Court recognized in *Ultramercial II* that "[a]lmost by definition, analyzing whether something was 'conventional' or 'routine' involves analyzing facts. … Likewise, any inquiry into the scope of preemption—how much of the field is 'tied up' by the claim— by definition will involve historic facts." 722 F.3d at 1339. Although § 101 is overall a legal determination, these are underlying adjudicative facts, which means dismissal under Rule 12(c) will normally be improper. *See id.*

The district court's reliance on *Hughes*, a district court decision from the Central District of California, to support its factual findings was in error. *Hughes* notes that courts frequently make fact findings when deciding purely legal issues. 59 F. Supp. 3d at 978 n.6. But § 101 is not a pure legal issue; it "is rife with underlying factual issues." *Ultramercial II*, 722 F.3d at 1339; *see also Certified Measurement, LLC v. Centerpoint Energy Houston Elec. LLC*, No. 14-CV-627-RSP, 2015 U.S. Dist. LEXIS 39821, at *4

(E.D. Tex. Mar. 29, 2015) (§ 101 analysis often does "contain underlying factual issues) (quoting *Accenture*, 728 F.3d at 1340-41); *Kenexa Brassring, Inc. v. HireAbility.com, LLC*, No. 12-10943-FDS, 2015 U.S. Dist. LEXIS 56156, at *19 (D. Mass. Apr. 28, 2015) (issues of inventive concept and preemption are inherently factual); *Ameritox, Ltd. v. Millennium Health, LLC*, No. 13-cv-832-WMC, 2015 U.S. Dist. LEXIS 53818, at *6-7 (W.D. Wis. Apr. 24, 2015) (same).

The Supreme Court has never said that fact-findings relating to the conventionality or preemptive scope of the claims-in-suit could be made without meeting the requirements for judicial notice of adjudicative facts or properly applying record evidence. *Hughes* refers to *Alice*'s citation to potentially out-of-record evidence showing historical intermediated settlement practice and makes vague comparative citation to Supreme Court decisions involving interpretation of constitutional provisions and statutes to suggest § 101 eligibility questions "mostly involve general historical observations." *Hughes*, 59 F. Supp. 3d at 978 n.6 (citing *District of Columbia v. Heller*, 554 U.S. 570, 581-92 (2008); *ABC, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014); *Alice*, 134 S. Ct. at 2356). Unlike the magistrate judge's unsupported fact findings, the Supreme Court's citation in *Alice* to several publications could potentially be justified as complying with Federal Rule of Evidence 201's requirements for taking judicial notice of adjudicative facts given the identification of accurate sources from which the fact they were cited for could be readily determined. Moreover, *Alice* was an appeal

from summary judgment with a factual record. *See* 134 S. Ct. at 2353; *CLS Bank*, 717 F.3d at 1312 (citing to the record).

The district court's belief that unsupported general historical observations can just be made anywhere in a § 101 analysis is contrary to foundational legal principles. Deciding the conventionality or scope of pre-emption of the claims-in-suit is distinctly not legislative fact-finding.

## B.   The district court's adjudicative fact finding also does not meet the requirements for use of judicial notice.

The district court fact findings do not comply with Federal Rule of Evidence 201. A court may only judicially notice a fact "that is not subject to reasonable dispute." Fed. R. Evid. 201(b). The rule is intended to "limit judicial notice of facts to those so universally…[or] generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute and those capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." *Id.* 1972 advisory committee notes (internal quotations omitted); *see also* Fed. R. Evid. 201(b). "[J]udicial notice applies to self-evident truths that no reasonable person could question, truisms that approach platitudes or banalities." *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 347 (5th Cir. 1982). "Surely where there is evidence on both sides of an issue the matter is subject to reasonable dispute." *Id.* at 348. In such cases, judicial notice is inappropriate. *Id.*

Whether the '085 patent claims cover something that was not conventional and routine in March 2000 is subject to at least reasonable dispute. The USPTO specifically found the claims novel and inventive before issuing them after reviewing more than 600 pieces of prior art. A40-48, A552 at ¶ 12. This alone should prevent use of unsupported "judicial notice" to conclude otherwise on a 12(c) motion where all allegations in the pleadings should be taken "in the light most favorable to the plaintiff." *See* A5 (quoting *Gentilello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010)). "It will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter … because every issued patent is presumed to have been issued properly, absent clear and convincing evidence to the contrary." *Kenexa*, 2015 U.S. Dist. LEXIS 56156, at *6 (quoting *Ultramercial II*, 722 F.3d at 1338). A court "cannot assume" "factual matters" such as whether claims cover only "routine" business practices that were utilized at a time-point before the patents-in-suit were filed and whether claims preempt everything defendants assert they preempt. *Id.* at *19-21 (denying motion for judgment on pleadings).

The magistrate judge's findings regarding what was conventional, routine, or well-understood at the time of the invention relies almost exclusively on other court decisions. *See* A30-36. None of these cited cases involved the same claim limitations at issue here, and thus provide no support for deciding whether the '085 patent claim limitations or claims, in particular, are ineligible. Even if another decision did happen to involve

54

similar claim elements (and a similar time of invention), the Fifth Circuit has expressly held that judicial notice cannot be used take notice of facts found within a legal judgment. *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998) (expressly holding a court cannot take judicial notice of a judgment other than for the limited purpose of taking as true the action of the court in entering judgment). The Fifth Circuit's position is consistent with several other circuit courts of appeals. *Id.* at 829-30 (citing *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388-89 (2d Cir. 1992), *Holloway v. Lockhart*, 813 F.2d 874, 878-79 (8th Cir. 1987), *United States v. Jones*, 29 F.3d 1549, 1553-54 (11th Cir. 1994)). A court cannot take judicial notice of the factual findings of another court because such facts are not indisputable. Because the district court's decision to dismiss was based impermissibly on factual findings outside of the record, the decision to dismiss was in error.

The district court erred because its unsupported adjudicative fact findings—contrary to expert evidence, Amazon's specific denials and affirmative defenses, and the issuance of the patent over the hundreds of pieces of prior art cited on the fact of the patent—cannot be justified as proper "judicial notice." It did not identify any easily accessible source of indisputable accuracy that supported any of its fact findings regarding the scope of preemption of the claims or the routine and conventional nature of the claims as a whole. For example, its findings regarding scope of preemption were based on nothing more than adoption of unsupported

attorney argument by Amazon. *See* A10 (patent would be ineligible "under theories of preemption because, as Amazon notes, the '085 Patent would prohibit anyone from playing media on a portable device" (citing Defendant's Reply brief on its motion for judgment on the pleadings at A635)). A court "cannot simply assume Defendants' characterization of the claims and implicit positions on the meaning of claim terms are correct without a meaningful ability to examine fully what a person of ordinary skill in the art would interpret those terms to mean." *Certified Measurement*, 2015 U.S. Dist. LEXIS 39821 at *5 (denying defendants' 12(b)(6) motion as validity determination of patent under § 101 at pleadings stage is "the exception rather than the rule" "only warranted in narrow circumstances"). On a Rule 12 motion, the magistrate judge improperly resolved factual disputes against Affinity Labs, the non-movant, which is error.

### C.   The district court erred in striking and not considering Affinity Labs' expert declaration offering evidence to rebut the court's unsupported fact findings

The district court erred in striking the expert declaration of Professor Kevin C. Almeroth submitted by Affinity Labs because Dr. Almeroth's opinions were relevant to conventionality and preemption. The Fifth Circuit has held "that the action of striking a pleading should be sparingly used by courts" and that "motion[s] to strike should be granted only when the pleading to be stricken has no possible relation to the controversy."

*Coney*, 689 F.3d at 379 (citing *Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962)). It is fundamentally unfair for the Court to consider and make factual findings against Affinity Labs—as the non-movant on a dispositive motion on the pleadings—while simultaneously denying Affinity Labs the ability to offer relevant evidence in its defense. The striking of Dr. Almeroth's declaration is illustrative of the core problem with the district court's insistence on deciding fact-based issues on the pleadings where a court's analysis involves considerations of §§ 102, 103, and 112. The law is clear that § 101 analyses can, as it did in this case, involve fact issues.

Factual issues of preemption and conventionality are central to a § 101 analysis. As explained above, preemption and the step two *Alice* analysis "are rife with underlying factual issues." *Ultramercial II*, 722 F.3d at 1339; *See also supra* III.A. In this case, the district court's § 101 inquiry relied on subsidiary factual issues related to preemption and what is routine, well-known, and conventional at the time of the invention. *See* A6-7, A8, A10, A30-32, A34-36, A38; *see also supra* III. Thus evidence related to preemption and conventionality has at least a "possible relation to the controversy." *See Coney*, 689 F.3d at 379.

Here, Dr. Almeroth's declaration was relevant to both of these factual issues and therefore should not have been stricken. Dr. Almeroth opined that the state of technology, as of March 2000, was very different than it is today. A551. Before 2000, if a user wanted to stream media, he or she was

generally tied to a wired connection, such as a traditional home computer. If a user wanted to consume media on-the-go, then he or she generally was limited to: 1) choosing content already stored in internal memory on the portable device (i.e., a previously downloaded file on an MP3 player); or 2) choosing content stored on external media such as CDs or cassette tapes. A551. Before the inventions of the '085 patent in March 2000, it was not routine, conventional, or well-known for handheld wireless device to have preloaded applications—or applications for download— that provided a customized graphical user interface, presented users with a list of selectable media content from a network library, and enabled the capability to receive streaming media from a media management and distribution system. A552-53. These opinions were relevant to issues—preemption and conventionality—related to this controversy and should not have been stricken.

As a general matter, the district court erred in not affording Affinity Labs the opportunity to present evidence, including the Almeroth declaration, to rebut the court's unsupported factual findings. Rule 12 contemplates the situation where matters outside of the pleadings are considered on a Rule 12(b)(6) or 12(c) motion: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

The central concern underlying this rule is fairness as "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id*. The same idea is embodied in Federal Rule of Evidence 201 which requires giving a party an opportunity "to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed." Fed. R. Evid. 201(e); *see also Colonial Leasing Co. v. Logistics Control Grp. Int'l*, 762 F.2d 454, 461 (5th Cir. 1985) (noting that court's taking of judicial notice in a post-trial order after the close of evidence "deprived" litigant of the opportunity to attack a judgment); *Soley v. Star & Herald Co.*, 390 F.2d 364, 367 (5th Cir. 1968) ("We are cognizant of the general rule which permits judicial notice of a court's prior cases to support a motion for summary judgment….But the trial court in this case did not inform the parties as to what he noticed.") (reversing and remanding for further proceedings).

The district court's striking of, and refusal to consider, the Almeroth Declaration demonstrates the fundamental flaw of the district court's actions. The Declaration, like the fact that the PTO found the specific claimed media delivery systems patentable over 600 prior art references reflected on the face of the patent, were both relevant evidence to the questions of preemption, and what was well-understood, conventional, or routine in the art at the time of the invention. The district court's failure to consider this evidence in view of its § 101 analysis, and not giving Affinity

Labs the opportunity to submit evidence in rebuttal of its unsupported factual findings, was reversible error, if not also a violation of due process.

While district courts are sorting out what they perceive to be new issues following *Alice*, they should not be permitted to disregard well-established procedural and evidentiary rules that facilitate the fair resolution of civil disputes, as the lower court did here.

## Conclusion

The '085 patent claims a novel, non-obvious, and inventive media management system that only exists in concrete and tangible form. The district court's grant of Amazon's motion for judgment on the pleadings pursuant to Rule 12(c) invalidating every claim of the '085 patent should be reversed. The case should be remanded for further proceedings.

Dated: December 18, 2015          Respectfully submitted,

*/s/Ronald J. Schutz*
Ronald J. Schutz
Cyrus A. Morton
Patrick M. Arenz
Brenda L. Joly
Benjamen C. Linden
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Tel.: (612) 349-8500

*Attorneys for Plaintiff-Appellant*
*Affinity Labs of Texas, LLC*

# ADDENDUM

# TABLE OF CONTENTS
# TO ADDENDUM

| JUDGMENT, ORDER OR DECISIONS IN QUESTION (AND SUPPORTING OPINIONS, MEMORANDUMS, OR FINDINGS AND CONCLUSIONS) | | |
|---|---|---|
| START | END | DESCRIPTION |
| A1 | A1 | Judgment in Case No. W-15-CV-29 (W.D. Tex.) (Docket No. 69) |
| A2 | A11 | Order (adopting magistrate judge's findings and recommendation and granting defendants' motion to dismiss) (Docket No. 68) |
| A12 | A39 | Report and Recommendation of the United States Magistrate Judge (Docket No. 61) |
| PATENT-IN-SUIT | | |
| A40 | A66 | United States Patent 8,688,085 |



# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

### WACO DIVISION

| | | |
|---|---|---|
| AFFINITY LABS OF TEXAS, LLC,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. W-15-CV-029 |
| AMAZON.COM, INC.; AMAZON<br>DIGITAL SERVICES, INC.,<br>    Defendants. | §<br>§<br>§ | |

## J U D G M E N T

In accordance with the Court's Order granting Defendants' Motion for Judgment on the Pleadings, the Court enters its Judgment as follows:

**IT IS ORDERED, ADJUDGED AND DECREED** that Plaintiff **TAKE NOTHING** against Defendants.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that any relief not specifically granted in this Judgment is **DENIED**.

**SIGNED** this _23_ day of September, 2015.

_____
**WALTER S. SMITH, JR.**
UNITED STATES DISTRICT JUDGE



# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

### WACO DIVISION

| | | |
|---|---|---|
| AFFINITY LABS OF TEXAS, LLC,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. W-15-CV-029 |
| AMAZON.COM, INC.; AMAZON<br>DIGITAL SERVICES, INC.,<br>    Defendants. | §<br>§<br>§ | |

## O R D E R

This case was referred to the United States Magistrate Judge for the Western District of Texas, Waco Division, for findings and recommendations, pursuant to 28 U.S.C. § 636(b). The Court received the Magistrate Judge's report, which was filed on June 12, 2015. Plaintiff filed objections to the report and recommendation on June 26, 2015, and Defendants filed a response to Plaintiff's objections on July 13, 2015, thus requiring a *de novo* review on appeal of the findings and recommendations. 28 U.S.C. § 636(b)(1)(C). *United States v. Kallestad*, 236 F.3d 225 (5th Cir. 2000).

Plaintiff brings this action asserting an infringement of its U.S. Patent No. 8,688,085 ("the '085 Patent"). Defendants filed a Motion for Judgment on the Pleadings under Fed.R.Civ.P. 12(c). The Magistrate Judge, in a careful and thorough review of the case and applicable law, has recommended that Defendants' motion be granted. Having conducted a *de novo* review, including Plaintiff's objections, Defendants'

response, and the entire file in this case, the Court is persuaded that the Magistrate

Judge's findings and recommendation should be adopted.

## FACTUAL HISTORY

Plaintiff Affinity Labs of Texas, LLC ("Plaintiff" or "Affinity") is an innovation

consulting firm that owns a large portfolio of technology-based patents.  Defendants

Amazon.Com, Inc. and Amazon Digital Services, Inc. (collectively "Defendants" or

"Amazon") are on-line retailers which offer a system to download and store music and

videos.  Affinity asserts Amazon's services are in violation of its '085 Patent.

## THE '085 PATENT

The '085 Patent, entitled "System and Method to Communicate Targeted

Information," is identified as a means for "wirelessly communicating selective information

to an electronic device."  Exhibit A to Original Complaint ("Exhibit A").  The Patent was

issued April 1, 2014.  The Abstract for the Patent describes it is:

> A method for targeted advertising is disclosed.  The method includes
> accessing at least one piece of demographic information associated with
> a user of a portable device, selecting an advertisement to be delivered to
> the user based at least in part on the demographic information, and
> initiating communication of a version of the advertisement configured for
> presentation at the portable device.

Exhibit A.  Affinity asserts the '085 Patent is a continuation of previously issued patents

reaching back to U.S. patent application Ser. No. 09.537,812 filed on March 28, 2000,

2

**A3**

and which is now U.S. Pat. No. 7,187,947, issued on March 6, 2007.  *Id.*  Claim 14 is

representative of the other claims:

> 14.  A media system, comprising:
> a network based media management system that maintains a library of
>     content that a given user has a right to access and a customized
>     user interface page for the given user;
> a collection of instructions stored in a non-transitory storage medium and
>     configured for execution by a processor of a handheld wireless
>     device, the collection of instructions operable when executed: (1) to
>     initiate presentation of a graphical user interface for the network
>     based media managing system; (2) to facilitate a user selection of
>     content included in the library; and (3) to send a request for a
>     streaming delivery of the content; and
> a network based delivery resource maintaining a list of network locations
>     for at least a portion of the content, the network based delivery
>     resource configured to respond to the request by retrieving the
>     portion from an appropriate network location and streaming a
>     representation of the portion to the handheld wireless device.

*Id.*

## ANALYSIS

Defendants seek dismissal of Plaintiff's complaint on the ground that the '085

Patent is invalid under 35 U.S.C. § 101 for failing to claim patentable subject matter.

Defendants base their motion on the recent Supreme Court case in *Alice Corp. Pty. Ltd.*

*v. CLS Bank Int'l*, ---- U.S. ----, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014).

The parties do not dispute the Magistrate Judge's recitation of the applicable law

related to Rule 12(c) motions and § 101 eligibility.  Plaintiff does, however, object to the

Magistrate Judge's application of the law as it relates to the '085 Patent.  The conclusion

3

reached by the Magistrate Judge is that the '085 Patent is not valid under § 101 as it involves an abstract idea, and "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp.*, 134 S.Ct. at 2354. These categories are not patent-eligible because "they are the basic tools of scientific and technological work . . ., free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs*, ---- U.S. ----, 132 S.Ct. 1289, 1293 (2012) (citations omitted). However, an invention is not rendered ineligible for patent protection merely because it involves an abstract concept. *Alice*, 134 S.Ct. at 2354; *Diamond v. Diehr*, 450 U.S. 175, 187 (1981). "Applications of such concepts to a new and useful end, . . . , remain eligible for patent protection." *Alice*, 134 S.Ct. at 2354 (quotation marks and citations omitted). The Court finds no error in the Magistrate Judge's findings, and finds no support for Plaintiff's specific objections.

A. Rule 12(c). A motion under 12(c) is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6). *Truong v. Bank of America, N.A.*, 717 F.3d 377, 381 (5th Cir. 2013) (quoting *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 209-10 (5th Cir. 2010)); *In re Deepwater Horizon*, 710 F.3d 338 (5th Cir. 2013). The standard under both sections is whether, "in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Gentilello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010) (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)).

4

In many patent cases, the § 101 inquiry is postponed until after claim construction; however, this "is not an inviolable prerequisite. . . ." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cri. 2014). Claim construction or a *Markman* hearing would add nothing to the evaluation of the patent in this case because there are no factual issues identified nor claims requiring construction which would preclude the legal determination that the '085 Patent does not consist of an inventive concept. Two recent cases out of the Federal Circuit have affirmed the invalidity of patents under § 101, analyzing them through the framework of Rule 12(b)(6) motions to dismiss. *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 343 (Fed.Cir. 2015); and *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed.Cir. 2015). As Rule 12(b)(6) and Rule 12(c) motions are analyzed under the same standard, there is no basis for objection regarding the timing or the analysis of this case under Rule 12(c).

C. The '085 Patent. The Magistrate Judge did not err in determining that the '085 Patent is an abstract idea. While Affinity argues that the '085 Patent is tangible and concrete, the independent claims of the Patent involve only an abstract idea–"delivering selectable media content and subsequently playing the selected content on a portable device." (R&R at 12, 14). This is, as the Magistrate Judge noted, a longstanding commercial practice. While the '085 Patent claims may contain technological terms, the Patent is, at its core, nothing more than an abstract idea. Just as in *Alice*, "all of these

5

**A6**

computer functions are 'well-understood, routine, conventional activit[ies]' previously known to the industry." *OIP Techs.*, 788 F.3d at 1362 (quoting *Alice*, 134 S.Ct. at 2359).

Once the Magistrate Judge determined that the '085 Patent involved an abstract idea, he correctly moved to the second step of the analysis – whether the elements of each claim "both individually and 'as an ordered combination,'" transforms "the nature of the claim into a patent-eligible application." *Internet Patents Corp.*, 790 F.3d at 1346 (quoting *Alice*, 134 S.Ct. at 2355). The second step is a "search for an 'inventive concept'–i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible] concept itself.'" *Id.* As in *Alice*, the '085 Patent amounts to "nothing significantly more than an instruction to apply the abstract idea . . . using some unspecified, generic computer." *Alice*, 134 S.Ct. at 2360 (citing *Mayo*, 132 S.Ct. at 1298). The Magistrate Judge correctly determined that the '085 Patent claims do not provide an inventive concept, either individually or in combination. The '085 Patent solves no problems, includes no implementation software, designs no system. The mere "statement that the method is performed by computer does not satisfy the test of 'inventive concept.'" *Internet Patents*, 790 F.3d at 1348-49 (quoting *Alice*, 134 S.Ct. at 2360).

Additionally, the Magistrate Judge did not err in his application of the "technological arts" test to determine whether the '085 Patent involved an inventive

6

.

**A7**

concept. The appropriate legal analysis was applied irrespective of the name of the test which Affinity would like to attach to it in an effort to articulate an objection.

Affinity's objection to the Magistrate Judge's factual determinations regarding what was conventional and routine at the time of the invention is also without merit. A § 101 determination is a question of law, and "[c]ourts frequently make findings when deciding purely legal questions." *Cal. Inst. Of Tech. v. Hughes Commc'ns Inc.*, 59 F.Supp.3d 974, 978 n. 6 (C.D. Cal. 2014). Patent "[e]ligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions[,]" and "[t]he Federal Circuit has noted that § 101 analysis is 'rife with underlying factual issues.'" *Id.* (quoting *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013)). Further, several Federal Circuit cases have made general historical observations in ruling on a similarly analyzed 12(b)(6) motion. *See, e.g., Content Extraction*, 776 F.3d at 1347; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354-55 (Fed. Cir. 2014); *Ultramercial*, 722 F.3d at 722-23 (Mayer, J., concurring); *Content Extraction*, 776 F.3d at 1347. Therefore, the Magistrate Judge's reliance on the patent specification and taking judicial notice of well-known, general historical observations was not error.

Nor did the Magistrate Judge err in determining that the '085 Patent failed the "machine-or-transformation" test. A claimed process can be patent eligible under the machine-or-transformation test if "(1) it is tied to a particular machine or apparatus, or

7

**A8**

(2) it transforms a particular article into a different state or thing." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (quotation marks omitted). Only the first prong was addressed in this case. R&R, at 18-19. As the Magistrate Judge explained:

> [A] general purpose computer, coupled with the internet, has been found to be a "ubiquitous information-transmitting medium, not a novel machine," thus failing the machine test. *Ultramercial III*, 772 F.3d at 716-17.
>
> . . .
>
> In reviewing representative claim 14, the Court finds it fails the "machine or transformation" test. Specifically, in analyzing claim 14, Affinity merely takes the abstract idea mentioned above and applies it to the Internet and a generic, electronic device–in this case, a wireless handheld device operating as a "ubiquitous information-transmitting medium, not a novel machine." *Ultramercial III*, 772 F.3d at 716-17. Although Affinity alleges the components in Claim 14 are specialized, the court finds the claim merely sets forth routine and generic processing and storing capabilities of computers generally. The claim described a "network based media managing system," in other words a generic database, with a "non-transitory storage medium"–which could be any kind of memory. '085 Patent col. 20 1.7, 10. The claim further describes a "network based delivery resource," which is merely a network that sends and receives data [media content] in a streaming form. *Id.* at 19, *see e.g., buySAFE*, 876 F.3d at 1355 (finding that "sending" and "receiving" data over a network is "not even arguably inventive"); *Ultramercial III*, 772 F.3d at 717 ("transfer of content between computers is merely what they do"); *Wolf*, 2014 WL 7639820, at *12 (holding a "computer network server" to be a generic piece of technology).

R&R, pp. 19-20. Affinity's objection and argument fails to persuade the Court to depart from the Magistrate Judge's sound reasoning.

Affinity further argues that the Magistrate Judge failed to hold Defendants to their burden of proving that each dependent claim was invalid by clear-and-convincing

8

**A9**

evidence, making only a conclusory analysis of the '085 dependent claims.  A court's § 101 analysis of dependent claims that fail to add an inventive concept are generally briefly addressed.  *See Content Extraction*, 776 F.3d at 1348-49.  Because the Court agrees with the Magistrate Judge that the claims in this case "add only trivial limitations insufficient to confer patentability[,]", the Magistrate Judge did not err in his dependent claims analysis.  R&R, p. 23.

Affinity next objects that the Magistrate Judge erred in his preemption analysis. The Court disagrees.  The Magistrate Judge concluded that "[a]llowing the asserted claims to survive would curb any innovation related to the implementation of the abstract idea on potentially any portable device that utilizes the internet."  R&R, pp. 26-27.  Even if the '085 Patent were not ineligible under the *Mayo/Alice* test, it would be under theories of preemption because, as Amazon notes, the '085 Patent would prohibit anyone from playing media on a portable device "without risking an infringement suit by Affinity."  Defendant's Reply to Plaintiff's Response to the Motion for Judgment on the Pleadings, p. 6.  The '085 Patent would create an unreasonable risk of burdening all present and future ways of downloading media and threaten further innovation.

Recent cases out of the Federal Circuit involved patents similar to Affinity's and held those patents invalid as abstract ideas, going beyond the limitations which Affinity would impose–that only mathematical algorithms and fundamental economic practices are eligible for the abstract-idea exception.  *See Internet Patents Corp. v. Active*

9

**A10**

*Active Network, Inc.*, 790 F.3d 343 (Fed.Cir. 2015); and *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed.Cir. 2015).

Finally, Affinity objects to the Magistrate Judge's order striking the Declaration of Dr. Kevin C. Almeroth, which expressed his expert opinion that the '085 Patent was not preempted and was an inventive concept.  The Court finds no error in the Magistrate Judge's ruling as the issues in this case were able to be evaluated through an analysis of the patent itself.  Accordingly, it is

**ORDERED** that the Magistrate Judge's findings and recommendation are **ADOPTED**.  It is further

**ORDERED** that Defendants' Motion to Strike Declaration of Dr. Kevin C. Almeroth (Doc. # 56) and Motion for Judgment on the Pleadings (Doc. # 47) are **GRANTED**.  It is further

**ORDERED** that any motions not previously ruled upon by this Court or the Magistrate Judge are **DENIED**.

**SIGNED** this  23  day of September, 2015.

WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

10

**A11**

*FILED*
*JUN 1 2 2015*
*CLERK*
*WESTERN DISTRICT OF TEXAS*
*BY _____ OF COURT*
*DEPUTY CLERK*

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

## WACO DIVISION

| | | |
|---|---|---|
| **AFFINITY LABS OF TEXAS, LLC,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **VS.** | § | **Case No. 6:15-CV-0029-WSS-JCM** |
| | § | |
| **AMAZON.COM, INC.; AMAZON** | § | |
| **DIGITAL SERVICES, INC.,** | § | |
| *Defendants.* | § | |

## REPORT AND RECOMMENDATION OF
## THE UNITED STATES MAGISTRATE JUDGE

**TO:   THE HONORABLE WALTER S. SMITH, JR.,
        UNITED STATES DISTRICT JUDGE**

This Report and Recommendation is submitted to the Court pursuant to 28 U.S.C. §
636(b)(1)(c) and Rules 1(h) and 4(b) of Appendix C of the Local Rules of the United States
District Court for the Western District of Texas, Local Rules for the Assignment of Duties to
United States Magistrate Judges.

Before the Court is Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(c).
ECF No. 47. The Motion has been fully briefed.[1] For the reasons that follow, the undersigned
**RECOMMENDS** that Defendants' Motion be **GRANTED** with respect to all of the asserted
claims of U.S. Patent No. 8,688,085.

### I. Background

Plaintiff is Affinity Labs of Texas, LLC, ("Affinity"), an innovation consulting firm
founded in 2008 by Russell White and Harlie Frost. Affinity is the owner of a large portfolio of
technology-based patents. Defendants are Amazon.com, Inc. and Amazon Digital Services, Inc.

---

[1] Pl.'s Resp., ECF No. 52; Defs.' Reply, ECF No. 56.

1

**A12**

(collectively, "Amazon"). Affinity filed suit against Amazon alleging infringement of Patent No. 8,688,085 ("the '085 Patent").[2] The case was assigned to the undersigned for all purposes. Order Reassigning Case, ECF No. 8.

The '085 Patent claims a means for "wirelessly communicating selective information to an electronic device." '085 Patent col. 2 l. 54-55 (filed Apr. 1, 2013). According to Affinity, the patent addresses the problem of allowing users to "consume media on the go" by using the Internet to stream media. Pl.'s Resp. at 12. The claimed invention allegedly allows a user to: "communicate the selected audio information to a remote electronic device, . . . a home computer, an electronic device coupled to a home network or computer system, etc. or other locations or devices operable to receive the selected audio information." *Id.* col. 14-15 l. 66-4.

There are three independent claims at issue in the '085 Patent: claims 1 and 14 are styled as system claims and claim 8 is a method claim. However, claims 1 and 14 are, in essence, nothing more than method claims. *Accenture Global Servs., GMBH v. Guideware Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (holding system claims that "closely track method claims and are grounded by the same meaningful limitations [] generally rise and fall together").

Claim 14 is representative of the three independent claims and is reproduced below:

14. A media system, comprising:

a network based media managing system that maintains a library of content that a given user has a right to access and a customized user interface page for the given user;

a collection of instructions stored in a non-transitory storage medium and configured for execution by a processor of a handheld wireless device, the collection of instructions operable when executed: (1) to initiate presentation of a

---

[2] On the same date, Affinity filed four patent infringement suits alleging infringement of U.S. Patent No. 7,970,379, a patent with specifications very similar to those of the '085 patent. *See Affinity Labs of Texas, LLC, v. DirecTV, et al.*, No. 6:15-CV-0030-WSS-JCM (consolidated). Defendants in that case likewise moved to dismiss Affinity's complaints pursuant to 28 U.S.C. § 101. On May 12, 2015, the Court held oral argument on the motion, and on June 2, 2015, the Court entered an order granting Defendants' motion. The opinion in this case tracks *DirecTV* in form and approach.

graphical user interface for the network based media managing system; (2) to facilitate a user selection of content included in the library; and (3) to send a request for a streaming delivery of the content; and

a network based delivery resource maintaining a list of network locations for at least a portion of the content, the network based delivery resource configured to respond to the request by retrieving the portion from an appropriate network location and streaming a representation of the portion to the handheld wireless device.

'085 Patent col. 20 l. 6-24; *see Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (affirming a district court's decision to examine one representative claim per patent "because all the claims are substantially similar and linked to the same abstract idea") (internal quotation marks omitted). Defendants jointly seek to dismiss Affinity's Complaint pursuant to Fed. R. Civ. P. 12(c) on the grounds that the '085 Patent is invalid under 35 U.S.C. § 101 for failing to claim patentable subject matter. In June 2014, the Supreme Court decided *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, a seminal decision in which the Court held that patent claims designed to facilitate the exchange of financial obligations between two parties by using a computer system as a third-party intermediary were drawn to a patent ineligible abstract idea and thus not patent eligible under § 101. 134 S. Ct. 2347 (2014). *Alice* prompted a wave of decisions from lower courts addressing the issue of patent eligibility under § 101.

## II. Relevant Law

Section 101 of the Patent Act defines patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. Section 101 also "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134

3

**A14**

S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)) (internal quotation marks omitted). "[T]he concern that drives this exclusionary principle [i]s one of pre-emption." *Alice*, 134 S. Ct. at 2354 (citing *Bilski v. Kappos*, 561 U.S. 593, 611 (2010)). These categories are not patent-eligible because "they are the basic tools of scientific and technological work . . . , free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1293 (2012) (citations omitted). Allowing patent claims for laws of nature, natural phenomena, and abstract ideas would "tend to impede innovation more than it would tend to promote it[,]" thereby thwarting the primary object of the patent laws. *Id.* The Supreme Court has "repeatedly emphasized this . . . concern that patent law not inhibit further discovery by improperly tying up the future use of" these building blocks of human ingenuity. *Id.* at 1301; *see also O'Reilly v. Morse*, 56 U.S. 62 (1853). However, the Court has also recognized the need to "tread carefully in construing this exclusionary principle, lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354. The Supreme Court recognized that, at some level, "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 132 S. Ct. at 1293. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept. *See Diamond v. Diehr*, 450 U.S. 175, 187 (1981). Applications of such concepts "to a new and useful end" remain eligible for patent protection. *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

In *Alice*, the Supreme Court identified a "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1289). This framework reflects the two-part test articulated by the Supreme Court in *Mayo*.

4

**A15**

Under the *Mayo/Alice* test, a court must first ask if the claim is "directed to one of those patent-ineligible concepts"—a law of nature, physical phenomenon, or abstract idea. *Alice*, 134 S. Ct. at 2355. If it is, the court moves to the second step. At step two, the court asks "[w]hat else is there in the claims before us?" *Mayo*, 132 S. Ct. at 1297. To answer that question, the court considers the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Id.* at 1298-97. This analysis serves as a search for an " 'inventive concept' "—i.e., an element or combination of elements "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 1294.

## III.  Analysis

### A.  Ripeness and Burden of Proof

Affinity argues Defendants' Motion is premature because: (1) claim construction has not occurred yet, Pl.'s Resp. at 18-19; (2) Amazon has not met its burden to prove all underlying factual disputes by clear-and-convincing evidence, *Id.* at 19; and (3) because "Amazon's Motion is incomplete in its effort to invalidate all twenty claims." *Id.* Accordingly, the Court will address the timeliness of Defendants' Motion and the appropriate standard of proof.[3]

Under the Federal Rules "a party may move for judgment on the pleadings" "[a]fter the pleadings are closed—but early enough not to delay a trial." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). The Rule

---

[3] The Court of Appeals for the Federal Circuit looks to regional circuit law for the resolution of procedural issues, such as the standard of review applied to challenges to a dismissal for failure to state a claim under Fed. R. Civ. P. 12(c). *See Content Extraction*, 776 F.3d at 1349 ("We review a district court's dismissal for failure to state a claim under the law of the regional circuit.") (citing *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed. Cir. 2012)).

12(c) "inquiry focuses on the allegations in the pleadings" and not on whether the "plaintiff actually has sufficient evidence to succeed on the merits." *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 209 (5th Cir. 2009) (citing *Ferrer v. Chevron Corp.*, 484 F.3d 776, 782 (5th Cir. 2007)) (internal quotations omitted). The "court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996) (citing *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992)). To avoid dismissal, the pleadings must show "specific facts, not mere conclusory allegations." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). The ultimate question for the Court in deciding a Rule 12(c) motion is whether the complaint, when viewed in the light most favorable to the plaintiff, states a valid claim for relief. *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001) (citing *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 440 n.8 (5th Cir. 2000)).

The Federal Circuit has confirmed that determining patent eligibility under § 101 is appropriate at the pleadings stage. "Issues of patent-eligible subject matter are questions of law." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011). *See, e.g., Content Extraction*, 776 F.3d at 1349 (affirming district court's resolution of a motion to dismiss at the pleading stage); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711 (Fed. Cir. 2014) (*Ultramercial III*) (affirming district court's decision granting motion to dismiss infringement claim for failure to state patent-eligible subject matter); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014) (affirming district court's decision to grant judgment on the pleadings based on § 101). "[S]ection 101 imposes 'a threshold test,' . . . one that must be satisfied before a court can proceed to consider subordinate validity issues such as non-obviousness under 35 U.S.C. § 103 or adequate written description under 35 U.S.C. § 112."

6

**A17**

*Ultramercial III*, 772 F.3d at 718 (Mayer, J., concurring) (citing *Bilski*, 561 U.S. at 602) (internal citation omitted). "[S]ubject matter eligibility is the primal inquiry, one that must be addressed at the outset of litigation." *Ultramercial III*, 772 F.3d at 717 (Mayer, J., concurring) (citing *In re Comiskey*, 554 F.3d 967, 973 (Fed. Cir. 2009)). The Federal Circuit's declaration on this point is rooted in sound policy. Addressing § 101 at the outset of litigation has "a number of salutary effects": it "conserve[s] scarce judicial resources," "provides a bulwark against vexatious infringement suits," and protects the public at the outset from "patents that stifle innovation and transgress the public domain." *Id.* at 719-20.

   Furthermore, in this case the § 101 inquiry is properly addressed prior to claim construction. "Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101." *Content Extraction*, 776 F.3d at 1349 (citing *Ultramercial III*, 772 F.3d at 714–15; *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012) (finding that the district court did not err by declaring claims patent-ineligible at the pleading stage without first construing the claims or allowing the parties to conduct fact discovery and submit opinions from experts supporting their claim construction positions)). However, completing claim construction prior to a § 101 analysis may be appropriate under certain circumstances. *See Bancorp*, 687 F.3d at 1273-74. For instance, "it will ordinarily be desirable—and often necessary—to resolve claim construction *disputes* prior to a [§] 101 analysis." *Id.* (emphasis supplied).

   Denying Defendants' 12(c) motion as premature, merely because claim construction has not occurred, is unwarranted. As Defendants point out, Affinity has not identified a disputed term requiring construction and has therefore not demonstrated why claim construction is

7

**A18**

necessary to determine whether the patent claims patent-eligible subject matter. Defs.' Reply at

9; *see TriPlay v. WhatsAPP Inc.*, No. 13-1703-LPS, 2015 WL 1927696, at *6 (D. Del. Apr. 28,

2015) (citing *Open Text S.A. v. Alfresco Software Ltd*, No. 13-cv-04843-JD, 2014 WL 4684429,

at *3 (N.D. Cal. Sept. 19, 2014) ("the parties have not sought construction of any terms . . . and

this lack of dispute over the proper construction of the asserted claims confirms that it is

unnecessary to engage in claim construction before addressing validity under [§] 101"").

Furthermore, as discussed herein, the asserted claims are drawn to an abstract idea and there is

no reasonable construction of any term that would serve to bring the claims within the ambit of

patentable subject matter. Accordingly, this Court's § 101 analysis is appropriate at the pleadings

stage.

Affinity argues factual disputes exist regarding what is "'well-known,' 'generic,' or

'conventional'" and cannot be resolved under Rule 12. Pl.'s Resp. at 19. However, the Supreme

Court has resolved § 101 patent validity by examining the face of the patent. *Bilski*, 561 U.S. at

622, 626; *Alice*, 134 S. Ct. at 2350, 2356; *see also OIP Techs. Inc., v. Amazon.com, Inc.*, No.

2012-1696, 2015 WL 3622181, at *4 (Fed. Cir. 2015) (finding, at the pleadings stage, that the

processes of "'present[ing] [offers] to potential customers' and 'gathering … statistics generated

during said testing about how the potential customers responded to the offers' are 'well-

understood, routine, conventional data-gathering activities that do not make the claims patent

eligible") (citations omitted). Thus, the Court only needs to view the patent itself. *See Wolf v.

Capstone Photography, Inc.*, No. 2:13-CV-09573, 2014 WL 7639820, at *6, *17 (C.D. Cal. Oct.

28, 2014) ("[T]he Court finds that the basic character of the claimed subject matter is readily

ascertainable from the face of the patent") (internal citation omitted); *Amdocs (Israel) Ltd. v.

Openet Telecom, Inc.*, 56 F. Supp. 3d 813, 817 (E.D. Va. 2014) ("a court must evaluate the

claims [o]n their face to determine to which concept the claims are drawn" (citing *Alice*, 134 S.

Ct. at 2356)) (internal citation omitted). Therefore, the Court can resolve the validity of the '085

Patent on its face at the pleadings stage.

Regarding burden of proof, there is no clear mandate from the Supreme Court or the

Federal Circuit, and lower courts are split as to whether the clear and convincing evidentiary

standard should be applied in a challenge to a patent's eligibility under § 101.[4] Section 101

involves a legal analysis as to whether the basic character of the claimed subject matter is patent

ineligible and thus largely implicates questions of law. Accordingly, to the extent legal questions

bear on the ultimate question of subject matter eligibility, the Court will decide those questions

as a matter of law.[5] Although the issue of invalidity under § 101 presents a question of law, the

---

[4] *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013) *(Ultramercial II), vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014) ("the *only* plausible reading of the patent must be that there is clear and convincing evidence of ineligibility"); *TriPlay*, 2015 WL 1927696, at *5 ("even assuming that the 'clear and convincing' evidence standard is applicable to [§] 101 challenges, it would apply only to the resolution of factual disputes, not to the resolution of pure issues of law") (citing *Microsoft Corp. v. i4i Ltd P'ship*, 131 S. Ct. 2238, 2242-43 (2011) (footnote omitted)); *Trading Techs. Int'l, Inc. v. CQG, Inc.*, No. 05-CV-4811, 2015 WL 774655, at *3 (N.D. Ill. Feb. 24, 2015) ("until the Federal Circuit or the United [States] Supreme Court mandates otherwise, CQG must show by clear and convincing evidence that the patents-in-suit claim patent-ineligible subject matter."); *Bascom Research, LLC v. LinkedIn, Inc.*, No. 12-CV-06293-SI, 2015 WL 149480, at *4 (N.D. Cal. Jan. 5, 2015) ("an alleged infringer asserting an invalidity defense pursuant to § 101 bears the burden of proving invalidity by clear and convincing evidence"); *Enfish, LLC, v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1170 (C.D. Cal. 2014) ("Federal Circuit precedent requires courts to apply the [clear and convincing evidence] standard to § 101 challenges") (citing *Ultramercial II*, 722 F.3d at 1339); *cf. Content Extraction*, 776 F.3d at 1345-49 (in which the Federal Circuit affirmed a dismissal under § 101 at the Rule 12(b)(6) stage without discussion of any disputed issues of fact); *Ultramercial III*, 772 F.3d at 720–21 (Mayer, J., concurring) ("Although the Supreme Court has taken up several [§] 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility. The reasonable inference, therefore, is that while a presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the [§] 101 calculus.") (internal citation omitted); *Shortridge v. Found. Constr. Payroll Servs., LLC*, No. 14-cv–04850–JCS, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14, 2015) ("Although the clear and convincing evidence standard is not applicable to the Motion, Defendants, as the parties moving for relief, still bear the burden of establishing that the claims are patent[-]ineligible under § 101."); *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, No. 14–7004; 14–7006(JLL), 2015 WL 1810378, at *6 (D.N.J. Apr. 20, 2015) ("With no authoritative law binding the Court as to an applicable standard, the Court adopts Judge Mayer's approach and will not afford Plaintiff's Patents the presumption of subject matter eligibility."); *Modern Telecom Sys. LLC, v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7 (C.D. Cal. Mar. 17, 2015) ("Because, ordinarily, no evidence outside the pleadings is considered in resolving a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to apply a 'clear and convincing evidence' standard-a burden of proof-to such motions.") (emphasis removed); *Open TV, Inc. v. Apple, Inc.*, No. 14–cv–01622–HSG, 2015 WL 1535328, at *3 (N.D. Cal. Apr. 6, 2015) (rejecting the clear and convincing evidence standard and applying the Rule 12(b)(6) standard).

[5] It is within this Court's province to make findings when deciding the legal question of whether the basic character of the claimed subject matter is patent ineligible. "Courts frequently make findings when deciding purely legal questions. Eligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions." *Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, No. 2:13–cv–07245–MRP–JEM, 2014 WL 5661290, at *20 n.6 (C.D. Cal. Nov. 3, 2014) (citations omitted).

**A20**

Court recognizes that a legal conclusion "may contain underlying factual issues." *See Accenture Global*, 728 F.3d at 1340–41; *Ultramercial II*, 722 F.3d at 1339 ("[T]he analysis under § 101, while ultimately a legal determination, is rife with underlying factual issues."). To the extent that questions of fact exist, the Court will apply the clear and convincing evidence standard.[6]

Finally, Affinity contends that Amazon is unable to invalidate all twenty claims of the '085 Patent because Amazon provides a conclusory analysis of the dependent claims. Pl.'s Resp. at 19-20. However, Amazon is not required to analyze each dependent claim when the dependent claim recites little more than the same abstract idea found in the independent claim. *See Content Extraction*, 776 F.3d at 1348 (finding 242 claims invalid based on analysis of just one independent claim, where the dependent claims "recite[d] little more than the same abstract idea"). The validity of the dependent claims are addressed in Section (C)(2) of this opinion.

**B.  *Mayo/Alice* Step 1: Are the claims of the '085 patent directed to an abstract idea**

The Court must first evaluate the patent claims "[o]n their face" and determine whether the claims are directed to patent-ineligible subject matter—"laws of nature, natural phenomena, and abstract ideas." *Alice*, 134 S. Ct. at 2355-56. The instant case only presents the question of whether Plaintiff's patent is directed to an abstract idea.

---

[6] By separate motion, Amazon requests the Court strike and disregard the Declaration of Professor Kevin C. Almeroth ("Almeroth Declaration") (ECF No. 52-1) submitted by Affinity in support of its opposition to Amazon's Motion for Judgment on the Pleadings. Defs.' Mot. to Strike (ECF No. 57). "When 'matters outside the pleadings' are submitted in support of or in opposition to a Rule 12(b)(6) motion to dismiss, Rule 12(c) grants courts discretion to accept and consider those materials, but does not require them to do so." *See ACE Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 188 (S.D. Tex. 2008) (citations omitted); *see also* Fed. R. Civ. P (12)(d). The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss. *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). The Court declines to accept the Almeroth Declaration and convert Amazon's § 101 Motion into a summary judgment motion under Rule 56. Although the Court recognizes that the legal analysis under § 101 can contain underlying factual issues, in the instant case, the Court is of the opinion that no factual issues are present, and the Court has adequately resolved the threshold matter of patent eligibility by examining the patent on its face, without considering materials outside of the pleadings. *See OIP Techs.*, 2015 WL 3622181, at *4 ("Accordingly, where, as here, asserted claims are plainly directed to a patent ineligible abstract idea, we have repeatedly sanctioned a district court's decision to dispose of them on the pleadings.") (Mayer, J., concurring) (citations omitted). Accordingly, Amazon's Motion to Strike the Declaration of Dr. Kevin C. Almeroth (ECF No. 57) is granted and the Court will disregard the Almeroth Declaration.

The Supreme Court and lower courts have provided some important principles to direct courts in evaluating whether an idea is abstract. At step one, "the court must identify the purpose of the claim—in other words, determine what the claimed invention is trying to achieve—and ask whether that purpose is abstract."[7] *Enfish*, 56 F. Supp. 3d at 1173. "Application of the first *Mayo* step does not include a detailed examination of the asserted claims, either individually or as an ordered combination; that analysis is properly lodged within step two." *Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, No. 12–10943–FDS, 2015 WL 1943826, at *5 (D. Mass. Apr. 28, 2015) (citing *Alice*, 134 S.Ct. at 2356; *Mayo*, 132 S.Ct. at 1297). Instead, courts should recite a claim's purpose at a reasonably high level of generality. *Enfish*, 56 F. Supp. 3d at 1174; *Cal. Inst. of Tech.*, 2014 WL 5661290, at *13. Step one is a "quick look" test, the purpose of which is to identify a risk of preemption and ineligibility. *Enfish*, 56 F. Supp. 3d at 1173. If a claim's purpose is abstract, the court looks with more care at the specific claim elements in step two. *Id.* at 1174; *Cal. Inst. of Tech.*, 2014 WL 5661290, at *13. All of the claim limitations need not be abstract. The patent may not pass § 101 muster if "the concept embodied by the majority of the limitations" describes an abstract idea. *See Ultramercial III*, 772 F.3d at 715 (holding that "[a]lthough certain additional limitations, such as consulting an activity log, add a degree of particularity, *the concept embodied by the majority of the limitations* describes only the abstract idea of showing an advertisement before delivering free content") (emphasis added).

Amazon suggests the '085 patent's purpose is simply "playing media (e.g., audio or video) on a portable device." Defs.' Mot. at 9. Affinity, for its part, argues that Amazon's

---

[7] The Supreme Court took this approach in *Alice* (concluding that the steps embodied in the claims were meant to achieve the purpose of mitigating settlement risk); in *Bilski* (characterizing the claims in terms of the invention's purpose—hedging risk); and in *Mayo* (characterizing the claims in terms of the invention's purpose, which was applying a natural law). The Federal Circuit has followed suit: *Content Extraction*, 776 F.3d at 1347 ("data collection, recognition, and storage"); *Ultramercial III*, 772 F.3d at 714 (holding that "the abstract idea at the heart of" the patent-in-suit was "that one can use [an] advertisement as an exchange for currency"); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 ("managing a game of Bingo"); and *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014) ("categorical data storage"); *OIP Techs.*, 2015 WL 3622181, at *3 ("offer-based price optimization").

proposed purpose is overly broad and untethered to the claim language because it ignores the "network-based media system," the fundamental nature of media streaming and distribution embodied in the claims, and the customized user interface—all of which are integral claim elements. Pl.'s Resp. at 4-5. While Affinity maintains the claimed invention cannot be reduced to an essential purpose, Affinity insists the independent claims address at least "a media management and distribution system for distributing and streaming media in connection with an application for execution on a wireless handheld device that includes a customized user interface." *Id.* at 6 (citing Ex. A).

Ultimately, the purpose is neither as broad nor as narrow as the parties suggest. The Court finds the purpose of the '085 Patent is delivering selectable media content and subsequently playing the selected content on a portable device. In reviewing the system and method claims, the Court notes this idea is embodied by all of the limitations in claim 1, claim 8, and claim 14. System claim 1 embodies the same abstract idea as representative claim 14, only it adds login, browse, and listen features. Claim 8, the method claim, likewise embodies the same abstract idea, only it adds a login feature.

Next, the Court examines whether the purpose is abstract. *See Enfish*, 56 F. Supp. 3d at 1174. The Supreme Court did not "delimit the precise contours of the 'abstract ideas' category" in *Alice*—instead, it left the lower courts to develop the category on a case-by-case basis. 134 S. Ct. at 2357. Nevertheless, over the course of several cases, the Supreme Court has identified several categories of precluded subject matter. For example, mathematical algorithms, including

12

**A23**

those executed on a generic computer, are patent-ineligible.[8]  Similarly, certain scientific

principles are patent-ineligible. *See Mayo*, 132 S. Ct. at 1293 (finding that a claim describing

relationships between concentrations of certain metabolites in the blood and the likelihood that a

dosage of a drug will cause harm set forth laws of nature). Additionally, some fundamental

economic and conventional business practices are also abstract ideas. *See Bilski*, 561 U.S. at 609

(finding the "fundamental economic practice" of hedging to be patent ineligible); *Alice*, 134 S.

Ct. at 2356 (finding that a "method of exchanging financial obligations between two parties

using a third-party intermediary to mitigate settlement" was a method of "organizing human

activity" and therefore abstract).

 Since *Alice*, the Federal Circuit has issued eight decisions interpreting § 101. This body

of case law has further defined the contours of the abstract ideas category.[9]  In addition, recent

---

[8] *See Benson*, 409 U.S. at 71-72 (finding a claim for a method of converting binary-coded decimal numerals into pure binary numerals using a mathematical formula in a general-use computer was a claim on an idea); *Parker v. Flook*, 437 U.S. 584, 586 (1978) (finding a claim for a method of computing an alarm limit in the catalytic conversion of hydrocarbons using a mathematical algorithm included a law of nature); *Diehr*, 450 U.S. at 178 (finding that a process for curing rubber involving use of a mathematic equation encompassed a law of nature).

[9] The Federal Circuit invalidated a patent that claimed the business method of using "an advertisement as an exchange for currency" (*Ultramercial III*, 772 F.3d at 714); a patent directed to another business method that was "a well-known, and widely understood concept—a third party guarantee of a sales transaction—and then applied that concept using conventional computer technology and the Internet" (*buySAFE*, 765 F.3d at 1352 (Fed. Cir. 2014)); a patent directed to a well-known practice in the banking industry of storing and collecting data, a function that "humans have always performed," especially in the banking industry (*Content Extraction*, 776 F.3d at 1347); a patent that managed "a bingo game while allowing a player to repeatedly play the sets of numbers in multiple sessions" because the idea "consists solely of mental steps which can be carried out by a human using pen and paper" (*Planet Bingo*, 576 F. App'x at 1007); a claim describing the process of taking two data sets and combining them into a single data set known as a "device profile" recited the "abstract process of gathering and combining data that does not require input from a physical device" (*Digitech Image Techs., LLC v. Elec. For Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014)); patent claims directed to identifying alterations of a gene by comparing the patient's gene with a "wild-type" gene and identifying inconsistencies arising therefrom (*In re BRCA1- and BRCA2-Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755 (Fed. Cir. 2014)); and a claim describing "the fundamental economic concept of offer-based price optimization through the use of generic computer functions" (*OIP Techs.*, 2015 WL 3622181, at *3. However, in *DDR Holdings v. Hotels.com, L.P.*, the Federal Circuit found that patents directed to systems and methods of generating a composite web page that combines certain visual elements of a "host" website with content of a third-party merchant were patent-eligible. 773 F.3d 1245, 1259 (Fed. Cir. 2014).

district court opinions post-*Alice*, including a decision from within this District, have found abstract ideas embodied in claims describing a wide variety of systems and processes.[10]

Amazon first argues the '085 Patent is abstract because it is "directed to the 'longstanding' practice of playing media (e.g., audio or video) on a portable device." Defs.' Mot. at 9. According to Amazon, transmitting "information for purposes of playing audio or video on a portable device[,]" is "an antiquated idea that pre-dates the patent." *Id.* (citing '085 Patent col. 2 l. 53-55).

According to Affinity, Supreme Court and Federal Circuit case law permits invalidating patents for abstractness only if they fall into "one of two categories: (1) mathematical algorithms, or (2) business methods involving fundamental economic practices." Pl.'s Resp. at 9. Affinity argues the '085 patent's claims are not directed to either of these limited categories. *Id.* Affinity further argues neither the Supreme Court nor the Federal Circuit has identified "longstanding practices" as an abstract category in and of itself and broadening the limited category of exceptions to include such practices risks swallowing all of patent law. *Id.* at 10. Moreover, Affinity argues, playing media on a portable device is not a longstanding commercial practice. *Id.* at 11.

Contrary to Affinity's position, the Supreme Court did not "delimit the precise contours of the 'abstract ideas' category" in *Alice* and instead left the lower courts to develop the category on a case-by-case basis. 134 S. Ct. at 2357. Affinity's interpretation of the law is overly narrow, and the distinction Affinity attempts to make between "business methods involving fundamental economic practices" and "longstanding practices" boils down to semantics. Affinity ignores the

---

[10] *See Morales v. Square, Inc.*, No. 5:13-CV-1092-DAE, 2014 WL 7396568, at *5 (W.D. Tex. Dec. 30, 2014) (cataloging cases); *see id.* at *6 ("The Federal Circuit's decision in *Digitech Image Techs., LLC v. Elec. For Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014), however, indicates that the abstract ideas category is broad.").

Supreme Court, Federal Circuit, and district court decisions that have recognized those fundamental economic or longstanding commercial practices as abstract ideas ineligible for patent protection under § 101.[11]

The Court finds that delivering selectable media content and subsequently playing the selected content on a portable device is a longstanding commercial practice and is therefore abstract.[12] The Court notes that the first transistor radio, which delivers selectable audio media to a portable device, was developed in the late 1940s and was immensely popular in the succeeding decades. Similarly, the first portable televisions, another form of delivering "selectable" media content to a portable device, were introduced in the 1980s and 1990s. The above examples represent just a few of the many general historical observations that come to mind as evidence of the long-standing commercial practice of delivering selectable media content and subsequently playing the selected content on a portable device.

Second, Amazon alleges the patent is abstract because it has "no particular concrete or tangible form." *Ultramercial III*, 772 F.3d at 715 (holding that an idea is abstract when it has "no particular concrete or tangible form," and is "devoid of a concrete or tangible application."). Amazon argues that the claims are written functionally and without specific guidance about the technology used to implement them. *See* Defs.' Mot. at 9.

---

[11] *See, e.g., Alice*, 134 S. Ct. at 2356 ("hedging is a longstanding commercial practice"); *See Bilski*, 130 S. Ct. at 3231 (finding the "fundamental economic practice" of hedging to be patent ineligible); *DDR*, 773 F.3d at 1257 (during step one of the Alice test the Federal Circuit found the claims did not "recite a fundamental economic or longstanding commercial practice"); *In re TLI Commc'ns LLC Patent Litig.*, No. 1:14md2534, 2015 WL 627858, at *6 (E.D. Va. Feb. 6, 2015) ("An abstract idea need not be a "preexisting, fundamental truth" and can instead merely be a "longstanding commercial practice") (quoting *Alice*, 134 S. Ct. at 2356)); *Morales*, 2014 WL 7396568, at *14-16 ("a claim is directed to an abstract idea when it describes a fundamental concept or longstanding practice).

[12] It is within this Court's province to make this finding. The Court notes that "[e]ligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions." *See Cal Inst. of Tech.*, 2014 WL 5661290. at *2, n.6. The Federal Circuit decided a number of post-Alice Rule 12 cases while making general historical observations in determining whether an abstract idea is well-known and longstanding. *See, e.g., buySAFE*, 765 F.3d at 1354-55; *Ultramercial III*, 772 F.3d at 722-23 (Mayer, J., concurring); *Content Extraction*, 776 F.3d at 1347.

15

**A26**

In its briefing, Affinity attempts to distinguish the '085 Patent's claims from the claims held to be abstract in *Ultramercial III*, 772 F.3d at 715 (finding that the claimed invention was directed to the abstract business method of "using advertising as an exchange for currency") and *Morsa v. Facebook, Inc.*, No. SACV 14-161-JLA (JPRx), 2014 WL 7641155, at *6 (C.D. Cal. Dec. 23, 2014) (finding claims abstract because they were directed towards "targeting advertisements to certain consumers" and "using a bidding system to determine when and how advertisements will be displayed."). According to Affinity, the '085 Patent's claims are inherently concrete and tangible because, unlike the claims in *Ultramercial III* and *Morsa*, which were "independent of any concrete or tangible form," the '085 patent's claims involve concrete and tangible elements such as computers, portable devices, and a mobile interface. Pl.'s Resp. at 7.

The process of selecting media, receiving that media, and subsequently playing that media describes an abstract idea, devoid of a concrete or tangible application. As Affinity points out, claim 14 does reference certain seemingly concrete elements such as a "customized user interface," a "network-based media management system" and a "handheld wireless device." '085 Patent col. 20 l. 9, 7, 12.[13] However, the inclusion of "some concrete claim elements—even elements associated with computer- or Internet-based technology—is insufficient to indicate that the claims as a whole are not directed to an abstract idea, if those elements are well overtaken in the claim by the articulation of the abstract idea itself." *TriPlay, Inc. v. WhatsApp Inc.*, 2015 WL 1927696, at *11 (citing *Ultramercial III*, 772 F.3d at 715-16). And although Affinity attempts to distinguish *Ultramercial III*, the claims of the '085 patent are in fact analogous to the abstract

---

[13] Similarly, claim 8 references a "network based media managing system," "a customized website interface," "an electronic device" ('085 Patent col. 19 l. 23-24, 25, 30-31), and claim 1 references a "media managing system" and a "wireless handheld device." *Id.* at col. 18 l. 24, 42.

claims in *Ultramercial III*. In *Ultramercial III*, the Federal Circuit held the process claimed in

the '545 patent was abstract and the addition of "non-routine components to the claimed idea[,]"

such as applying the idea to the Internet, does not "necessarily turn[] an abstraction into

something concrete." 772 F.3d at 715. Here, too, the inclusion of "tangible" components does

nothing to transform the naked concept into something concrete.[14]

Affinity further attempts to support its position by arguing that the claims cannot "be

performed in the human mind, or by a human using a pen and paper." Pl.'s Resp. at 8 (citing

*OpenTV, Inc. v. Apple, Inc.*, No. 14-cv-01622-HSG, 2015 WL 1535328, at *4 (N.D. Cal. Apr. 6,

2015) (internal quotations omitted)). However, Amazon never asserted the claims can be

performed by the human mind alone or with a pen and paper. Defs.' Reply at 2. Further, the

mental-steps approach is not dispositive and is only one test to determine if a claim is directed to

an abstract idea. *See Alice*, 134 S. Ct. 2356-57 (finding a claim to be abstract that required a

computer because it was a fundamental economic practice).

Having found the purpose of the '085 Patent—delivering selectable media content and

subsequently playing the selected content on a portable device—is a well-known and

longstanding commercial practice, devoid of any tangible or concrete application, the Court finds

as a matter of law that the claims of the '085 Patent are directed to an abstract idea. Because the

Court finds the Plaintiff's claims are drawn to an abstract idea, the Court will move to the second

---

[14] Affinity relies on *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, supporting the position that the '085 patent's customized user interface is tangible. No. PWG-14-111, 2015 U.S. Dist. LEXIS 62601 (D. Md. May 12, 2015). But in that case the claimed apparatus actually solved a problem in user interface design by enabling the "manipulation of XML documents by a user not familiar with XML by handling the edits and changes via the use of the PRTs and MRTs." *Id.* at 28. The claims in *Intellectual Ventures*, including the user interface, did not describe a highly general concept. Instead, the claimed invention provided a specific solution to a niche problem and described detailed functions and directions for implementing the technology. In contrast, the '085 Patent does not detail the form the user interface takes or how it is implemented. It describes generic technology performing its basic functionality. Further, other courts have found a "user interface" did not save the claims from abstractness. *See e.g., DietGoal Innovations LLC v. Bravo Media LLC*, 33 F. Supp. 3d 271, 288 (S.D.N.Y. 2014) *aff'd*, 599 F. App'x 956 (Fed. Cir. 2015); *Clear with Computers, LLC v. Altec Indus., Inc.*, No. 6:14-cv-00089, 2015 WL 993392, at *2, *6 (E.D. Tex. Mar. 3, 2015); *MyMedicalRecords, Inc. v. Walgreen Co.*, No. 2:13-cv-00631-ODW (SHx), 2014 WL 7339201, at *3 (C.D. Cal. Dec. 23, 2014).

step of the analysis: determining whether the claims include an inventive concept " 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.' " *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294).

**C.    *Mayo/Alice* step 2:  Do the claims contain an "inventive concept"?**

**1.    Analysis of representative claim 1**

The United States Supreme Court has held that if an abstract idea is found, then at step two of the analysis the Court is to:

> examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application.  A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'  *Mayo* made clear that transformation into a patent-eligible application requires 'more than simply stat[ing] the [abstract idea] while adding the words apply it.

*Id.* at 2357 (internal citations omitted). Further, the Court is to consider claim elements both individually and as an ordered combination. *Id.* at 2355. The "additional features must be more than well-understood, routine, conventional activity." *Ultramercial III*, 772 F.3d at 715 (citing *Mayo*, 132 S. Ct. at 1298) (internal quotations omitted). *Alice* also held that the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." 134 S. Ct. at 2358. The Supreme Court held that "[s]tating an abstract idea while adding the words 'apply it with a computer' " amounts to a "mere instruction to 'implemen[t]' an abstract idea 'on a computer'" and "cannot impart patent eligibility." *Id.*

In its brief, Affinity contends the '085 Patent satisfies the "machine or transformation" ("MOT") test, which is a "useful clue" in the second step of the *Alice* analysis. Pl.'s Resp. at 17. Under the "machine or transformation" test, a claimed process can be patent eligible if: 1) it is tied to a particular machine or apparatus; or 2) it transforms a particular article into a different state or thing. *See Bilski*, 561 U.S. at 603. Affinity only discusses the first prong of the "machine

18

**A29**

or transformation" test with respect to the '085 Patent. Pl.'s Resp. at 17-18. Accordingly, the Court will only apply prong one.

The Court notes that a general purpose computer, coupled with the internet, has been found to be a "ubiquitous information-transmitting medium, not a novel machine," thus failing the machine test. *Ultramercial III*, 772 F.3d at 716-17. Affinity counters that the '085 Patent provides more than a general purpose computer because the claims reference "software and hardware elements that play a significant part in managing and distributing digital multimedia to mobile devices[,]" including a "network based media managing system," "network based delivery resource," and collection of instructions "stored in a 'non-transitory storage medium.'" Pl.'s Resp. at 17-18. Further, Affinity contends the claim steps cannot be performed by a human alone, supporting its position that the claims pass the "machine or transformation" test. *Id.* at 17.

In reviewing representative claim 14, the Court finds it fails the "machine or transformation" test. Specifically, in analyzing claim 14, Affinity merely takes the abstract idea mentioned above and applies it to the Internet and a generic, electronic device—in this case, a wireless handheld device operating as a "ubiquitous information-transmitting medium, not a novel machine." *Ultramercial III*, 772 F.3d at 716-17. Although Affinity alleges the components in Claim 14 are specialized, the Court finds the claim merely sets forth routine and generic processing and storing capabilities of computers generally. The claim described a "network based media managing system," in other words a generic database, with a "non-transitory storage medium"—which could be any kind of memory. '085 Patent col. 20 l. 7, 10. The claim further describes a "network based delivery resource," which is merely a network that sends and receives data [media content] in a streaming form. *Id.* at 19; *see e.g.*, *buySAFE*, 765 F.3d at 1355 (finding that "sending" and "receiving" data over a network is "not even arguably inventive");

19

**A30**

*Ultramercial III*, 772 F.3d at 717 ("transfer of content between computers is merely what they do"); *Wolf*, 2014 WL 7639820, at *12 (holding a "computer network server" to be a generic piece of technology).

Affinity contends "the customized user interface in the claimed inventions by itself is an inventive concept." Pl.'s Resp. at 13. Affinity claims the customized user interface is "integral—and indeed, essential—to the management, selection, and access to streaming media." *Id.* at 13-14. Affinity also argues the "claimed inventions of the '085 patent [were not] well-known, conventional, or routine as of March 2000." *Id.* at 14. The Court notes that, under recent Federal Circuit and district court case law, to determine whether something is an inventive concept, a court must look to see if the patent adds something to the abstract idea that is an "integral" or "significant part" of the invention. *Bancorp,* 687 F.3d at 1278; *TLI Commc'ns*, 2015 WL 627858, at *29 n.34. In other words, and as stated by the Supreme Court in *Mayo,* "[w]hat else is there in the claims before us?" *Mayo*, 132 S. Ct. at 1297. In the instant case, there is nothing sufficient to transform the patent into a patent-eligible invention.

In *Alice,* the Supreme Court set out a "technological arts"[15] test, finding that the asserted method and system claims: 1) do not "purport to improve the functioning of the computer itself," 2) "nor do they effect an improvement in any other technology or technical field." *Alice,* 134 S. Ct. at 2359. In order to satisfy the technological arts test, claims must "not only [1]] describe a technological objective, but [2]] set out a precise set of instructions for achieving it." *Ultramercial III*, 772 F.3d at 721-22 (Mayer, J., concurring). In determining whether a claim presents an inventive concept, the Federal Circuit and post-*Alice* district courts have examined whether the inventive concept has a "specific functionality" or explains the "how" as to the

---

[15] *See Ultramercial III*, 772 F.3d at 721 (Mayer, J., concurring).

manner in which the inventive concept performs. *See id.*; *see also TriPlay,* 2015 WL 1927696, at

*15; *TLI Commc'ns,* 2015 WL 627858, at *19-20. In *TLI,* the Eastern District of Virginia, in

examining whether the claimed limitation was an inventive concept, found the Federal Circuit's

decision in *Dealertrack, Inc. v. Huber,* 674 F.3d 1315 (Fed. Cir. 2012) instructive, wherein the

circuit court noted:

> Although the district court construed 'computer aided' as a limitation, the '427
> patent does not specify how the computer hardware and database are specially
> programmed to perform the steps claimed in the patent . . . The claims are silent
> as to *how* a computer aids the method, the *extent* to which a computer aids the
> method, or the *significance* of a computer to the performance of the method. The
> undefined phrase 'computer aided' is no less abstract than the idea of a
> clearinghouse itself.

*Id.* at *18. (citing *Dealertrack,* 674 F.3d at 1333) (emphasis added). In the instant case, the claim

limitations of Affinity's '085 Patent, specifically the customized user interface, do not identify

any specific functionality or explain "how" this customization is to be achieved. On its face,

claim 14 merely enables the device to present a "graphical user interface for the network based

media managing system." '085 Patent col. 20 l. 13-14. The claim is devoid of any specific

technology or instructions that explain how the device can do what it purports to do or direct the

practitioner how to carry out the claims. This is a generic computer component that does not

contain an inventive concept. *See Cloud Satchel v. Amazon.com, Inc.,* No. 13–941–SLR, 2014

WL 7227942 (D. Del. Dec. 18, 2014). In *Cloud Satchel,* the limitations present in the dependent

claims included a "display unit and a graphical user interface." *Id.* at 12 n.9. The defendants

contended that such limitations merely recited "generic computer components" or "token

postsolution components." *Id.* In finding the patent invalid, the District of Delaware concluded

that "the claimed computers and hardware elements of the claimed subsystem are generic." *Id.* at

8. Likewise, this Court finds that the "graphical user interface" is a generic computer component.

As a final point on "customized" or "graphical user interfaces," the Court finds the *Trading Techs.* decision provides a useful distinction. In *Trading Techs.*, the Northern District of Illinois determined that graphical user interfaces designed to display a "static price axis" for commodities trading "recite[d] an invention that is not merely the routine or conventional use of computers or the Internet," but rather "eliminated some problems of prior GUIs relating to speed, accuracy and usability." 2015 WL 774655, at *5 (internal quotations omitted). First, the undersigned notes the Northern District of Illinois initially stated that "the recitation of a GUI in the claims of the patents in suit does not automatically impart patent eligibility." *Id.* Rather, the district court found that the "claims are directed to a *technological improvement* of GUIs." *Id.* (emphasis supplied). As such, *Trading Techs.* is distinguishable because unlike in the instant case, the claims of the patent in the case examined by the Northern District of Illinois explained the "how" and "specific functionality" of the graphical user interface resulting in a technological improvement. As explained above, the claims of the '085 Patent present the customized/graphical user interface as merely a generic computer component.

Finally, Affinity finds its patent claims analogous to the claims in *DDR Holdings*. Pl.'s Resp. at 12. Affinity contends, as in *DDR Holdings*, "the claims of the '085 patent addressed a technological problem with a technological solution." *Id.* Prior to Affinity's alleged invention, "a user interested in media content" was generally limited "to a wired connection." *Id.* Affinity contends the '085 Patent "overcame [this] challenge[] through a media management and distribution system that allows streaming a rich collection of media to a user, so that the user can access and play that media on a mobile device." *Id.* at 13. However, unlike the patent in *DDR Holdings*, the claims here do not address a "challenge particular to the internet" nor did the claims solve a problem "specifically arising in the realm of computer networks." 773 F.3d at

22

**A33**

1257. Further, the claims in *DDR Holdings* passed the second step of *Alice* because they detailed "how interactions with the internet are manipulated to yield a desired result" and a specific way to do so. *Id.* at 1258-60. In the instant case, the claims of the '085 Patent do not explain *how* streaming is accomplished, *how* interface customization is enabled, or *how* to implement the claimed media management system.

Therefore, the Court finds as a matter of law that claim 14, the representative claim of the '085 Patent, does not contain an inventive concept that would add something to the abstract idea that is an "integral" or "significant part" of the invention. Since claim 14 is representative of claims 1 and 8, those claims are likewise abstract and contain no inventive concept. The Court will now review the dependent claims to determine if they add an inventive concept to the independent claims.

### 2.   Analysis of dependent claims

The dependent claims of the '085 Patent consist of claims 2-7 and 15-20 of the system claims and 9-13 of the method claims. Defendants allege the dependent claims of the '085 Patent add only trivial limitations insufficient to confer patentability. The Court agrees.

The other asserted claims add little to the substance of claims 1, 8, and 14. To escape invalidity, the dependent claims of the '085 Patent must "offer[] a meaningful limitation" over the abstract idea claimed by the independent claims. *Alice*, 134 S. Ct. at 2360. Claims 6, 7, 9, 10, and 15 recite generic network systems that stream or deliver audio or video content using generic computing functions and only limit the claims to a particular technological environment. *buySAFE*, 765 F.3d at 1355 (generic computing functionality adds nothing inventive to the abstract idea); *Alice*, 134 S. Ct. at 2358 ("patenting abstract ideas cannot be circumvented" by "generic computer implementation" or "by attempting to limit the use of [the idea] to a particular

23

**A34**

technological environment"). Likewise, claims 2, 12, and 13 merely apply the abstract idea to a wireless device with a conventional display or a generic software application. Other courts have held these types of claims do not add an inventive concept,[16] as the claims solely detail general-purpose computing equipment or functionalities, none which is particularized in the claims.

Claims 3, 4, and 11 merely recite music and text media content. *See Ultramercial III*, 772 F.3d at 712 (finding no inventive concept in the patent where one of the claims included receiving "media products . . . being comprised of at least one of text data, music data, and video data"). Claim 5 recites "targeted advertising," which predates the patent with activities such as: targeted commercial advertisements for particular goods on certain types of broadcasts. *Morsa*, 2014 WL 7641155, at \*6, \*9 (holding a patent for targeted advertising to be an abstract idea and did not contain an inventive concept). Claim 16 describes buffering while delivering content, which is just manipulation of data flow and is not inventive. *See CyberSource*, 654 F.3d at 1375 ("[t]he mere manipulation or reorganization of data" is not an inventive concept). Last, claims 17, 18, 19, and 20 recite how users access the content: by browsing, requesting, and acquiring the right to access content.[17] Affinity summarily attempts to defend dependent claims 2, 15, 16, and 18. Affinity alleges the claims contain limitations "rooted in computer technology, which all include inventive concepts." Pl.'s Resp. at 20. According to Affinity, claims 2 and 18 enabled "the wireless device to communicate streaming content to yet another device." *Id.* However, as

---

[16] *See Wolf*, 2014 WL 7639820, at \*12 (holding a "computer network server" to be a generic piece of technology); *Alice*, 134 S. Ct. at 2358 ("generic computer implementation" does not supply the necessary inventive concept); *Bilski*, 561 U.S. at 610-11 ("patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment") (internal quotations omitted); *buySAFE*, 765 F.3d at 1355 (generic computer functionality, including "receiv[ing] and send[ing] the information over network—with no further specification—is not even arguably inventive").

[17] *See Ultramercial III*, 772 F.3d at 712, 716 (finding no inventive concept in the patent where one of the claims included how users access content including restricting access); *Wolf*, 2014 WL 7639820, at \*2-3, \*12 (finding the claims lacked inventive concept which contained a browse feature); *IpLearn v. K12 Inc.*, No. 11-1026-RGA, 2014 U.S. Dist. LEXIS 173850, at \*16 (D. Del. Dec. 17, 2014) (finding no inventive concept when one of the claims included a share feature for content "to be shared with others"); *Intellectual Ventures I, LLC v. Motorola Mobility LLC*, No. CV 11-908-SLR, 2015 WL 846532, at \*7 (D. Del. Feb. 24, 2015) (claims reciting generic steps of "presenting, sending and receiving" the requested content did not supply an inventive concept).

24

**A35**

mentioned previously, those claims only include generic computing equipment or functions and do not contain an inventive concept. *See Wolf*, 2014 WL 7639820, at *12; *Alice*, 134 S. Ct. at 2358; *buySAFE*, 765 F.3d at 1355. Affinity contends claim 16, which describes the process of buffering, adds an inventive concept. However, despite Affinity's best effort to convince the Court otherwise, "buffering is and always has been an incidental and conventional step in transmitting data." Defs.' Mot. at 17; *See CyberSource*, 654 F.3d at 1375. Claim 15 describes the request for and delivering of content over a network, however the Federal Circuit held sending and receiving information over a network "is not even arguably inventive." *buySAFE*, 765 F.3d at 1355.

In sum, the dependent system and method claims, considered with Claims 1, 8, and 14, either individually or as an ordered combination, all describe conventional, well known and routine concepts, accomplished using computer hardware and software recited in "purely functional and generic" terms and are invalid under § 101. *See Alice,* 134 S. Ct. at 2360. Accordingly, the Court finds as a matter of law that the dependent claims do not add something to the abstract idea that is an "integral" or "significant part" of the invention.

**D. Preemption inquiry**

United States Supreme Court jurisprudence makes it clear that the rationale for excluding laws of nature, natural phenomena and abstract ideas from patentability is the concern of preemption. *See Alice*, 134 S. Ct. at 2354. "'[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Id.* (quoting *Mayo*, 132 S. Ct. at 1293). In analyzing whether a patent is preemptive, the Supreme Court has stated that the relevant question is "how much future innovation is foreclosed relative to the contribution of the inventor." *Mayo,*

132 S. Ct. at 1303. The concern recognized by the Supreme Court is that "patent law not inhibit further discovery by improperly tying up the future use of" "the basic tools of scientific and technological work" which the Court has found to be the basic "building blocks of human ingenuity." *Alice*, 134 S. Ct. at 2354. Although much of the preemption analysis is subsumed in step two of the *Mayo/Alice* analysis, it will also be addressed separately by the Court. *See Open Text, S.A. v. Box, Inc., et al.*, No. 13-cv-04910-JD, 2015 WL 269036, at *4 (N.D. Cal. Jan. 20, 2015) (the "preemption concern . . . is [] baked into the *Mayo/Alice* test"). Affinity argues that the claimed inventions of the '085 Patent do not risk preemption because the patent's claims do not cover radio, portable televisions, "portable DVD players, CD players, traditional MP3 players . . . or the Walkman." Pl.'s Resp. at 16. However, Amazon contends that the '085 patent is preemptive because it prohibits anyone wishing to implement the abstract idea of playing media on a portable device "without risking an infringement suit by Affinity." Defs.' Reply at 6. Amazon further argues that "[p]atents like Affinity's, which are agnostic about the specific technology used to implement its claimed invention, create an unreasonable risk of burdening *all* present and future ways of doing so and threaten innovation." *Id.* (emphasis in original).

In determining how much future innovation is foreclosed relative to the contribution of the inventor, a claim need not tie up the entire field to be preemptive, rather the concern is whether the claim "tie[s] up too much future use" of the abstract idea. *See Mayo*, 132 S. Ct. at 1302. In other words, the "pre-emption inquiry focuses on whether the patent 'would risk disproportionately tying up the use of the underlying ideas.'" *Cloud Satchel*, 2014 WL 7227942 at *9 (citing *Alice*, 134 S. Ct. at 2354; *Mayo*, 132 S. Ct. at 1294).

On the issue of preemption, the analysis of steps one and two under the *Mayo/Alice* test leads the Court to side with Defendants. Allowing the asserted claims to survive would curb any

26

**A37**

innovation related to the implementation of the abstract idea on potentially any portable device that utilizes the Internet. The asserted claims of the '085 patent preempt delivering selectable media content and subsequently playing the selected content on a portable device, thereby monopolizing the idea, as is evidenced by the scope in the specification, on ubiquitous devices such as: "a network radio, a modular device, an audio system, a personal digital assistant (PDA), a cellular phone, or other electron devices." '085 Patent col 4 l. 35-37. In this case, it is clear neither the system nor method claims, considered individually or as an ordered combination, impose any significant limitation on the abstract idea and, therefore, disproportionately tie up the future use of that idea.

### IV. Conclusion and Recommendations

For the foregoing reasons, the undersigned **RECOMMENDS** that the Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) be **GRANTED** and that this matter be **DISMISSED.**

It is further recommended that Defendants' pending Motions to transfer Venue to the Western District of Texas, Austin division be **DENIED as MOOT.**

The parties may wish to file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Commc'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from

**A38**

appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc). To the extent that a party has not been electronically served by the Clerk with this Report and Recommendation pursuant to the CM/ECF procedures of this district, the Clerk is directed to send such party a copy of this Report and Recommendation by a national overnight delivery service having confirmation of pickup and delivery.

SIGNED this 12th day of June, 2015.

JEFFREY C. MANSKE
U.S. MAGISTRATE JUDGE

**A39**



US008688085B2

(12) **United States Patent**
White et al.

(10) Patent No.: **US 8,688,085 B2**
(45) Date of Patent: **Apr. 1, 2014**

(54) **SYSTEM AND METHOD TO COMMUNICATE TARGETED INFORMATION**

(71) Applicants: **Russell W. White**, Austin, TX (US);
**Kevin R. Imes**, Austin, TX (US)

(72) Inventors: **Russell W. White**, Austin, TX (US);
**Kevin R. Imes**, Austin, TX (US)

(73) Assignee: **Affinity Labs of Texas, LLC**, Dripping
Springs, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/854,232**

(22) Filed: **Apr. 1, 2013**

(65) **Prior Publication Data**
US 2013/0325628 A1    Dec. 5, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/117,507, filed on
May 27, 2011, now Pat. No. 8,521,140, which is a
continuation of application No. 12/495,190, filed on
Jun. 30, 2009, now Pat. No. 7,953,390, which is a
continuation of application No. 12/015,320, filed on
Jan. 16, 2008, now Pat. No. 7,778,595, which is a
continuation of application No. 10/947,755, filed on
Sep. 23, 2004, now Pat. No. 7,324,833, which is a
continuation of application No. 09/537,812, filed on
Mar. 28, 2000, now Pat. No. 7,187,947.

(51) **Int. Cl.**
*H04M 3/42*    (2006.01)

(52) **U.S. Cl.**
USPC ................. **455/414.1**; 455/410; 455/414.3

(58) **Field of Classification Search**
USPC ............... 455/410 412.2, 414.1 414.3, 466,
455/550.1, 556.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,582,926 | A | 6/1971 | Hassan |
| 4,291,749 | A | 9/1981 | Ootsuka et al. |
| 4,314,232 | A | 2/1982 | Tsunoda |
| 4,337,821 | A | 7/1982 | Saito |
| 4,401,848 | A | 8/1983 | Tsunoda |
| 4,407,564 | A | 10/1983 | Ellis |
| 4,419,730 | A | 12/1983 | Ito et al. |
| 4,441,405 | A | 4/1984 | Takeuchi |
| 4,481,584 | A | 11/1984 | Holland |
| 4,536,739 | A | 8/1985 | Nobuta |
| 4,570,217 | A | 2/1986 | Allen et al. |
| 4,582,389 | A | 4/1986 | Wood et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2225910 | 12/1997 |
| CN | 1218258 | 6/1999 |

(Continued)

OTHER PUBLICATIONS

Richard Menta, "1200 Song MP3 Portable Is A Milestone Player,"
Jan. 11, 2000, pp. 1-3.

(Continued)

*Primary Examiner* — Kashif Siddiqui

(57) **ABSTRACT**

A method for targeted advertising is disclosed. The method
includes accessing at least one piece of demographic infor-
mation associated with a user of a portable device, selecting
an advertisement to be delivered to the user based at least in
part on the demographic information, and initiating commu-
nication of a version of the advertisement configured for
presentation at the portable device.

**20 Claims, 8 Drawing Sheets**



**US 8,688,085 B2**

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,636,782 A | 1/1987 | Nakamura et al. |
| 4,716,458 A | 12/1987 | Heitzman et al. |
| 4,731,769 A | 3/1988 | Schaefer |
| 4,740,779 A | 4/1988 | Cleary et al. |
| 4,740,780 A | 6/1988 | Brown et al. |
| 4,752,824 A | 6/1988 | Moore |
| 4,795,223 A | 1/1989 | Moss |
| 4,802,492 A | 2/1989 | Grunstein |
| 4,807,292 A | 2/1989 | Sorscher |
| 4,809,177 A | 2/1989 | Windle et al. |
| 4,812,843 A | 3/1989 | Champion, III et al. |
| 4,817,203 A | 3/1989 | Tsurumoto et al. |
| 4,818,048 A | 4/1989 | Moss |
| 4,827,520 A | 5/1989 | Zeinstra |
| 4,837,551 A | 6/1989 | Iino |
| 4,876,594 A | 10/1989 | Schiffman |
| 4,905,272 A | 2/1990 | Van de Mortel |
| 4,914,705 A | 4/1990 | Nigawara |
| 4,977,509 A | 12/1990 | Pitchford et al. |
| 4,988,976 A | 1/1991 | Lu |
| 4,995,258 A | 2/1991 | Frank |
| 4,996,959 A | 3/1991 | Akimoto |
| 4,999,622 A | 3/1991 | Amano et al. |
| 5,006,829 A | 4/1991 | Miyamoto et al. |
| 5,051,735 A | 9/1991 | Furukawa |
| 5,070,323 A | 12/1991 | Iino et al. |
| 5,124,915 A | 6/1992 | Krenzel |
| 5,164,904 A | 11/1992 | Sumner |
| 5,179,385 A | 1/1993 | O'Loughlin et al. |
| 5,198,797 A | 3/1993 | Daidoji |
| 5,203,499 A | 4/1993 | Knittel |
| 5,214,413 A | 5/1993 | Okabayashi |
| 5,214,707 A | 5/1993 | Fujimoto |
| 5,214,793 A | 5/1993 | Conway |
| 5,239,700 A | 8/1993 | Guenther |
| 5,257,190 A | 10/1993 | Crane |
| 5,270,689 A | 12/1993 | Hermann |
| 5,274,560 A | 12/1993 | LaRue |
| 5,278,532 A | 1/1994 | Hegg |
| 5,293,115 A | 3/1994 | Swanson |
| 5,299,132 A | 3/1994 | Wortham |
| 5,307,326 A | 4/1994 | Osawa |
| 5,327,558 A | 7/1994 | Burke |
| 5,335,743 A | 8/1994 | Gillbrand |
| 5,345,817 A | 9/1994 | Grenn |
| 5,351,041 A | 9/1994 | Ikata |
| 5,361,165 A | 11/1994 | Stringfellow |
| 5,363,355 A | 11/1994 | Takagi |
| 5,371,510 A | 12/1994 | Miyauchi |
| 5,388,248 A | 2/1995 | Robinson |
| 5,400,045 A | 3/1995 | Aoki |
| 5,400,246 A | 3/1995 | Wilson |
| 5,404,443 A | 4/1995 | Hirata |
| 5,408,686 A | 4/1995 | Mankovitz |
| 5,410,326 A | 4/1995 | Goldstein |
| 5,414,439 A | 5/1995 | Groves |
| 5,416,318 A | 5/1995 | Hegyi |
| 5,418,962 A | 5/1995 | Bodin |
| 5,420,573 A | 5/1995 | Tanaka |
| 5,422,565 A | 6/1995 | Swanson |
| 5,432,904 A | 7/1995 | Wong |
| 5,440,428 A | 8/1995 | Hegg |
| 5,442,553 A | 8/1995 | Parrillo |
| 5,442,557 A | 8/1995 | Kaneko |
| 5,450,321 A | 9/1995 | Crane |
| 5,450,471 A | 9/1995 | Hanawa |
| 5,450,613 A | 9/1995 | Takahara |
| 5,475,399 A | 12/1995 | Borsuk |
| 5,475,835 A | 12/1995 | Hickey |
| 5,479,157 A | 12/1995 | Suman |
| 5,483,632 A | 1/1996 | Kuwamoto |
| 5,486,840 A | 1/1996 | Borrego |
| 5,488,357 A | 1/1996 | Sato |
| 5,493,658 A | 2/1996 | Chiang |
| 5,497,271 A | 3/1996 | Mulvanny |
| 5,504,482 A | 4/1996 | Schreder |
| 5,504,622 A | 4/1996 | Oikawa |
| 5,506,595 A | 4/1996 | Fukano |
| 5,511,724 A | 4/1996 | Freiberger |
| 5,519,410 A | 5/1996 | Smalanskas |
| 5,523,559 A | 6/1996 | Swanson |
| 5,524,051 A | 6/1996 | Ryan |
| 5,525,977 A | 6/1996 | Suman |
| 5,528,248 A | 6/1996 | Steiner |
| 5,528,496 A | 6/1996 | Brauer |
| 5,532,684 A | 7/1996 | Katsu |
| 5,534,888 A | 7/1996 | Lebby |
| 5,539,645 A | 7/1996 | Mandhyan |
| 5,539,658 A | 7/1996 | McCullough |
| 5,539,869 A | 7/1996 | Spoto |
| 5,543,789 A | 8/1996 | Behr |
| 5,547,125 A | 8/1996 | Hennessee |
| 5,553,661 A | 9/1996 | Beyerlein et al. |
| 5,555,172 A | 9/1996 | Potter |
| 5,555,286 A | 9/1996 | Tendler |
| 5,555,502 A | 9/1996 | Opel |
| 5,557,541 A | 9/1996 | Schuhof et al. |
| 5,568,390 A | 10/1996 | Hirota et al. |
| 5,576,724 A | 11/1996 | Fukatsu et al. |
| 5,586,090 A | 12/1996 | Otte |
| 5,587,560 A | 12/1996 | Crooks |
| 5,589,090 A | 12/1996 | Song |
| 5,594,709 A | 1/1997 | Nagano et al. |
| 5,594,779 A | 1/1997 | Goodman |
| 5,596,319 A | 1/1997 | Spry |
| 5,604,676 A | 2/1997 | Penzias |
| 5,614,895 A | 3/1997 | Ohomori et al. |
| 5,616,876 A | 4/1997 | Cluts |
| 5,619,412 A | 4/1997 | Hapka |
| 5,621,252 A | 4/1997 | Bucknam |
| 5,625,608 A | 4/1997 | Grewe et al. |
| 5,625,668 A | 4/1997 | Loomis et al. |
| 5,627,547 A | 5/1997 | Ramaswamy et al. |
| 5,638,305 A | 6/1997 | Kobayashi et al. |
| 5,639,305 A | 6/1997 | Brown et al. |
| 5,646,608 A | 7/1997 | Shintani |
| 5,650,929 A | 7/1997 | Potter et al. |
| 5,653,386 A | 8/1997 | Hennessee et al. |
| 5,654,715 A | 8/1997 | Hayashikura et al. |
| 5,657,221 A | 8/1997 | Warman et al. |
| 5,661,652 A | 8/1997 | Sprague et al. |
| 5,664,228 A | 9/1997 | Mital |
| 5,666,102 A | 9/1997 | Lahiff |
| 5,670,953 A | 9/1997 | Satoh et al. |
| 5,677,837 A | 10/1997 | Reynolds |
| 5,682,525 A | 10/1997 | Bouve et al. |
| 5,684,490 A | 11/1997 | Young et al. |
| 5,691,695 A | 11/1997 | Lahiff |
| 5,694,120 A | 12/1997 | Indekeu |
| 5,699,056 A | 12/1997 | Yoshida |
| 5,699,255 A | 12/1997 | Ellis et al. |
| 5,702,165 A | 12/1997 | Koibuchi |
| 5,712,640 A | 1/1998 | Andou et al. |
| 5,715,474 A | 2/1998 | Burke et al. |
| 5,721,827 A | 2/1998 | Logan et al. |
| 5,732,216 A | 3/1998 | Logan et al. |
| 5,734,973 A | 3/1998 | Honda |
| 5,742,226 A | 4/1998 | Szabo et al. |
| 5,742,893 A | 4/1998 | Frank |
| 5,752,754 A | 5/1998 | Amitani et al. |
| 5,754,774 A | 5/1998 | Bittinger et al. |
| 5,754,775 A | 5/1998 | Adamson et al. |
| 5,757,359 A | 5/1998 | Morimoto et al. |
| 5,758,311 A | 5/1998 | Tsuji et al. |
| 5,760,742 A | 6/1998 | Branch et al. |
| 5,772,534 A | 6/1998 | Dudley |
| 5,774,070 A | 6/1998 | Rendon |
| 5,774,793 A | 6/1998 | Cooper |
| 5,774,827 A | 6/1998 | Smith, Jr. et al. |
| 5,777,394 A | 7/1998 | Arold |
| 5,790,973 A | 8/1998 | Blaker et al. |
| 5,790,974 A | 8/1998 | Tognazzini |
| 5,794,164 A | 8/1998 | Beckert et al. |
| 5,798,759 A | 8/1998 | Dahl |

**US 8,688,085 B2**
Page 3

(56)             **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,806,018 A | 9/1998 | Smith et al. |
| 5,808,224 A | 9/1998 | Kato |
| 5,808,566 A | 9/1998 | Behr et al. |
| 5,812,870 A | 9/1998 | Kikinis et al. |
| 5,819,160 A | 10/1998 | Foladare et al. |
| 5,822,098 A | 10/1998 | Morgaine |
| 5,835,732 A | 11/1998 | Kikinis et al. |
| 5,839,108 A | 11/1998 | Daberko et al. |
| 5,864,305 A | 1/1999 | Rosenquist |
| 5,867,494 A | 2/1999 | Krishnaswamy et al. |
| 5,870,660 A | 2/1999 | Ito et al. |
| 5,870,680 A | 2/1999 | Guerlin et al. |
| 5,875,412 A | 2/1999 | Sulich et al. |
| 5,878,282 A | 3/1999 | Mital |
| 5,885,085 A | 3/1999 | Fujita |
| 5,900,564 A | 5/1999 | Kurakake |
| 5,908,464 A | 6/1999 | Kishigami et al. |
| 5,917,405 A | 6/1999 | Joao |
| 5,919,239 A | 7/1999 | Fraker et al. |
| 5,919,246 A | 7/1999 | Waizmann et al. |
| 5,926,624 A | 7/1999 | Katz et al. |
| 5,940,767 A | 8/1999 | Bourgeois et al. |
| 5,953,005 A | 9/1999 | Liu |
| 5,953,657 A | 9/1999 | Ghisler |
| 5,953,659 A | 9/1999 | Kotzin et al. |
| 5,956,029 A | 9/1999 | Okada et al. |
| 5,956,651 A | 9/1999 | Willkie et al. |
| 5,963,916 A | 10/1999 | Kaplan |
| 5,969,283 A | 10/1999 | Looney et al. |
| 5,969,826 A | 10/1999 | Dash et al. |
| 5,974,333 A | 10/1999 | Chen |
| 5,982,298 A | 11/1999 | Lappenbusch et al. |
| 5,987,381 A | 11/1999 | Oshizawa |
| 5,987,394 A | 11/1999 | Takakura et al. |
| 5,990,803 A | 11/1999 | Park |
| 5,999,525 A | 12/1999 | Krishnaswamy et al. |
| 5,999,877 A | 12/1999 | Takahashi et al. |
| 6,006,115 A | 12/1999 | Wingate |
| 6,006,161 A | 12/1999 | Katou |
| 6,009,355 A | 12/1999 | Obradovich et al. |
| 6,009,363 A | 12/1999 | Beckert et al. |
| 6,014,569 A | 1/2000 | Bottum |
| 6,014,689 A | 1/2000 | Budge et al. |
| 6,018,571 A | 1/2000 | Langlois et al. |
| 6,023,232 A | 2/2000 | Eitzenberger |
| 6,023,241 A | 2/2000 | Clapper |
| 6,029,064 A | 2/2000 | Farris |
| 6,032,089 A | 2/2000 | Buckley |
| 6,041,023 A | 3/2000 | Lakhansingh |
| 6,047,234 A | 4/2000 | Cherveny et al. |
| 6,047,327 A | 4/2000 | Tso et al. |
| 6,055,478 A | 4/2000 | Heron |
| 6,061,306 A | 5/2000 | Buchheim |
| 6,083,009 A | 7/2000 | Kim et al. |
| 6,084,584 A | 7/2000 | Nahi et al. |
| 6,088,730 A | 7/2000 | Kato |
| 6,091,067 A | 7/2000 | Drobot et al. |
| 6,100,884 A | 8/2000 | Tomita et al. |
| 6,104,334 A | 8/2000 | Allport |
| 6,114,970 A | 9/2000 | Kirson et al. |
| 6,115,669 A | 9/2000 | Watanabe et al. |
| 6,121,282 A | 9/2000 | Dominianni et al. |
| 6,122,403 A | 9/2000 | Rhoads |
| 6,128,559 A | 10/2000 | Saitou et al. |
| 6,131,060 A | 10/2000 | Obradovich et al. |
| 6,133,853 A | 10/2000 | Obradovich et al. |
| 6,144,358 A | 11/2000 | Narayanaswamy et al. |
| 6,144,848 A | 11/2000 | Walsh |
| 6,147,938 A | 11/2000 | Ogawa et al. |
| 6,148,261 A | 11/2000 | Obradovich et al. |
| 6,150,925 A | 11/2000 | Casazza |
| 6,151,634 A | 11/2000 | Glaser |
| 6,157,619 A | 12/2000 | Ozluturk et al. |
| 6,157,725 A | 12/2000 | Becker |
| 6,160,551 A | 12/2000 | Naughton et al. |
| 6,161,071 A | 12/2000 | Shuman et al. |
| 6,163,079 A | 12/2000 | Miyazaki et al. |
| 6,163,711 A | 12/2000 | Juntunen et al. |
| 6,167,253 A | 12/2000 | Farris |
| 6,169,515 B1 | 1/2001 | Mannings et al. |
| 6,175,782 B1 | 1/2001 | Obradovich et al. |
| 6,175,789 B1 | 1/2001 | Beckert et al. |
| 6,177,950 B1 | 1/2001 | Robb |
| 6,178,403 B1 | 1/2001 | Detlef |
| 6,178,514 B1 | 1/2001 | Wood |
| 6,182,006 B1 | 1/2001 | Meek |
| 6,185,491 B1 | 2/2001 | Gray et al. |
| 6,189,057 B1 | 2/2001 | Schwanz et al. |
| 6,192,340 B1 | 2/2001 | Abecassis |
| 6,196,846 B1 | 3/2001 | Berger et al. |
| 6,199,076 B1 | 3/2001 | Logan |
| 6,201,540 B1 | 3/2001 | Gallup et al. |
| 6,202,008 B1 | 3/2001 | Beckert et al. |
| 6,225,984 B1 | 5/2001 | Crawford |
| 6,230,322 B1 | 5/2001 | Saib |
| 6,232,539 B1 | 5/2001 | Looney |
| 6,233,430 B1 | 5/2001 | Helferich |
| 6,236,832 B1 | 5/2001 | Ito |
| 6,236,918 B1 | 5/2001 | Sonoda et al. |
| 6,240,297 B1 | 5/2001 | Jadoul |
| 6,240,347 B1 | 5/2001 | Everhart et al. |
| 6,243,725 B1 | 6/2001 | Hempleman et al. |
| 6,246,935 B1 | 6/2001 | Buckley |
| 6,247,130 B1 | 6/2001 | Fritsch |
| 6,248,946 B1 | 6/2001 | Dwek |
| 6,253,061 B1 | 6/2001 | Helferich |
| 6,255,961 B1 | 7/2001 | Van Ryzin et al. |
| 6,262,724 B1 | 7/2001 | Crow et al. |
| 6,275,231 B1 | 8/2001 | Obradovich |
| 6,278,531 B1 | 8/2001 | Tesavis |
| 6,278,676 B1 | 8/2001 | Anderson et al. |
| 6,278,842 B1 | 8/2001 | Yamazaki et al. |
| 6,278,884 B1 | 8/2001 | Kim |
| 6,282,464 B1 | 8/2001 | Obradovich |
| 6,289,382 B1 | 9/2001 | Bowman-Amuah |
| 6,292,440 B1 | 9/2001 | Lee |
| 6,292,743 B1 | 9/2001 | Pu et al. |
| 6,301,116 B1 | 10/2001 | Tamura |
| 6,314,094 B1 | 11/2001 | Boys |
| 6,314,326 B1 | 11/2001 | Fuchu |
| 6,332,163 B1 | 12/2001 | Bowman-Amuah |
| 6,335,927 B1 | 1/2002 | Elliott et al. |
| 6,339,706 B1 | 1/2002 | Tillgren |
| 6,339,832 B1 | 1/2002 | Bowman-Amuah |
| 6,344,861 B1 | 2/2002 | Naughton et al. |
| 6,349,352 B1 | 2/2002 | Lea |
| 6,353,637 B1 | 3/2002 | Mansour et al. |
| 6,363,240 B1 | 3/2002 | Ito |
| 6,377,825 B1 | 4/2002 | Kennedy et al. |
| 6,396,164 B1 | 5/2002 | Barnea et al. |
| 6,396,769 B1 | 5/2002 | Polany |
| 6,401,085 B1 | 6/2002 | Gershman |
| 6,407,750 B1 | 6/2002 | Gioscia |
| 6,418,138 B1 | 7/2002 | Cerf |
| 6,418,330 B1 | 7/2002 | Lee |
| 6,418,421 B1 | 7/2002 | Hurtado et al. |
| 6,420,975 B1 | 7/2002 | DeLine |
| 6,421,305 B1 | 7/2002 | Gioscia et al. |
| 6,422,941 B1 | 7/2002 | Thorner et al. |
| 6,425,018 B1 | 7/2002 | Kaganas et al. |
| 6,434,459 B2 | 8/2002 | Wong et al. |
| 6,434,568 B1 | 8/2002 | Bowman-Amuah |
| 6,434,628 B1 | 8/2002 | Bowman-Amuah |
| 6,438,594 B1 | 8/2002 | Bowman-Amuah |
| 6,442,748 B1 | 8/2002 | Bowman-Amuah |
| 6,446,080 B1 | 9/2002 | Van Ryzin et al. |
| 6,449,541 B1 | 9/2002 | Goldberg et al. |
| 6,453,281 B1 | 9/2002 | Walters |
| 6,456,892 B1 | 9/2002 | Dara-Abrams et al. |
| 6,476,825 B1 | 11/2002 | Croy et al. |
| 6,477,580 B1 | 11/2002 | Bowman-Amuah |
| 6,477,665 B1 | 11/2002 | Bowman-Amuah |
| 6,493,546 B2 | 12/2002 | Patsiokas |
| 6,493,743 B2 | 12/2002 | Suzuki |

**A42**

**US 8,688,085 B2**

Page 4

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,496,205 | B1 | 12/2002 | White |
| 6,496,692 | B1 | 12/2002 | Shanahan |
| 6,496,850 | B1 | 12/2002 | Bowman-Amuah |
| 6,501,832 | B1 | 12/2002 | Saylor et al. |
| 6,502,213 | B1 | 12/2002 | Bowman-Amuah |
| 6,507,762 | B1 | 1/2003 | Amro et al. |
| 6,509,716 | B2 | 1/2003 | Yi |
| 6,510,210 | B1 | 1/2003 | Baughan |
| 6,510,325 | B1 | 1/2003 | Mack, II et al. |
| 6,516,466 | B1 | 2/2003 | Jackson |
| 6,526,335 | B1 | 2/2003 | Treyz |
| 6,529,909 | B1 | 3/2003 | Bowman-Amuah |
| 6,529,948 | B1 | 3/2003 | Bowman-Amuah |
| 6,539,396 | B1 | 3/2003 | Bowman-Amuah |
| 6,549,942 | B1 | 4/2003 | Janky |
| 6,549,949 | B1 | 4/2003 | Bowman-Amuah |
| 6,550,057 | B1 | 4/2003 | Bowman-Amuah |
| 6,559,773 | B1 | 5/2003 | Berry |
| 6,564,243 | B1 | 5/2003 | Yedidia et al. |
| 6,571,282 | B1 | 5/2003 | Bowman-Amuah |
| 6,578,068 | B1 | 6/2003 | Bowman-Amuah |
| 6,584,403 | B2 | 6/2003 | Bunn |
| 6,587,127 | B1 | 7/2003 | Leeke et al. |
| 6,587,825 | B1 | 7/2003 | Treyz et al. |
| 6,587,835 | B1 | 7/2003 | Treyz et al. |
| 6,591,085 | B1 | 7/2003 | Grady |
| 6,594,723 | B1 | 7/2003 | Chapman et al. |
| 6,594,740 | B1 | 7/2003 | Fukuda |
| 6,594,774 | B1 | 7/2003 | Chapman et al. |
| 6,601,192 | B1 | 7/2003 | Bowman-Amuah |
| 6,601,234 | B1 | 7/2003 | Bowman-Amuah |
| 6,606,082 | B1 | 8/2003 | Zuberec |
| 6,606,660 | B1 | 8/2003 | Bowman-Amuah |
| 6,606,744 | B1 | 8/2003 | Mikurak |
| 6,609,105 | B2 | 8/2003 | Van Zoest et al. |
| 6,615,199 | B1 | 9/2003 | Bowman-Amuah |
| 6,615,253 | B1 | 9/2003 | Bowman-Amuah |
| 6,618,039 | B1 | 9/2003 | Grant et al. |
| 6,622,083 | B1 | 9/2003 | Knockeart et al. |
| 6,629,000 | B1 | 9/2003 | Moon et al. |
| 6,629,197 | B1 | 9/2003 | Bhogal et al. |
| 6,636,242 | B2 | 10/2003 | Bowman-Amuah |
| 6,639,584 | B1 | 10/2003 | Li |
| 6,640,238 | B1 | 10/2003 | Bowman-Amuah |
| 6,640,244 | B1 | 10/2003 | Bowman-Amuah |
| 6,640,249 | B1 | 10/2003 | Bowman-Amuah |
| 6,640,306 | B1 | 10/2003 | Tone et al. |
| 6,671,567 | B1 | 12/2003 | Dwyer et al. |
| 6,671,715 | B1 | 12/2003 | Langseth et al. |
| 6,671,745 | B1 | 12/2003 | Mathur et al. |
| 6,671,818 | B1 | 12/2003 | Mikurak |
| 6,675,233 | B1 | 1/2004 | Du |
| 6,678,215 | B1 | 1/2004 | Treyz |
| 6,681,120 | B1 | 1/2004 | Kim |
| 6,694,200 | B1 | 2/2004 | Naim |
| 6,697,824 | B1 | 2/2004 | Bowman-Amuah |
| 6,697,944 | B1 | 2/2004 | Jones et al. |
| 6,704,394 | B1 | 3/2004 | Touma et al. |
| 6,707,889 | B1 | 3/2004 | Saylor et al. |
| 6,708,086 | B2 | 3/2004 | Richard |
| 6,715,145 | B1 | 3/2004 | Bowman-Amuah |
| 6,721,489 | B1 | 4/2004 | Benyamin et al. |
| 6,721,710 | B1 | 4/2004 | Lueck |
| 6,725,022 | B1 | 4/2004 | Clayton et al. |
| 6,728,531 | B1 | 4/2004 | Lee et al. |
| 6,731,625 | B1 | 5/2004 | Eastep et al. |
| 6,741,980 | B1 | 5/2004 | Langseth et al. |
| 6,742,015 | B1 | 5/2004 | Bowman-Amuah |
| 6,754,181 | B1 | 6/2004 | Elliott et al. |
| 6,760,916 | B2 | 7/2004 | Holtz et al. |
| 6,772,212 | B1 | 8/2004 | Lau |
| 6,786,528 | B2 | 9/2004 | Guillez et al. |
| 6,788,528 | B2 | 9/2004 | Enners et al. |
| 6,791,907 | B2 | 9/2004 | Berhan |
| 6,792,086 | B1 | 9/2004 | Saylor et al. |
| 6,792,263 | B1 | 9/2004 | Kite |
| 6,792,615 | B1 | 9/2004 | Rowe et al. |
| 6,832,316 | B1 | 12/2004 | Sibert |
| 6,842,906 | B1 | 1/2005 | Bowman-Amuah |
| 6,845,398 | B1 | 1/2005 | Galensky et al. |
| 6,862,357 | B1 | 3/2005 | Albus et al. |
| 6,888,927 | B1 | 5/2005 | Cruickshank et al. |
| 6,888,929 | B1 | 5/2005 | Saylor et al. |
| 6,892,067 | B1 | 5/2005 | Sharma et al. |
| 6,901,067 | B1 | 5/2005 | Kalavade |
| 6,904,264 | B1 | 6/2005 | Frantz |
| 6,904,449 | B1 | 6/2005 | Quinones |
| 6,907,112 | B1 | 6/2005 | Guedalia |
| 6,909,708 | B1 | 6/2005 | Krishnaswamy et al. |
| 6,912,514 | B2 | 6/2005 | Matsushima et al. |
| 6,915,272 | B1 | 7/2005 | Zilliacus |
| 6,917,923 | B1 | 7/2005 | Dimenstein |
| 6,956,833 | B1 | 10/2005 | Yukie |
| 6,963,783 | B1 | 11/2005 | Bi et al. |
| 6,963,784 | B1 | 11/2005 | Gibbs |
| 6,966,065 | B1 | 11/2005 | Kitazato et al. |
| 6,975,835 | B1 | 12/2005 | Lake et al. |
| 6,978,127 | B1 | 12/2005 | Bulthuis et al. |
| 6,990,208 | B1 | 1/2006 | Lau et al. |
| 6,990,334 | B1 | 1/2006 | Ito |
| 6,990,464 | B1 | 1/2006 | Pirillo |
| 7,013,151 | B2 | 3/2006 | Hirokawa |
| 7,020,704 | B1 | 3/2006 | Lipscomb et al. |
| 7,058,376 | B2 | 6/2006 | Logan et al. |
| 7,065,342 | B1 | 6/2006 | Rolf |
| 7,085,710 | B1 | 8/2006 | Beckert |
| 7,120,462 | B2 | 10/2006 | Kumar |
| 7,123,936 | B1 | 10/2006 | Rydbeck et al. |
| 7,124,101 | B1 | 10/2006 | Mikurak |
| 7,130,807 | B1 | 10/2006 | Mikurak |
| 7,145,898 | B1 | 12/2006 | Elliott |
| 7,149,772 | B1 | 12/2006 | Kalavade |
| 7,200,357 | B2 | 4/2007 | Janik et al. |
| 7,209,892 | B1 | 4/2007 | Galuten et al. |
| 7,209,943 | B1 | 4/2007 | Ching et al. |
| 7,219,123 | B1 | 5/2007 | Fiechter et al. |
| 7,321,923 | B1 | 1/2008 | Rosenberg et al. |
| 7,324,833 | B2 | 1/2008 | White et al. |
| 7,339,993 | B1 | 3/2008 | Brooks et al. |
| 7,343,414 | B2 | 3/2008 | Lipscomb et al. |
| 7,346,687 | B2 | 3/2008 | Lipscomb et al. |
| 7,379,541 | B2 | 5/2008 | Iggulden et al. |
| 7,437,485 | B1 | 10/2008 | Kruglikov et al. |
| 7,440,772 | B2 | 10/2008 | White et al. |
| 7,444,353 | B1 | 10/2008 | Chen et al. |
| 7,610,597 | B1 * | 10/2009 | Johnson et al. ................. 725/32 |
| 7,778,595 | B2 | 8/2010 | White et al. |
| 2001/0042107 | A1 | 11/2001 | Palm |
| 2002/0023028 | A1 | 2/2002 | Quarendon |
| 2002/0026442 | A1 | 2/2002 | Lipscomb et al. |
| 2002/0046084 | A1 | 4/2002 | Steele |
| 2002/0058475 | A1 | 5/2002 | Patsiokas |
| 2002/0060701 | A1 | 5/2002 | Naughton et al. |
| 2002/0069244 | A1 | 6/2002 | Blair et al. |
| 2002/0072818 | A1 | 6/2002 | Moon et al. |
| 2002/0144271 | A1 | 10/2002 | Behagen et al. |
| 2003/0008646 | A1 | 1/2003 | Shanahan |
| 2003/0010633 | A1 | 1/2003 | Baughan |
| 2003/0105718 | A1 | 6/2003 | Hurtado et al. |
| 2003/0126335 | A1 | 7/2003 | Silvester |
| 2003/0163486 | A1 | 8/2003 | Van Der Meulen |
| 2003/0215102 | A1 | 11/2003 | Marlowe |
| 2004/0078274 | A1 | 4/2004 | Aarnio |
| 2004/0151327 | A1 | 8/2004 | Marlow |
| 2004/0210765 | A1 | 10/2004 | Erickson |
| 2005/0010633 | A1 | 1/2005 | Shanahan |
| 2005/0010833 | A1 | 1/2005 | Suen et al. |
| 2005/0049002 | A1 | 3/2005 | White |
| 2005/0054379 | A1 | 3/2005 | Cao |
| 2005/0095016 | A1 | 5/2005 | White |
| 2005/0096018 | A1 | 5/2005 | White et al. |
| 2005/0282600 | A1 | 12/2005 | Paradice |
| 2006/0039263 | A1 | 2/2006 | Trotabas |
| 2006/0080741 | A1 | 4/2006 | Nair |

**A43**

**US 8,688,085 B2**

Page 5

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2006/0094349 | A1 | 5/2006 | Slesak et al. |
| 2006/0105804 | A1 | 5/2006 | Kumar |
| 2006/0206493 | A1 | 9/2006 | Lipscomb et al. |
| 2007/0150963 | A1 | 6/2007 | Lee et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 4431070 | | 3/1996 |
| DE | 19651308 | | 10/1996 |
| DE | 10205641 | A1 | 2/2002 |
| DE | 4431070 | | 7/2004 |
| DE | 20200401365 | | 12/2004 |
| EP | 333330 | | 9/1989 |
| EP | 0569343 | | 10/1993 |
| EP | 0569243 | | 11/1993 |
| EP | 0661676 | | 12/1994 |
| EP | 0675341 | | 10/1995 |
| EP | 0771686 | | 7/1997 |
| EP | 0 898 378 | A2 | 2/1999 |
| EP | 0898378 | | 2/1999 |
| EP | 0920016 | | 2/1999 |
| EP | 0918408 | | 5/1999 |
| EP | 0982732 | | 1/2000 |
| EP | 0982732 | A1 | 2/2000 |
| EP | 1146674 | | 10/2001 |
| JP | 59085599 | | 5/1984 |
| JP | 63136828 | | 6/1988 |
| JP | 1018712 | | 1/1989 |
| JP | 1196735 | | 8/1989 |
| JP | 2301330 | | 12/1990 |
| JP | H4261576 | | 9/1992 |
| JP | 5077679 | | 3/1993 |
| JP | 5294250 | | 11/1993 |
| JP | 6187597 | | 7/1994 |
| JP | 6289118 | | 10/1994 |
| JP | 6294659 | | 10/1994 |
| JP | 7036382 | | 2/1995 |
| JP | 07129895 | | 5/1995 |
| JP | 07146155 | | 6/1995 |
| JP | 7262493 | | 10/1995 |
| JP | 7270171 | | 10/1995 |
| JP | 879814 | | 3/1996 |
| JP | H08-79814 | | 3/1996 |
| JP | H0879814 | | 3/1996 |
| JP | 8110231 | | 4/1996 |
| JP | 950282 | | 2/1997 |
| JP | 961514 | | 3/1997 |
| JP | 974580 | | 3/1997 |
| JP | 10103966 | | 4/1998 |
| JP | 10143349 | | 5/1998 |
| JP | 10-173737 | A | 6/1998 |
| JP | 10149182 | | 6/1998 |
| JP | 10173737 | | 6/1998 |
| JP | 1998052033 | | 9/1998 |
| JP | 3056721 | | 10/1998 |
| JP | 11168685 | | 3/1999 |
| JP | 1173192 | | 3/1999 |
| JP | 2901445 | | 3/1999 |
| JP | 1196735 | | 4/1999 |
| JP | 11143791 | | 5/1999 |
| JP | 19990042565 | | 6/1999 |
| JP | 11219580 | | 8/1999 |
| JP | 11168685 | | 9/1999 |
| JP | 11242686 | | 9/1999 |
| JP | H11242686 | | 9/1999 |
| JP | 11219580 | | 10/1999 |
| JP | 11317061 | | 11/1999 |
| JP | H11317061 | | 11/1999 |
| JP | 200066974 | | 3/2000 |
| JP | 2001128280 | | 5/2001 |
| JP | 3890692 | | 12/2006 |
| JP | 2007207257 | | 8/2007 |
| KR | 1019970016743 | | 4/1997 |
| KR | 2019970012254 | | 5/1997 |
| KR | 0142256 | | 3/1998 |
| KR | 1999-024210 | | 3/1999 |
| KR | 1999-024210 | A | 3/1999 |
| KR | 1999-0033726 | | 5/1999 |
| KR | 1999-0033726 | A | 5/1999 |
| KR | 19990033393 | | 5/1999 |
| KR | 2019990022030 | | 6/1999 |
| KR | 19990048723 | | 7/1999 |
| KR | 19990055970 | | 7/1999 |
| KR | 100242563 | | 10/1999 |
| KR | 19990073234 | | 10/1999 |
| KR | 20000001465 | | 1/2000 |
| KR | 20000036680 | | 7/2000 |
| KR | 20010009302 | | 2/2001 |
| KR | 20010028354 | | 4/2001 |
| KR | 10356742 | | 10/2002 |
| KR | 100356742 | | 10/2002 |
| WO | WO9418763 | | 8/1994 |
| WO | WO9604724 | | 2/1996 |
| WO | WO9607110 | | 3/1996 |
| WO | WO9713657 | | 4/1997 |
| WO | WO 98/19480 | A2 | 5/1998 |
| WO | WO 9819480 | | 5/1998 |
| WO | WO9821672 | | 5/1998 |
| WO | WO9819480 | | 7/1998 |
| WO | WO9833102 | | 7/1998 |
| WO | WO9847252 | | 10/1998 |
| WO | WO9906910 | | 2/1999 |
| WO | WO9918518 | | 4/1999 |
| WO | WO9923856 | | 5/1999 |
| WO | WO9928897 | | 6/1999 |
| WO | WO9935009 | | 7/1999 |
| WO | WO 99/43136 | A2 | 8/1999 |
| WO | WO9943136 | | 8/1999 |
| WO | WO 9943136 | | 8/1999 |
| WO | WO9912152 | | 11/1999 |
| WO | WO0007849 | | 2/2000 |
| WO | WO 00/38340 | A2 | 6/2000 |
| WO | WO0038340 | | 6/2000 |
| WO | WO 0038340 | | 6/2000 |
| WO | WO0054187 | | 9/2000 |
| WO | WO0060450 | | 10/2000 |
| WO | WO0070523 | | 11/2000 |
| WO | WO0079372 | | 12/2000 |

OTHER PUBLICATIONS

J. Braunstein, "Airbag Technology Takes Off," Automotive & Transportation Interiors, Aug. 1996, p. 16.

I. Adcock, "No Longer Square," Automotive & Transportation Interiors, Aug. 1996, pp. 38-40.

M. Krebs, "Cars That Tell You Where to Go, The New York Times, Dec. 15, 1996, section 11, p. 1.

L. Kraar, "Knowledge Engineering," Fortune, Oct. 28, 1996, pp. 163-164.

S. Heuchert, "Eyes Forward: An ergonomic solution to driver information overload," Society of Automobile Engineering, Sep. 1996, pp. 27-31.

"OnStar" brochure by General Motors Corporation, 1997.

Sun Microsystems, Inc., "Why Jini Now?", Aug. 1, 1998, pp. 1-14.

Kim Clohessy, Object Technology, Inc., Virtual Machine Technology: Managing Complexity and Providing Portability for Embedded Systems, 2001, pp. 58-60.

Yamaha Corporation, "QY Data Filer—Owner's Manual," pp. 1-250, 1997.

*Affinity Labs of Texas, LLC,* Plaintiff, v. *DICE Electronics, LLC, et al.,* Defendants, C.A. No. 9:08-cv-00163 (Eastern District of Texas), Defendants' Motion to Stay Litigation Pending Reexamination. Filed Jan. 12, 2009, pp. 1-15.

Declaration of John M. Jackson in Support of Defendants' Motion to Stay Litigation Pending Reexamination, Filed on Jan. 12, 2009, pp. 1-2.

Exhibit B to Defendants' Motion to Stay Litigation Pending Reexamination (Ex Parte Reexamination (Ex Parte Reexamination Communication Transmittal Form and Order Granting Request for Ex Parte Reexamination, Issued by the U.S. Patent and Trademark Office on Dec. 12, 2008, pp. 1-16).

US 8,688,085 B2

Page 6

(56)                References Cited

OTHER PUBLICATIONS

Exhibit C to Defendants' Motion to Stay Litigation Pending Reexamination (Affinity Labs of Texas website, http://www.afflabstx.com/, printed on Dec. 29, 2008, Filed on Jan. 12, 4 pages total).
Exhibit D to Defendants' Motion to Stay Litigation Pending Reexamination (United States Patent and Trademark Office, Ex Parte Reexamination Filing Data, Sep. 30, 2008, pp. 1-2).
*Affinity Labs of Texas, LLC,* Plaintiff, v. *BMW North America, LLC, et al.,* Civil Action No. 9:08-cv-00164 RC (Defendants' Joint Motion to Stay Litigation Pending Reexamination, Filed Jan. 13, 2009, pp. 1-8).
Proposed Order on Defendants' Motion to Stay Litigation Pending Reexamination, Filed on Jan. 13, 2009, 1 page total.
*Affinity Labs of Texas, LLC,* Plaintiff, v. *BMW North America, LLC, et al.,* Defendants, Civil Action No. 9:08-cv-164, Order Denying Defendants' Motion to Stay, Filed Feb. 20, 2009, pp. 1-9.
Braunstein, J., "Airbag Technology Takes Off," Automotive & Transportation Interiors, Aug. 1880, p. 16.
Adcock, I., "No Longer Square," Automotive & Transportation Interiors, Aug. 1996, pp. 38-40.
Krebs, M., "Cars That Tell You Where to Go," The New York Times, Dec. 15, 1996, section 11, p. 1.
Kraar, L., "Knowledge Engineering," Fortune, Oct. 28, 1996, pp. 163-164.
Heuchert, S., "Eyes Forward: An ergonomic solution to driver information overload," Society of Automobile Engineering, Sep. 1996, pp. 27-31.
"OnStar" brochure by General Motors Corp., 1997.
Clohessy, Kim, Object Technology, Inc., Virtual Machine Technology: Managing Complexity and Providing Portability for Embedded Systems, 2001, pp. 58-60.
*Affinity Labs of Texas, LLC,* Plaintiff, v. *Apple, Inc.,* Defendant, C.A. No. 9:09-cv-00047-RC (Eastern District of Texas), Complaint (pp. 1-7), with Exhibits A, B and C, Filed Mar. 24, 2009, 76 pages in total.
Kumin, Daniel, Stereo Review, "Jukebox Heaven," Jan. 1999, pp. 64-71.
Audio. "Anthem Five-Channel Amp," Jul./Aug. 1999, p. 15.
Sony webpages in Japanese, "Portable Mini Disc Player MD Recorder," Jul. 21, 1996, pp. 1-5.
Sony, "MD Walkman Operating Instructions—MZ-R4ST," 1996, pp. 1-64.
Sony, "MD Walkman Operating Instructions  MZ-R5ST," 1997, pp. 1-79.
Stereo Review, "New Products," Jun. 1998, 1 page.
Sony webpages in Japanese, "Portable Mini Disc Player MD Recorder," Oct. 21, 1999, pp. 1-63.
Sorcher, Jamie, Stereo Review, "New for the Road," May 1998, 2 pages.
Sony, "MD Walkman Operating Instructions—MZ-R55," 1998. pp. 1-42.
Whitters, John, The Advertiser, "Is the cassette doomed?" Jul. 16, 1998, pp. 1-2.
Cole, George, Financial Times, "Listen with your eyes: A new music CD format supplies textual information," Oct. 23, 1997, pp. 1-2.
Parker, Dana J Standard Deviations, "CD-TEXTra! Read all about it!". Oct. 1996, pp. 1-2.
Mobile Electronics, "Down the Road," Jul. 2004, pp. 1-2.
PR Newswire, "Alpine Announces Fall Release of Interface Adapter That Enables iPod Control and Playback From In-Vehicle Sound Systems," Jul. 7, 2004, 2 pages total.
Borrowman, Greg, The Sydney Morning Herald, "Philips Releases Its Latest DVD," 1999, 2 pages total.
Sony webpages in Japanese, "Portable MD Recorder," Oct. 1997, 5 pages total.
Sony, "Walkman MZ-R50 Recorder," Oct. 1997 7 pages total.
Sony, "MD Walkman MZ-R55," Oct. 10, 1998, 6 pages total.
Von Herbert Pauler, Funkschau, "Kopierschutz fur MP3-Audio," 1999, 9 pages total.
Tessler, Franklin N., Macworld, "Mobile MAC, Highway Fidelity," Jun. 2004, pp. 1-3.

Collins, Barry, The Sunday Times, "High-class high-tech—Buyer's guide," 2001, 2 pages.
Familar, Peter, Herald-Sun, "Clever Deck—CD and mini-disc combination," 1998, 1 page.
Rio Car, "Car Toy Sole Retailer for Rio Car," May 28, 2001, 1 page.
Gilroy, Amy, Twice, "Panasonic Ships First SD MP3," Dec. 4, 2000, 1 page.
Twice, "PhatNoise Readies MP3," Nov. 5, 2001, 1 page.
Savetz, Kevin, The Washington Post, "Putting Your MP3 Collection in Drive (Final Edition)," Aug. 10, 2001, pp. 1-3.
Twice, "Study Sees Retail Opportunities for Mobile Multimedia," vol. 14, Issue 15, Jun. 28, 1999, pp. 1-2.
Kempainen, Stephen, EDN Access for Design, by Design "In-car computing gets personal," Aug. 17, 1998, pp. 1-7.
Japanese Website, MM MPMANIA.com, http:/mpmania, x-y.net/ bbs/zboard.php?id=products&keyword=1998, 1 page.
Japanese document regarding MP3, May 1999, 2 pages.
Moeller, Mark, Computing Unplugged Magazine, "Software Review, New software products for the Auto PC," 1999-2009, Zatz Publishing, pp. 1-4.
Moeller, Mark, Computing Unplugged Magazine, "Auto PC Power, A survey of resources for Auto PC owners," 1999-2009, Zatz Publishing, pp. 1-5.
Moeller, Mark, Computing Unplugged Magazine, "Auto PC Power, A look at the first year of the Auto PC with Microsoft," 1999-2009, Zatz Publishing, pp. 1-5.
Moeller, Mark, Computing Unplugged Magazine, "Auto PC Power, Next generation AutoPCs make a big debut at CES," 1999-2009, Zatz Publishing, pp. 1-6.
Moeller, Mark, Computing Unplugged Magazine, "Programming Power, Getting started developing software for the Auto PC," 1999-2009, Zatz Publishing, pp. 1-5.
Moeller, Mark, Computing Unplugged Magazine, "Behind the Scenes, The AutoPC: Vision vs. Reality," 1999-2009, Zatz Publishing, pp. 1-7.
Moeller, Mark, Computing Unplugged Magazine, "Product Preview, A Survey of Auto PC 2.0 for software developers," 1999-2009, Zatz Publishing, pp. 1-7.
Moeller, Mark, Computing Unplugged Magazine, "AutoPC Update, Auto PC/Windows CE for Automotive news bites," 1999-2009, 1999-2009, Zatz Publishing, pp. 1-4.
Streitz, Norbert A., et al., "Dolphin: Integrated Meeting Support Across Local and Remote Desktop Environments and LiveBoards," Integrated Publication and Information Systems Institute, 1994, pp. 345-358.
Degen, Leo, et al. "Working with Audio: Integrating Personal Tape Recorders and Desktop Computers," May 3-7, 1992, pp. 413-418.
Jun Gibee, H.S., "A Virtual Information Desk on the Internet," University of Ulsan, Sep. 1999, pp. 265-268.
Whittaker, Steve, et al., "TeleNotes: Managing Lightweight Interactions in the Desktop," Lotus Development Corporation, Jun. 1997, pp. 137-168.
Crowder, R.M., et al., "Integration of Manufacturing Information Using Open Hypermedia," Computer in Industry, 1999, pp. 31-42.
Bostrom, Tomas, et al., "Mobile Audio Distribution," Royal Institute of Technology, 1999, pp. 166-172.
Poon, Alex, et al., Xerox Disclosure Journal, vol. 19, No. 2, "Gestural User Interface Technique for Controlling the Playback of Sequential Media," Mar./Apr. 1994, pp. 187-190.
Roy, Deb Kumar, "NewsComm: A Hand-Held Device for Interactive Access to Structured Audio," Massachusetts Institute of Technology, Jun. 1995, pp. 1-12.
Bellotti, Victoria, et al., "Walking Away from the Desktop Computer: Distributed Collaboration and Mobility in a Product Design Team," 1996, pp. 209-218.
Obeysekare, Upul, et al., "The Visual Interactive Desktop Laboratory," Jan.-Mar. 1997, pp. 63-71.
Poon, Sui-Meng, et al., "Integration of Value-Added Audio Playback Capacity Into Computer Network," Nanyang Technological University, 1995, pp. 632-636.
Paksoy, Erdal, et al., "A variable-rate celp coder for fast remote voicemail retrieval using a notebook computer," DSPS R&D Center, Texas Instruments, 1997, pp. 119-124.

**US 8,688,085 B2**

Page 7

(56)          **References Cited**

OTHER PUBLICATIONS

Davis, Jeffrey A., "Use of Personal Computers in Satellite Command and Control Systems," Raytheon Systems Company, Oct. 24, 1999, pp. 283-291.

Chan, A., et al.. "The Pep-II Project-Wide Database," Stanford University, 1996, pp. 840-842.

Bharat, Krishna, et al., "Migratory Applications," Springer Berlin. vol. 1222, 1997, pp. 1-21.

Microsoft, "Getting Started Microsoft. Windows. 98" Second Edition, 1998, pp. 1-138.

Greenberg, Saul, "PDAs and Shared Public Displays: Making Personal Information Public, and Public Information Personal," University of Calgary, Mar. 1999, pp. 1-11.

Microsoft, "Introducing Microsift Windows 95—Certificate of Authenticity," 1995, pp. 1-117.

Davis, Richard C., et al., "A Framework for Sharing Handwritten Notes," 1998, pp. 119-120.

Bharat, Krishna A., et al., "Migratory Applications," UIST '95, Nov. 14-17, 1995, pp. 133-142.

Myers, Brad A., "Collaboration Using Multiple PDAs Connected to a PC," Carnegie Mellon University, 1998, pp. 385-294.

Davis, Richard C., et al., "NotePals: Lightweight Note Sharing by the Group, for the Group," May 15-20, 1999, pp. 338-345.

Rekimoto, Jun, et al., "Augmented Surfaces: A Spatially Continuous Work Space for Hybrid Computing Environments," May 15-20, 1999, pp. 378-385.

Olsen, Jr., Dan R., "Interacting with Chaos," Sep. and Oct. 1999, pp. 42-54.

Robertson, Scott, et al., "Dual Device User Interface Design: PDAs and Interactive Television," Apr. 13-18, 1996, pp. 79-86.

Symantec Corporation, "pcAnywhere32 User's Guide," 1993-1997, pp. 1-216.

Bharat, Krishna, et al., Migratory Applications, "Mobile Object Systems Towards the Programmable Internet," Springer Berlin/ Heidelberg, vol. 1222/11997, 1997, pp. 1-134.

Diamond Multimedia Systems, Inc., "Rio PMP300, User's Guide," 1998, pp. 1-27.

Sony, "Portable MiniDisc Recorder, Operating Instructions, MZ-R55," 1998, pp. 1-42.

Streitz, Norbert A., et al., "i-Land: An Interactive Landscape for Creativity and Innovation." Proceedings of the ACM Conference on Human Factors in Computing Systems. May 15-20, 1999, pp. 120-127.

IBM, "WordPad z50 Cradle Option—User's Guide," 1990, pp. 1-18.

IBM Mobile Systems, "WorkPad z50 Mobile Companion (2608-1Ax), Hardware Maintenance Manual," Mar. 1999, pp. 1-77.

Jost, Kevin, Automotive Engineering International, "The car as a mobile-media platform," May 1998, pp. 49-53.

Microsoft Corporation, "Windows CE 2.1 Technical Articles, Developing Applications for an Auto PC," Jun. 1999, pp. 1-13.

Infogation Corporation, "InfoGation Corp. Introduces Software Applications for Next-Generation Smart Car Systems," Jan. 8, 1998, pp. 1-2.

Business Wire, "ORA Electronics Announces USB-Compatible TelCar Mark VII Begins Shipping First Quarter of 1999," Jan. 6, 1999, pp. 1-2.

ORA USA, "ORA Electronics Patents Telcar Cellular Telephone Interface," Jul. 6, 1998, pp. 1-2.

Hewlett Packard, "HP Jornada 430/430se Palm-Size PC, User's Guide," Edition 1, 1999, pp. 1-151.

NEC, "NEC MobilePro 750C, User's Guide," 1998, pp. 1-83.

MPMan, "User's Guide, The Portable MP 3player using the flash memory and SmartMedia card," 1997, pp. 1-35.

MPMan, "User's Guide, The portable MP3 player using the flash memory with variety features including the voice recording, phone/ memo browsing, etc.," 1997, pp. 1-47.

Shimpi, Anand Lal, Empeg, Ltd., "MP3 meets Car Audio: Empeg Mark II in-dash Car MP3 Player," Sep. 18, 2000, pp. 1-17.

Clarke, Peter, EE Times, "Engineers drive craze for MP3 audio players," Feb. 5, 1999, pp. 1-4.

Diamond Multimedia Systems, Inc., "Rio PMP300 User's Guide," 1998, pp. 1-27.

Buckley, Stephen J., et al., "The Car as a Peripheral, Adapting a Portable Computer to a Vehicle Intranet," Sae Technical Paper Series, 98C030, Oct. 19-21, 1998, pp. 1-14.

"The MP3 Mobile," Apr. 8, 1998, pp. 1-13.

12-Volt Business & Technology Solutions, AutoMedia, "How the Intelligent Data Bus will impact the way you do business," Nov. 1998, pp. 1-2.

Press Release, "Creative Labs Launches Nomad Portable MP3 Players," Apr. 15, 1999, pp. 1-5.

BMW, "Betriebsanleitung Bordmonitor mit Navigation and TV," 1995, pp. 1-82.

BMW, "Owner's Manual, On-board monitor with navigation system," 1996, pp. 1-81.

Transperfect/Translations, "True and accurate translation of the 1995 BMW Manual, from German into English," Aug. 16, 2005, pp. 1-80.

Sodeikat, Heinz, "Euro-Scout is facing the German 1994 Market," 1994, pp. 551-556.

BMW, "The BMW On-Board Navigation System—Technology Takes a Remarkable Turn," 2005, pp. 1-9.

Oldsmobile, "1991 Toronado/Trofeo User's Guide," 1991, pp. 1-41.

Yepp, "Digital Sounds—yepp—YP-E32/E64102-291," Oct. 23, 1999, pp. 1-46.

U.S. Appl. No. 60/167,179, entitled "System, Method, and Device for Playing Recorded Music on a Wireless Communications Device," by Devon A. Rolf, filed Nov. 23, 1999, pp. 1-48.

Microsoft, "Getting Started, Microsoft Windows 98, for distribution with a new PC only," 1998, pp. 1-145.

PR Newswire, "Alpine Announces Fall Release of Interface Adapter That Enables iPod Control and Playback from In-Vehicle Sound Systems," Jul. 7, 2004, pp. 1-2.

Park, Ha-Young, The Customer Times, "Portable Computer Music, MP3 File and MP3 Player rise as the Next Generation Audio Format," May 1999, pp. 1-2.

"MP3 Players Introduced in the Korean IT Magazines," 1998-1999, pp. 1-15.

PR Newswire Association, Inc., "Delphi's Communiport(R) Technology for Tomorrow, Today Demonstrated at Frankfurt Auto Show," Sep. 15, 1999, pp. 1-8.

Crain Communiations, Inc., "Products," Agilent Technologies Press Release, Feb. 21, 2000, pp. 1-6.

The Washington Times, LLC, John Hanan, Dallas Morning News, "Cars add computer, audiovisual gear," Jan. 14, 2000, pp. 1-3.

Request for Ex Parte Reexamination Under 35 U.S.C..sctn.302 for U.S. Patent No. 7,324,833, Filed on Nov. 7, 2008 (pp. 1-21).

Menta, Richard, "12-Volt Song MP3 Portable Is a Milestone Player," Jan. 11, 2000, pp. 1-3.

Lind, R., et al., "The Network Vehicle—A Glimpse into the Future of Mobile Multi-Media," Sep. 1999, pp. 27-32.

Yamaha Corporation, "Yamaha Music Sequencer, QY70, Owner's Manual," Chapters 1-11, 1997.

"Universal Serial Bus Specification," Revision 1.1, Sep. 23, 1998, pp. U-106.

Real Networks, Inc., RealJukebox Plus Manual, 1999, pp. 1-90.

Nokia 9110 Communicator User Manual, Copyright 1999.

Sony, "Sony Notebook Computer User Guide PCG-717/719," User Guide, 1997.

AirCard, "Sierra Wireless Announces First Cellular Network Interface Card for Notebook PCs," Jun. 21, 1999

MusicMatch Internet Music System, "MusicMatch Jukebox Reviews," Mar. 4, 2000, May 8, 1999, Aug. 29, 1999, May 8, 1999, Feb. 4, 1997, Aug. 12, 1999, Jan. 24, 2000, Jan. 25, 2000, Feb. 22, 2000, pp. 1-32.

Bluetooth, "Specification of the Bluetooth System, Profiles," Dec. 1, 1999.

J. Schneidawind, "Big Blue Unveiling," USA Today. Nov. 23, 1992, p. 2B.

Nokia Suomi, "Range of suspension GSM products unveiled: Nokia's innovations offer a new dimension to mobile communication," Mar. 13, 1996, 1 page.

Nokia 9000i User's Manual, Copyright 1995-1997.

**A46**

**US 8,688,085 B2**

Page 8

(56)        **References Cited**

OTHER PUBLICATIONS

FCC Website, "Broadband PCS," available at http://wireless.foc.gov/services/index.htm?job=service.sub.—home&id=broadband.sub.—pcs (accessed Nov. 9, 2009).

RealNetworks, "RealPlayer plus, RealPlayer 7 Plus User Manual," Copyright 2000, Mar. 6, 2000.

David Pogue, "SoundJam MP Digital Audio System Manual," 1999.

iTunes Wikipedia Page, http://en.wikipedia.org/wiki/iTunes, accessed Jul. 31, 2009.

K. Jost, "The Car as a Mobile-Media Platform," Automotive Engineering International, May 1998, pp. 49-53.

R. Lind, et al., "The Network Vehicle—A Glimpse into the Future of Mobile Multi-Media," 17th AIAA/IEEE/SAE Digital Avionics Sys. Conference Proceedings, Oct. 31 to Nov. 7, 1998, at 121-1 to 121-8.

D. Peters, et al., "Car Multimedia—Mobile Multimedia for the 21st Century," Oct. 5-6, 2000, pp. 1-58.

Stephan Hartwig, et al., "Mobile Multimedia Challenges and Opportunities Invited Paper," Jun. 19, 2000, pp. 1-12.

John Hanan, "Car Audio Has Come Far since the 8-Track," Knight Ridder/Tribune Business News, Dec. 17, 1999, pp. 1-2.

Business Wire. "Lobjects Announces New Digital Audio Player Technology for the Next-Generation Auto PC," Aug. 4, 1999, pp. 1-2.

Jason Meserve, "Windows Media Player now available for WinCe, (from Microsoft) (Product Announcement)," Network World, Mar. 6, 2000, pp. 1-2.

Business Wire, "'HUM MP3 Software Turns Windows Ce Handheld Computers Into Portable Music Players," May 24, 1999, pp. 1-2.

Chris De Herrera, "Windows CE 2.0 Auto PC Pictures," Chris De Herrera's Windows CE Website, Revised Jan. 11, 1999, pp. 1-3.

John Murray, "Inside Microsoft Windows CE," Microsoft Press. 1998, pp. 1-20.

Compaq, Intel, Microsoft, NEC, "Universal Serial Bus Device Class Definition for Audio Devices," Release 1.0, Mar. 18, 1998, pp. 1-130.

S.K. Kirschner, "Wired Wheels," Popular Science, Mar. 1998, pp. 54-55.

Compaq, Intel, Microsoft, NEC, "Universal Serial Bus Specification," Revision 1.1, Sep. 23, 1998, pp. 1-327.

Vesa, Video Electronics Standards Association, "VESA Plug and Display (P&D) Standard," Version 1, Revision 0, Jun. 11, 1997, pp. 1-109.

Panasonic, "Portable DVD/Video CD/CD Player, Operating Instructions, DVC-L10D," 1998, pp. 1-84.

Clarion Car Audio and Beyond, "1998 Car Audio & Security Product Catalog," 1998, pp. 1-24.

Clarion Car Audio and Beyond, "1999 Car Audio & Security Product," 1999, pp. 1-60.

Jamie Anderson, "Driving our way soon: the e-car," the Times, Nov. 9, 2000, pp. 1-4.

Clarion Auto PC, "Clarion Auto Pc Owner's Manual," 1998, pp. 1-177.

Delphi Automotive Systems, "The Personal Productivity Vehicle," 1998, pp. 1-2.

Delphi Delco Electronics Systems, "On-Board Architecture," 1997, pp. 1-2.

Janet Braunstein, "Diversified Software Industries: Enabling digital instrument panels," Jan. 10, 2001, pp. 1-2.

Microsoft PressPass, "Microsoft Previews New Devices Using Windows CE for Automotive 2.0," Jan. 2000, pp. 1-2.

Gina Hertel, "A Voice-Activated Co-Pilot: ICES," Odds & Ends, Jan. 2000, vol. 8, Issue 1, pp. 1-5.

Kami Buchholz, "Diversified Software launches Ivis." Automotive Engineering Online, 2009, one page.

Empeg Car webpage, http://web.archive.org/web/19990430033318/www.empeg.com/main.html, Apr. 30, 1999, one page.

Clarion AutoPC, "Frequently Asked Questions," 1998, pp. 1-3.

Clarion AutoPC, "Frequently Asked Questions," 1999, pp. 1-9.

Stereophile, "Clarion Debuts World's First Automobile PC/Stereo," Dec. 5, 1998, pp. 1-3.

Factiva, Hardware Review, "Lost in the Supermarket," Mar. 1, 2000, pp. 1-4.

"Phillips PSA[128 MAX," PC Authority Reviews, May 1, 2003, pp. 1-2.

"Sony Network Walkman NW-MS70D," PC Authority Reviews, Oct. 8, 2003, 1 pg.

"Targa TMU-401," PC Authority Reviews, Oct. 8, 2003, pp. 1-2.

"Targa TMU-604," PC Authority Reviews, Oct. 8, 2003, pp. 1-2.

U.S. Patent and Trademark Office, Right of Appeal mailed Oct. 1, 2012, with Notice of Appeal filed Oct. 31, 2012 in Reexamination U.S. Appl. No. 95/001,266.

Patent Owner, Affinity Labs of Texas, LL, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed on Dec. 7, 2012 in Reexamination U.S. Appl. No. 95/001,266.

U.S. Patent and Trademark Office, Action Closing Prosecution mailed Oct. 1, 2012, with Reply to Action Closing Prosecution filed Nov. 1, 2012 in Reexamination U.S. Appl. No. 95/001,782.

Patent Owner, Affinity Labs of Texas, LL, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the USPTO on Nov. 27, 2012 in Reexamination U.S. Appl. No. 95/001,782.

U.S. Patent and Trademark Office, Action Closing Prosecution mailed Oct. 5, 2012, with Reply to Action Closing Prosecution filed Nov. 5, 2012 in Reexamination U.S. Appl. No. 90/010,333.

Patent Owner, Affinity Labs of Texas, LL, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the USPTO on Nov. 9, 2012 in Reexamination U.S. Appl. No. 95/001,281.

U.S. Patent and Trademark Office, Patent Board Decision on Appeal mailed Nov. 1, 2012 in Reexamination U.S. Appl. No. 95/001,263.

Patent Owner, Affinity Labs of Texas, LL, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the USPTO on Dec. 7, 2012 in Reexamination U.S. Appl. No. 95/001,263.

Patent Owner, Affinity Labs of Texas, LL, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the USPTO on Dec. 7, 2012 in Reexamination U.S. Appl. No. 95/001,262.

U.S. Appl. No. 61/672,853, filed Dec. 26, 2012, Farris et al.

U.S. Patent and Trademark Office, Reexam Final Rejection mailed Feb. 14, 2013, with Reply to Final Office Action filed Mar. 13, 2013 by Patent Owner in Reexamination U.S. Appl. No. 90/011,982.

U.S. Patent and Trademark Office, Advisory Action mailed Jul. 10, 2013 in U.S. Appl. No. 90/011,982.

U.S. Patent and Trademark Office, Right of Appeal mailed Oct. 1, 2012, with Notice of Appeal filed Oct. 31, 2012, and Appeal Brief filed by Patent Owner on Dec. 31, 2012 in U.S. Appl. No. 95/001,266.

Patent Owner, Affinity Labs of Texas, LLC, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the USPTO on Dec. 7, 2012 in U.S. Appl. No. 95/001,266.

U.S. Patent and Trademark Office, Action Closing Prosecution mailed Oct. 1, 2012, with Reply to Action Closing Prosecution filed Nov. 1, 2012 in U.S. Appl. No. 95/001,782.

Patent Owner, Affinity Labs of Texas, LLC, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the USPTO on Nov. 27, 2012 in U.S. Appl. No. 95/001,782.

U.S. Patent and Trademark Office, Action Closing Prosecution mailed Oct. 5, 2012, with Reply to Action Closing Prosecution filed Nov. 5, 2012 in U.S. Appl. No. 90/010,333.

Patent Owner, Affinity Labs of Texas, LLC, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the USPTO on Nov. 9, 2012 in U.S. Appl. No. 95/001,281.

U.S. Patent and Trademark Office, Patent Board Decision on Appeal mailed Nov. 1, 2012, Patent Owner's Request for Rehearing filed Nov. 28, 2012 and U.S. Patent and Trademark Office's Final Decision mailed Feb. 15, 2013, in U.S. Appl. No. 95/001,263.

Patent Owner, Affinity Labs of Texas, LLC, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the USPTO on Dec. 7, 2012 in U.S. Appl. No. 95/001,263.

Patent Owner, Affinity Labs of Texas, LLC, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the USPTO on Dec. 7, 2012 in U.S. Appl. No. 95/001,262.

Patent Owner, Affinity Labs of Texas, LLC, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding," filed in the

**US 8,688,085 B2**

Page 9

(56)         **References Cited**

OTHER PUBLICATIONS

USPTO on Jan. 29, 2013 and U.S. Patent and Trademark Office, Decision on Petition mailed Feb. 22, 2013 in U.S. Appl. No. 90/010,333.
Patent Owner, Affinity Labs of Texas, LLC, "Notice of Appeal to the Federal Circuit," filed in the USPTO on Mar. 25, 2013 in U.S. Appl. No. 95/001,263.
"Philips PSA [128MAX," PC Authority Reviews, May 1, 2003, 1 pg.
"Sony Network Walkman NW-M570D," PC Authority Reviews, Oct. 8, 2003, 1 pg.
"Targa TMU-401," PC Authority Reviews, Oct. 8, 2003, 1 pg.
"Targa TMU-604," PC Authority Reviews, Oct. 8, 2003, 1 pg.
U.S. Appl. No. 60/167,179, filed Nov. 23, 1999.
U.S. Appl. No. 09/234,259, filed Jan. 20, 1999.
U.S. Patent and Trademark Office, Inter Partes Reexamination Examiner's Answer mailed May 14, 2013 in U.S. Appl. No. 95/001,266.
U.S. Patent and Trademark Office, Office Action in Inter Partes Reexamination mailed May 17, 2013 in U.S. Appl. No. 95/001,262 (and merged U.S. Appl. No. 90/011,254).
*Affinity Labs of Texas, LLC* (Plaintiff) v. *BMW North America, LLC, et al.* (Defendants), Civil Action No. 9:08CV164 and *Affinity Labs of Texas, LLC* (Plaintiff) v. *Alpine Electronics of America, Inc., et al.*, Civil Action No. 9:08CV171, Order Construing Claim Terms of United States Patent No. 7,324,833, issued on Dec. 18, 2009, pp. 1-31.
*Affinity Labs of Texas, LLC,* Plaintiff, v. *BMW North America, LLC, et al.,* Defendants, C.A. No. 9:08-cv-00164-RC, Affinity's Infringement Contentions, with Infringement Chart Exhibits A-G, Feb. 2, 2009.
*Affinity Labs of Texas, LLC,* Plaintiff, v. *Alpine Electronics of America, Inc., et al.,* Defendants, C.A. No. 9:08-cv-00171- RC, Affinity's Infringement Contentions, with Infringement Chart Exhibits A-1 to G, Feb. 2, 2009.
*Affinity Labs of Texas, LLC,* Plaintiff, v. *Dice Electronics, LLC, et al.,* Defendants, C.A. No. 9:08-cv-00171-RC, Affinity's Infringement Contentions, with Infringement Chart Exhibits A-C, Feb. 2, 2009.
Gregory L. White, "After AutoPC's Hard Ride, Detroit Tries Rebooting In-Car Computers," The Wall Street Journal, pp. 1-3, Oct. 4, 2000.
Asim Smailagic, et al., "MoCCA: A Mobile Communication and Computing Architecture," Institute for Complex Engineered Systems, pp. 1-8, Oct. 1999.
Niki Davis, "Remote Teaching Via ISDN2 and Desktop Conferencing,"Exeter University School of Education, pp. 1-3, Feb. 25, 1993.
Naohiko Kohtake, et al., "InfoStick: an interaction device for Inter-Appliance Computing," Keio University, pp. 1-15, 1999.
Norbert A. Streitz, et al., "Roomware for Cooperative Buildings: Integrated Design of Architectural Spaces and Information Spaces," pp. 1-20, 1998.
Amy Gilroy Mobile Electronics, "Apple's iPod Seen Transforming Car Audio Business," 1 page, Jun. 7, 2004.
Amy Gilroy, Mobile Electronics "OEM Integrators Embrace Podsuccess" 1 page, Aug. 23, 2004.
RIO500, Getting Started Guide for Windows 98 and Macintosh OS 8.6, pp. 1-2, 1999.

* cited by examiner



FIG. 1



**FIG. 2**



**FIG. 3**



FIG. 4



**FIG. 5A**



**FIG. 5B**



FIG. 6



FIG. 7

FIG. 8



FIG. 9

US 8,688,085 B2

1

## SYSTEM AND METHOD TO COMMUNICATE TARGETED INFORMATION

This application is a continuation of U.S. patent application Ser. No. 13/117,507, filed May 27, 2011, which is a continuation of U.S. patent application Ser. No. 12/495,190, filed on Jun. 30, 2009, which is now U.S. Pat. No. 7,953,390, which issued on May 31, 2011, which is a continuation of U.S. patent application Ser. No. 12/015,320, filed Jan. 16, 2008, which is now U.S. Pat. No. 7,778,595, which issued on Aug. 17, 2010, which is a continuation of U.S. patent application Ser. No. 10/947,755, filed on Sep. 23, 2004, which is now U.S. Pat. No. 7,324,833, which issued on Jan. 29, 2008, which is a continuation of U.S. patent application Ser. No. 09/537,812, filed on Mar. 28, 2000, which is now U.S. Pat. No. 7,187,947, which issued on Mar. 6, 2007, the disclosures of which are all hereby incorporated herein by reference in their entirety for all purposes.

### FIELD OF THE DISCLOSURE

The present disclosure relates to digitally stored content and, more specifically, to a content delivery system and method.

### BACKGROUND

The first commercial radio stations in the United States began operation around 1920. Today, there may be as many as 12,000 radio stations in the United States programming in several distinct formats. When broadcasting their respective signals, these radio stations often use an analog signal, which may be modulated based on frequency or amplitude. Frequency modulated (FM) radio appears to be the dominant entertainment medium while amplitude modulated (AM) radio seems to be a popular outlet for news and information.

Unfortunately, analog radio may be unable to provide the sound quality and consistency that radio listeners desire. As such, several broadcasting related companies have begun to consider a movement to digital radio. Unlike analog radio reception, digital radio reception may be able to provide compact disk (CD) quality sound while remaining virtually immune to interference. Being immune to interference may result in reducing static growls or "multipath" echoes, echoes caused by signal reflections off buildings or topographical features.

Some countries, like Canada and many European countries, may choose to have digital radio operate in a single digital radio band such as the L-band between 1452-1492 megahertz (MHz). This band would allow the reception of both terrestrially and satellite-originated signals. By comparison, FM radio typically operates between 88 and 108 MHz while AM radio typically operates between 0.525 and 1.705 MHz. Neither of these bands allows for easy transmission via satellite.

Canada proposed using the L-Band for digital radio as early as 1992. Several countries throughout the world have since agreed to use the L-Band for digital radio with one notable exception. It appears the United States has chosen not to operate its digital radio within the L-Band. In the United States, the L-Band may already be committed for military uses. Apparently, the United States plans to adopt a system called in-band on-channel, or IBOC, which fits within the AM and FM frequencies.

IBOC technology may offer some advantages over L-Band transmissions. For example, there may be no need for new spectrum allocations. There may be backward and forward

2

compatibility with existing AM and FM systems on both the transmitter and receiver sides, and there may be a low-investment upgrade to digital systems. Unfortunately, a workable IBOC solution is yet to be seen though technology may someday make IBOC digital radio commercially possible.

Even if an IBOC solution becomes commercially available in the United States, IBOC digital radio may suffer from several shortcomings. For example, there may global standardization problems. Though the United States favors IBOC, the European and Canadian communities seem to favor L-Band making the establishment of a global standard difficult.

### BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present embodiments and advantages thereof may be acquired by referring to the following description taken in conjunction with the accompanying drawings, in which like reference numbers indicate like features, and wherein:

FIG. 1 depicts a general system for wirelessly communicating selective information to an electronic device in accordance with one aspect of the present invention;

FIG. 2 illustrates a block diagram of a method of wirelessly communicating selected information to an electronic device;

FIG. 3 illustrates an electronic device operable to receive selected audio information in accordance with the teachings of the present invention;

FIG. 4 illustrates a graphical user interface (GUI) for displaying selectable audio information according to one aspect of the present invention;

FIG. 5A illustrates a portable radio system having a mount for an electronic device according to one embodiment of the present invention;

FIG. 5B illustrates an automobile console having a mount for coupling an electronic device according to one aspect of the present invention;

FIG. 6 illustrates a block diagram of a system for communicating voice mail messages using email according to one embodiment of the present invention;

FIG. 7 illustrates a flow chart for providing voice email messages according to one embodiment of the present invention;

FIG. 8 illustrates a flow diagram of a method for providing selected audio information to an electronic device according to one embodiment of the present invention; and

FIG. 9 illustrates an automobile console having a mount for an electronic device according to one embodiment of the present invention.

### DETAILED DESCRIPTION

The conceptual groundwork for the present invention includes wirelessly communicating selective information to an electronic device. According to one aspect, a user may interact with the Internet to select information, such as audio information, and wirelessly communicate the selected information to an electronic device. The electronic device receives the information via a wireless communications network and processes the information accordingly. In a particularized form, a user may select information from an Internet website operable to allow selectivity of audio information such as songs, on-line radio stations, on-line broadcasts, streaming audio, or other selectable information. Upon selecting the audio information, information or data associated with the selected audio information is wirelessly communicated to an electronic device. The electronic device may then be used to

<table>
<tr><td>3</td><td>4</td></tr>
</table>

process the selected audio information. In this manner, a user may receive selective audio information via a wireless electronic device.

In one form, the electronic device may be operable to communicate with an individual's automobile audio system. A user may select audio information utilizing a personal computer with access to a website operable to display selectable audio information. The selected audio information may then be wirelessly communicated to the electronic device associated with an automobile's audio system. Therefore, upon receiving the selected audio information, a user may access and play the received audio information utilizing the electronic device in association with the automobile's audio system.

The present invention is not limited to communicating only audio information. One skilled in the art can appreciate that other types of information, such as video, textual, etc. may be communicated utilizing the systems and methods disclosed herein without departing from the spirit and scope of the present invention. Additionally, it will be understood that information may be formatted in a plurality of ways at different phases of communication without loosing the underlying content of the selected information. For example, an audio file may be formatted, segmented, compressed, modified, etc. for the purpose of providing or communicating the audio invention. Therefore, the term "audio information" or "information" is used in a general sense to relate to audio information in all phases of communication.

FIG. 1 depicts a general system for wirelessly communicating selective information to an electronic device in accordance with one aspect of the present invention. The system, illustrated generally at **100**, includes a digital engine **101** coupled to a communications engine **102**. Communications engine **102** is remotely coupled to an electronic device **103**. Digital engine **101** may be directly or indirectly coupled to storage device **105** operable to store information. Digital engine **101** maintains information or data associated with selected information in a digital format. The information may be stored within storage device **105** or other storage devices operable to maintain data or information associated with the selected information.

Communications engine **102** is communicatively coupled to digital engine **101** and operable to wirelessly communicate the selected information to electronic device **103**. During operation, audio information may be selected by a user utilizing a personal computer or other devices operable to communicate with an information network. Digital engine **101** is operable to maintain information associated with the selected audio information. For example, the information could be several songs or titles configured as an audio file and formatted in a digital format such as an MP3 file, wave file, etc. The maintained information may also be a reference to a network location where an audio file may be stored, a network location where a network broadcast of audio information may be located, etc. or other network locations having information associated with the selected audio information. Therefore, digital engine **101** may maintain a plurality of different types of information or data associated with the selected audio information.

System **100**, utilizing communication engine **102**, may wirelessly communicate data or information associated with the selected audio information to electronic device **103** thereby providing wireless communication of selected information to an electronic device operable to receive wireless communications. In one embodiment, digital engine **101** may be used in association with an Internet website configured to provide access to selectable information. The Internet website operably associated with digital engine **101** allows a user to select information to be wirelessly communicated to electronic device **101** utilizing a network environment. The Internet website may include several different types of information related to audio information.

FIG. **4**, described in greater detail below, illustrates one embodiment of providing an Internet website for displaying selectable audio information. For example, the Internet website may include music and/or artist search engines, playlists, top **10** charts, artists by genre, and other information associated with audio information. A user may select information associated with the audio information and digital engine **101** can maintain the information or data associated with the selected information in a digital format. Communications engine **102** coupled to digital engine **101** may wirelessly communicate data associated with the selected audio information to electronic device **103**. Therefore, a user may access and select audio information via an Internet website and wirelessly communicate the data to an electronic device. As such, system **100** advantageously allows for wireless communication of selected audio information to electronic devices that may be remotely located from a conventional terrestrial communication network.

Electronic device **105** may be configured in a plurality of ways for receiving wireless communication of selected audio information. In one embodiment, electronic device **105** may be operable as a component configured to receive a cellular signal comprising the selected information communicated by the communication engine. For example, a device having a cellular modem may be operable to receive the information at specified intervals. Upon receiving the information the electronic device may process the received information. Electronic devices are described in more detail below and may include a network radio, a modular device, an audio system, a personal digital assistant (PDA), a cellular phone, or other electronic devices operable to receive information wirelessly communicated by communication engine **102**.

Communications engine **102** may be operable to wirelessly communicate selected information to electronic device **103** in a plurality of ways. The present invention advantageously allows for several different embodiments of wirelessly communicating selected audio information to electronic device **103** and is not limited to any specific configuration described below. Several different types or combinations of wireless communication may be realized by the present invention. Communications engine **102** may be operable to wirelessly communicate the selected information from an information network, such as the Internet, to an electronic device operable to receive wireless communications. In one embodiment, communications engine **102** may comprise a conduit to interface information with a wireless communication network. The conduit may configure the information located within the information network into a format operable to be transmitted via wireless communication.

For example, a wireless device may be operable to receive packets of information having a specific size and in a specific format. In such an embodiment, communications engine **102** could format the information into a desirable format for wirelessly communicating the information to electronic device **103**. Several types of wireless communication may be used by communications engine **102** to communicate the selected information to an electronic device. Communications networks such as GSM, Digital Satellite communication, SB, Radio bands, DRC, SuperDRC or other systems or types of transmission such as TDMA, CDMA, spread spectrum, etc. or frequencies such as between about 1.7 GHz and 2.0 GHz

US 8,688,085 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

may be realized by the present invention for communicating information or data representing the selected audio information to electronic device 103.

In one embodiment, the selective information may be communicated using a digital broadcast signal. Digital broadcast includes providing information via a signal such as AM, FM, and the like. Digital information may be included or encoded as a sub-carrier within the broadcast signal and received by electronic device 103. A digital sub-carrier may include a selective bandwidth of frequencies for a specific radio station (i.e., 6 MHz for FM). The selective information may be wirelessly communicated to electronic device 103 utilizing a communication engine 102 operable to communicate the selective information via a digital FM signal. In this manner, selective information may be communicated within digital FM sub-carriers to an electronic device operable to receive the information. For example, a user may subscribe to communicate the information via an FM sub-carrier and receive the selective data through wireless communication via a specified FM sub-carrier.

In one embodiment, the selected information may be formatted and transmitted to achieve a desirable transmission rate. For example, conventional systems may transmit information at a speed of 10 kilobits per second. Therefore, for 1 megabyte of information to be communicated to an electronic device, a transmission time of approximately 800 seconds may be required. The present invention may allow for a relative increase in transmission speed by removing the requirement that information be communicated asynchronously to an electronic device. For example, conventional wireless communication utilizes a specified frequency to communicate information in two directions (i.e., cellular phones). As such, information is communicated across a channel in an asynchronous manner to provide a continuous audio signal to the recipient.

The present invention advantageously allows for signals to be transmitted to an electronic device in a less than asynchronous manner. For example, if a user selected a song to be wirelessly communicated to an electronic device, system 100 could communicate the information in a less than asynchronous manner allowing the selected information to be transmitted efficiently thereby decreasing the overall download time for the selected audio information. In one embodiment, the selected information may be compressed and transmitted across the same frequency but at different phases thereby allowing plural signals having different phases to be wirelessly communicated to an electronic device. Therefore, the electronic device may be operable to receive multiple phased signals and process the selective information accordingly.

In one embodiment, the information may be wirelessly communicated at a relatively slow transmission rate. For example, a user may schedule when the selected audio information may be used by electronic device 103. The user may select several different audio tracks or songs to be transmitted to an electronic device associated with the user's vehicle such that the user can listen to the user selected audio information during the drive home at the end of a workday. Therefore, it may be desirable to utilize a slower transfer speed due to the extended amount of time available prior to actual use of the selected audio information. In this manner, communications networks having less or slower transfer rates may be used to wirelessly communicate the selected audio information to the electronic device.

In another embodiment, high-speed wireless communication networks may be used to communicate the selected audio information. For example, a user may want to listen to an Internet broadcast of an Internet radio station. Therefore,

high-speed communication may be required to wirelessly communicate or stream the selected audio information to an electronic device. In another embodiment, a hybrid of wireless communication rates may be deployed depending on the requirements of the selected audio information and/or the electronic device. For example, the selected audio information may first be transmitted to the electronic device via high-speed communication until enough information has been wirelessly communicated and buffered into a memory device operably associated with the electronic device. Upon communication of a certain percentage of the selected audio information, slower communication speeds may then be used to communicate additional selected audio information.

Therefore, system 100 may be configured in a plurality of ways to communicate selected information to electronic device 103. Digital engine 101 may be used to maintain data or information associated with the selected information and communication engine 102, communicatively coupled to digital engine 101, may wirelessly communicate selected information to electronic device 103.

FIG. 2 illustrates a block diagram of a method of wirelessly communicating selected information to an electronic device. The method may be used in association with the system illustrated in FIG. 1 or other systems operable to utilize the method of FIG. 2.

The method begins generally at step 200. At step 201, selectable audio information may be accessed utilizing a network communications device. For example, selectable audio information may be displayed at an Internet website accessible by a personal computer. In another embodiment, the selectable information may be accessed utilizing a wireless communications device such as, a cellular phone, a PDA device, or other devices operable to provide access to the selectable audio information.

Upon accessing the selectable information, the method proceeds to step 202 where a user can identify or select audio information to be wirelessly communicated to an electronic device. For example, a user may select an entire album to be wirelessly communicated to a PDA device.

Upon the user selecting the audio information, the method proceeds to step 203 where the method maintains information associated with the selected information. In one embodiment, the information may be an audio file, such as a wave file, and MP3 file, etc. representative of the selected audio information. In another embodiment, a network location that comprises a file representing the selected information may be maintained. Another example may include a network location of a network broadcast of audio information. Therefore, the method at step 203 may maintain several different types of information associated with the selected audio information.

Upon maintaining information or data associated with the selected information, the method proceeds to step 204 where the method wirelessly communicates information associated with the selected information to an electronic device. For example, if an audio file associated with the selected audio information was maintained, the method would communicate the audio file to the electronic device. In another embodiment, a link or network address broadcasting the selected audio information may be accessed and, at step 204, wirelessly communicated to an electronic device. In another embodiment, a combination of different types of audio information may be wirelessly communicated to an electronic device. Upon transmitting the selected audio information, the method proceeds to step 205 where the method ends.

Selected audio information may be communicated in a plurality of ways as described above including communicating via a cellular communications network to an electronic

US 8,688,085 B2

7

device operable to receive cellularly-communicated signals. For example, the information may be selected from a website operable to display selectable information. Upon selecting the audio information, a data file representing the selected audio information may be wirelessly communicated to an electronic device thereby allowing a user to select audio information via the Internet and wirelessly communicate the information to an electronic device.

In some embodiments, the wireless communication to an electronic device may occur in an off-line environment. For example, a user may go "on-line" to access a website and select information and then go "off-line" or end the browsing session. The wireless communication may then occur while the user is off-line thereby removing the confines of using an active or on-line browsing environment (i.e. Internet radio broadcast, streaming audio, etc.) to access selected information. Therefore, the method of FIG. 2 allows for information, such as audio information, to be communicated from a network location such as a web site, to an electronic device "via" wireless communication. The present invention advantageously allows users to access and download information accessible by a network location to an electronic device operable to receive wireless communications thereby reducing the need for land lines, terrestrial communication networks, etc. for communicating selective information.

In one embodiment, the method of FIG. 2 may be deployed in association with an Internet website operable to display selectable links for downloading information. The information may include audio information such as MP3s, streaming audio, streaming. Internet broadcasts, etc. are selectable by a user and operable to be wirelessly communicated to an electronic device. By providing a user with a website of selectable audio information operable to be wireless communicated to an electronic device, a user may customize information communicated to an electronic device. In one embodiment, a user may communicate information to an electronic device that may not be owned by the user. For example the method of FIG. 2 could be modified to allow a user to wirelessly communicate audio information to a plurality of electronic devices that may or may not be owned by the user.

FIG. 3 illustrates an electronic device operable to receive selected audio information in accordance with the teachings of the present invention. Electronic device 300 includes a communication module 301 such as a transceiver coupled to storage medium 303 such as a high speed buffer, programmable memory, or other devices operable to store information. Electronic device 300 may also include processor 302 operably associated with communication module 301 and storage medium 303. Processor 302 may be operable to process wirelessly communicated selected information and in one embodiment may be integrated as part of communication module 301 of storage medium 303. In the same manner, as larger scale integration of electronic devices proliferate, communication module 301, processor 302, and storage medium 303 may be integrated into one communication component or device operable as electronic device 300.

Processor 302 may be operable using software that may be stored within storage medium 303. In one embodiment, software upgrades may be communicated to electronic device 300 via wireless communication allowing for efficient system upgrades for electronic device 300. Storage medium 303 may include one or several different types of storage devices. For example, storage medium 303 may include programmable gate arrays, ROM devices, RAM devices, EEPROMs, minidisks or other memory devices operable to store information.

During use, electronic device 300 receives wireless communications of selective information. The information may

8

be transmitted via a wireless communications network and received by electronic device 300 via transceiver 301. Transceiver 301 may be operable to convert the received wireless communication signal into a desirable format and store the received information within storage medium 303. The received information may then be processed by electronic device 300.

In one embodiment, electronic device 300 may be operable as an audio player configured to play digital representations of music. For example, electronic device 300 may also include an MP3 player operable to process the received information into an audio signal. Therefore, electronic device 300 may be used to receive wirelessly communicated MP3 audio files and play these files using an MP3 player when desired. In another embodiment, electronic device 300 may be configured as a PDA wherein the PDA includes a web browser operable to wirelessly communicate with the Internet. The PDA device may include a user interface allowing a user to select information to be wirelessly communicated to electronic device 300.

By providing a website of selectable information, the PDA devices may provide an efficient embodiment for electronic device 300 in that is allows a user to access and select information using a wireless communication network and receive the selected information using the same or different wireless communication network. In yet another embodiment, electronic device 300 may be configured as a component operable to receive selective information via wireless communication and communicate the information to a second electronic device such as an automobile sound system, home stereo, etc.

For example, electronic device 300 may utilize transceiver 301 to receive wirelessly communicated information. Electronic device 300 may then be coupled to an automobile sound system using an interface and communicate the received information to the automobile sound system. In this manner, electronic device 300 may be used to provide the automobile sound system with audio files received via wireless communication.

In another embodiment, electronic device 300 may be operable to communicate the received audio information to an audio system via a localized communications-signaling network. One such network may include utilizing "Bluetooth" communication standard, used to provide communication between electronic devices in a proximal setting. In one embodiment, electronic device 300 may be integrated into an audio component such as a radio receiver. Electronic device 300 integrated into an audio component may be configured to process digital audio files wirelessly communicated to an audio component. In another embodiment, electronic device 300 may be operable to communicate with an analog receiver at a predetermined frequency.

For example, a specific frequency may be selected (i.e., 93.7 MHz) for communicating the wireless received selected information from electronic device 300 to a localized audio system. Electronic device 300 communication of the wirelessly received information allows a conventional receiver to receive the selected audio information. In one embodiment, the conventional receiver may be configured to receive a digital sub-carrier, on-carrier, or other within a specified frequency. Therefore, electronic device 300 may be operable to locally transmit the signal at a specific frequency thereby allowing the conventional receiver to receive the information. In another embodiment, electronic device 300 may be operable to scan plural bandwidths to receive the selective information. For example, transceiver 301 may be operable to receive selective information across several frequencies and process the received information accordingly.

**A60**

US 8,688,085 B2

9                                                    10

In another embodiment, electronic device **300** may be operable to scan several frequencies to obtain the desirable information. For example, a user may select several Internet broadcasts comprised of streaming audio information. Therefore, the information may be transmitted across several wireless frequencies receivable by electronic device **300**. Electronic device **300** may then be operable to allow a user to scan wirelessly communicated Internet broadcast signals thereby providing a user selected virtual broadcast radio network. In another embodiment, electronic device **300** may include a user interface operable to communicate with an Internet website operable to display selectable audio information. The Internet website may be configured as a user-preferred environment displaying a users selected audio information. Internet broadcast selections, streaming audio selections, etc.

With a display device for displaying a Website having selectable information, electronic device **300** may allow a user to select audio information via a user interface and receive the selected information via wireless communication thereby providing a customizable WebRadio device for the user. In another embodiment, electronic device **300** may be a modular device configured to be coupled to, for example, a portion of a cars interior. For example, electronic device **300** may be mounted to a portion of a car's console thereby providing a removably coupled electronic device operable to wirelessly receive selected audio information. As a removable device, electronic device **300** may also be coupled to a home audio system, a portable radio system or other systems thereby providing a versatile electronic device operable to receive wirelessly communicated selected audio information.

In another embodiment, electronic device **300** may be operable as a PDA and/or a cellular phone that may be mounted to an automobile's console. Electronic device **300** may then integrate with a user's automobile to provide an all-encompassing communications device. For example, electronic device **300** configured as a PDA and cellular phone may allow for communication with a user's email account, voice mail account, the Internet, as well as allowing for the receipt of selected audio information via wireless communication. Electronic device **300** may be operable in a hands-free mode allowing a user to maintain safe driving fundamentals. During use, electronic device **300** may be processing selective audio information for communicating with an automobile audio system and may further be operating to receive incoming cellular calls.

Electronic device **300** may be set-up by the user to pause the music being played and allow the received cellular call to be communicated either via an independent speaker or utilizing the automobiles "audio system." Additionally, electronic device **300** may be operable to adjust the listening level of an automobile's audio system, it may play received voice mail messages, allow a user to view the Internet, etc. In one embodiment, electronic device **300** may be operable as a dual mode electronic device capable of receiving both digital and analog wireless communication signals. In this manner, electronic devices may efficiently utilize available bandwidth for receiving selected information from a communications engine. For example, transceiver **301** may be a wireless communications modem operable to receive digital or analog signals.

FIG. 4 illustrates a graphical user interface (GUI) for displaying selectable audio information according to one aspect of the present invention. The GUI may be operable with a computer system, cellular device, PDA, or other electronic devices or systems operable to display the GUI of FIG. 4. The GUI, shown generally at **400**, may be displayed using a conventional web browser **402** such as Microsoft® Internet Explorer, a WAP browser, or other browsers operable to display the audio information. Browser **402** includes browser functions, shown collectively at **403**, for navigating a network such as the Internet or an intranet. Homepage **401** may be displayed using browser **402** and may include several functions, features, information, etc. related to audio information. Home page **401** may be developed using several different types of programming (i.e., HTML, XML, Java, etc.) used to developing a network location or website.

The present invention is not limited to any one specific type of software and may be realized in plurality of ways as can be appreciated by those skilled in the art. Homepage **401** may also include login region **410** allowing a user to log into homepage **401** and display a user-preferred environment. For example, a user may want Radio Dial **412** to appear when a user logs into homepage **401**. In another embodiment, a user may want to view a current playlist selected by the user or the status of wirelessly communicated playlist. A user may also provide demographic information allowing advertisers to access the demographic information and provide advertisements based upon the demographic information. For example, an advertiser may want to target Hispanic females in the 21-25 year old age group.

Through providing demographic information to advertisers, when a user logs into homepage **401** selective advertising can be "targeted" for a group of users. Homepage **401** may also include several tabs for efficiently navigating homepage **401**. Library tab **405** may be provided to allow a user to browse available audio information that may be presented by title, genre, artist, decade, culture, etc. Store tab **407** may also be provided for locating items available for purchase such as CDs, PDA devices, MP3 players, wireless communication hardware, interfaces, software or other types of products that may be purchased while on-line. Chat tab **408** may also be provided allowing a user to chat with other users of home page **401**. For example, a guest musical artist may be available to chat with visitors of home page **401** via a chat page associated with chat tab **408**. Home page **401** may also include contest tab **409** for displaying current contests, prizes, and/or winners.

Radio tab **406** may also be provided for displaying audio information. For example, radio tab **406** may display a collective menu **411** of selectable functions or features associated with audio information. Top ten lists may be provided to a user based on several different billboard polls or genres. A search engine may be provided allowing a user to search for a specific type of audio information such as an artist, song title, and genre. Internet radio station, etc. In one embodiment, a user may input the lyrics to a song within the search engine. As such, the search engine may locate several different songs having the desirable lyrics and allow a user to select the search results. A user may also use a select a device feature that allows a user to select a destination device for communicating selected audio information. For example, a user may want to communicate a playlist to several different devices such as a PDA, a home computer system, a work computer system, etc.

As such, a user can communicate selective information to several devices without having to download the information separately for each device. A send a friend link may also be provided allowing a user to send selective audio information to a friend's electronic device. A user may also join a group comprised of individuals that select a certain genre of music to be communicated to the user's electronic device. For example, a user may want to join a group that plays only 50s swing music. As such, the user could communicate the group's selected songs to the user's electronic device. A user

**A61**

US 8,688,085 B2

11

may also utilize an email account provided by homepage **401** allowing a user to correspond with others via email. A user may also access a list of guest DJs that may provide playlists of songs chosen by the guest DJ and selectable by a user.

In one embodiment, a user's radio dial **412** may be provided when a registered user logs into homepage **401**. As such, radio dial **412** may include several functional buttons similar to conventional systems such as a volume control and a station control. However, radio dial **412** surpasses the limitations of conventional systems through providing a programmable radio dial of user customized audio information. Radio dial **412** includes several stations that may be programmed using program interface **413**. The preset stations may include several different types of user customized preset information such as user selected playlists, Internet broadcast stations, top lists, group playlists, artist-selected lists, on-line radio station, conventional radio stations. Internet phone, cellular phone, etc. and other functions, features, or information associated with audio information.

Radio dial **412** may also be displayed as a separate user interface and in some embodiments, does not require a "browsing" environment to view radio dial **412**. For example, an electronic device, such as a PDA, having a display may graphically present radio dial **412** to a user. One example may be using electronic device in association with an automobile audio system. Electronic device may display radio dial **412** and may allow a user to navigate, modify, select, adjust volume, access daytimer, access phone lists, etc. or perform other functions while the electronic device is used in association with an automobile sound system. Therefore, radio dial **412** may be operable as an application for use with several different types of electronic devices (i.e., computer systems, portable computing devices, cellular phones, etc.) operable to display radio dial **412** and in come embodiments may be wirelessly communicated to an electronic device.

In another embodiment, homepage **401** may allow a user to select when to download the information to an electronic device. For example, a user may want to listen to a certain genre of music at a specific time of day thereby allowing a user to select the information. As such, a user may select a different playlist for every day of the week thereby allowing a user to listen to different songs on different days of the week. The user can further identify when the selected playlist should be available for listening. For example, if a user wanted to listen to "playlist #1" on Monday morning during the drive into work, between 8:00 am and 9:00 am, the user would enter the time and the day "playlist #1" would be available for listening. In this manner, the playlist may be communicated to the electronic device thereby allowing a user to listen to selective audio information at a desirable time.

FIG. 5A illustrates a portable radio system having a mount for an electronic device according to one embodiment of the present invention. Portable radio **500** includes a mount **501** operable to receive electronic device **502**. Mount **501** may include a connector operable to provide communications and power to electronic device **502**. During use, electronic device **502** when mounted within portable radio **500** communicates with portable radio to provide remotely received selective audio information. In one embodiment, electronic device **502** may include a user interface allowing a user to access the Internet. Therefore, selective audio information located on the Internet may be accessed by the user and remotely communicated to electronic device **502** coupled to portable radio **500**.

In another embodiment, portable radio **500** may include memory operably located within for storing downloaded

12

information. For example, portable radio **500** may include 32 MB of RAM allowing electronic device **502** to receive selective information and download the selective information to memory located within portable radio **500**. In this manner, the downloaded music may be operable to be played within portable radio **500** while allowing electronic device to be removed from portable radio **500**. Therefore, portable radio **500** including electronic device **502** allows a user to communicate selected audio information to portable radio **500**.

FIG. 5B illustrates automobile console having a mount for coupling an electronic device according to one aspect of the present invention. Console **510** includes mount **511** operable to receive electronic device **512**. Mount **511** may be located in many different locations within an automobile such as coupled to a sun visor, center console, dashboard, floorboard, etc. Mount **511** allows the user to couple electronic device **512** to the automobile and provide an interface for communication between electronic device **512** and the automobile audio system. Mount **511** may also include a power connection that allows electronic device **512** to use the automobiles power during use. The power connection may also be used in association with a recharging circuit operable to recharge a power supply within the electronic device. During operation, electronic device **512** coupled to mount **511** may receive selected audio information via wireless communication and communicate the selective information to the automobile audio system.

In one embodiment, the automobile may include memory operable associated with the automobile for storing-information. The memory may be used in association with mount **511** and electronic device **512** to store the selected audio information. In this manner, voluminous audio information can be stored within the memory allowing electronic device **512** to receive additional information. In one embodiment, a mount may be provided for a home audio system (not shown) for downloading selected audio information for use with a home audio system. For example, a mount device may be coupled to a home stereo system such that the upon placing an electronic device such as electronic device **500** within the mount, selected audio information may be communicated to the home audio system thereby allowing a home audio system to be used in association with an electronic device.

FIG. 6 illustrates a block diagram of a system for communicating voice mail messages using email according to one embodiment of the present invention. The system, indicated generally at **600**, includes email server **601** coupled to a voice mail storage device **602**. System **600** further includes a computer system or network terminal **603** such as a computer coupled to network **604**. System **600** further includes mount **605** for mounting electronic device **606** for hardwire communication of information. Device **606** may also communicate with network **604** using a wirelessly communication network operably associated with network **604** and coupled, for example, via tower **607**.

During operation, system **600** communicates voice mail messages to a user utilizing email server **601**. For example, if a user receives a voice mail message, email server **601** would be notified and a voice mail message would be sent to the user's email account in the form of an email message. For example, a voice mail message would be sent to a user's email account within intranet **604** in the form of an audio file as an attachment to the email. Upon receiving the email, a user may click on the audio file representing the voice mail message to hear the message left by a caller.

In one embodiment, a user may be accessing the Internet via a phone line and, as such, be unable to receive notification that a voice mail message has been received. System **600**

US 8,688,085 B2

13

would receive the voice mail message and send an email comprising the voice mail message to the user email account. In this manner, a user can remain connected to the network and receive voice mail without having to log off or disconnect from the Internet. In one embodiment, a user may receive the voice mail message via a portable electronic device. For example, a user may be using remote device **605** operable to receive wirelessly communicated information. System **600** would receive the voice mail message and forward the voice mail message to a user's portable electronic device **606**. In this manner, a user may be capable of receiving voice emails at remote locations.

In another embodiment, a user may subscribe to use an Internet email account that may be operably associated with system **600**. Utilizing an Internet email account may allow a user the flexibility to check voice email messages from any location in the world. For example, a user may access a "Hotmail" email account while traveling on business in a foreign country. The user, upon gaining access to the "Hotmail" account, would be able to listen to voice mail messages sent to the user via the "Hotmail" email account. Through utilizing an email account to receive voice mail messages, a user may be afforded great flexibility in communicating voice mail messages. For example, a user may be able to forward a voice mail message received in the form of an email to one or a plurality of other email accounts. In this manner, a voice email message may be sent efficiently to other email users.

For example, a user may maintain a distribution list of individuals working on a particular project that may have a need to hear certain voice email messages. In this manner, a user may efficiently disseminate information to other individuals while adding additional textual information to the body of the email allowing a user to comment on the original voice email message. In another embodiment, a user may forward a received voice email message to another account operable to receive forwarded voice email messages. For example, system **600** may be operable to receive an email message having a voice mail message as an attachment. The system would then be operable to forward the voice mail message to specified phone number, separate email account, and/or voice mail account, etc. thereby providing a user flexibility in receiving voice email.

In one embodiment, a user may utilize an email account to establish an answering service for voice mails. For example, a user's telephone number may be operable with an email account to provide an answering service. A user may record a message for a specified phone number or extension and, upon receiving an incoming call; the recorded message may be played back to incoming the call's initiator. System **600** would then forward the received voicemail message via an email account to the user. For example, a user may have an account set up at a residence for receiving voicemail messages via a user-defined email account. The user could then forward all received voice mails from the home account to an email account at a place of work. Therefore, the user may have complete access to received voicemail messages. In the same manner, a user could set up their work phone number to forward a voicemail message to the user's home email account thereby allowing a user to receive a voicemail at a home email account. Therefore, system **600** may be operable in a plurality of ways to provide email messages comprised of voicemail messages received via a voice mail or email account.

FIG. **7** illustrates a flow chart for providing voice email messages according to one embodiment of the present invention. The method begins at step **701** where a voice mail message is left for a user. The message could be at a residence,

14

place of business, etc. The method then proceeds to step **702** where the message may be stored as an audio file within a database operable to store a file comprised of the voice mail message. Upon storing the file, the method proceeds to step **703** where an electronic mail message may be generated. The electronic mail message may be addressed to the recipient of the voice mail message. The method then proceeds to step **704** where the audio file representing the voice mail message is attached to the electronic message.

Upon attaching the audio file, the method then proceeds to step **705** where the email message may be sent to the email address. Upon sending the email message the method proceeds to step **706** where the method determines if the email message should be sent to a wireless electronic device. If the message is not to be sent to a wireless device, the method proceeds to step **720** where the method ends. If the message is to be sent to a wireless electronic device, the method proceeds to step **707** where a signal may be sent to the wireless electronic device and at step **708** an indication is provided to the electronic device indicating that a voicemail message has been received via a user's email account. The method may then proceed to step **709** where the user decides whether or not to listen to the voice email message. If the user decides not to listen to the voice email message, the method may proceed to step **710** where the method ends. If the user decides to listen to the voice email message, the method proceeds to step **711** where a request may be sent by the electronic device requesting the voice email message be forwarded to the user's electronic device.

At step **712**, the voicemail message may be sent to the user's electronic device. Upon forwarding the voicemail message to the user the method may proceed to step **720** where the method ends. As such, FIG. **7** depicts one method of providing an email message comprised of a voice mail message. Certainly, other methods may be deployed as advancements in technology and are made without departing for the spirit and scope of the present invention.

FIG. **8** illustrates a flow diagram of a method for providing selected audio information to an electronic device according to one embodiment of the present invention. The method begins at step **800** where a user accesses a webpage via the Internet. The webpage may be a home page illustrated in FIG. 4 or other web pages operable to display selectable references to audio information. The method proceeds to step **801** where a user selects desirable audio information. For example, a user may select a single song, a plurality different songs, an entire album, a broadcast station, streaming audio, etc. or other selectable audio information. Upon the user selecting a reference to audio information, the method may proceed to step **802** where a playlist may be created that represents the user's selected audio information.

The playlist may be variable in size and comprised of a plurality of different types of available audio information. Upon creating a playlist, the method may proceed to step **803** where information associated with the playlist is obtained. For example, a list of network or URL locations comprised of the desirable audio information may be obtained. In this manner, desirable audio information may be obtained from many different sources such as URLs, network addresses, hard drives, databases comprised of audio information, etc. The sources may be accessed to obtain the selected audio information.

Upon obtaining data associated with the customized playlist, the method may proceed to step **804** where the user is prompted for a destination for the playlist. For example, a user may want to communicate the selected audio information to a remote electronic device, an automobile audio sys-

US 8,688,085 B2

15    16

tem, a home stereo system, a home computer, an electronic device coupled to a home network or computer system, etc. or other locations or devices operable to receive the selected audio information. In one embodiment, a user may select a device owned by a friend to accept the selected audio information. For example, a husband may want to send a romantic playlist to his wife on their anniversary. In this situation, the husband would select his wife's electronic device as the receiving device for the selected audio information.

Upon selecting a device, the method proceeds to step 805 where the method determines the destination of the selected audio information. If the information is to be sent to a device via a wire line connection, the method proceeds to step 813 where playlist data is sent to a user via a wire line connection. The method may then proceed to step 814 where the playlist is executed at the device. If the information is to be sent to a device requiring wireless communication, the method proceeds to step 806 where the information is formatted for communicating the information to a wireless electronic device. For example, a wireless PDA device may be selected as a destination device for the selected audio information. The PDA device may include an audio player, such as an MP3 player operable to play or execute MP3 audio files. In such an embodiment, the method could format the information such that the information may be wirelessly communicated and subsequently played by the MP3 player.

Upon formatting the information, the method may then proceed to step 807 where the audio information is wirelessly communicated to the selected device. In some embodiments, the device may be operable to receive a limited amount of information based upon storage capacity of the device (i.e., 16 MB). In such a case, the method may divide the information into component parts and periodically communicate the component parts, such as packets, to the electronic device. Upon communicating the audio information, the method may then proceed to step 808 where the signal may be received by the destination or electronic device.

The method may then proceed to step 809 where the method determines if all of the audio information has been received. For example, if 16 MB or 32 MB of selected audio information was initially transmitted due to capacity limitations of the selected device, the method may query the selected device to determine if capacity is available. If available memory exists, the method may proceed to step 807 where the method may communicate additional audio information based upon the amount of available memory. The method repeats until all of the selected audio information has been transmitted.

Upon communicating the selected information, the method may proceed to step 810 where the playlist may be executed. For example, a user may select a continuous communication of selected audio information (e.g., several hours of music. Internet broadcast, etc.). As such, the method may continuously play or execute the received audio information. In another embodiment, the method may proceed to step 811 where the method may store or buffer the received information until it is desirable to execute the received selected audio information. As such, upon executing the selected audio information, the method may proceed to step 809 where the method may repeat. In one embodiment, a user may elect to download a broadcast of an on-line radio station. For example, a user may want to listen to a radio station located in a remote location wherein conventional radio receivers could not receive the desired broadcast. For example, a person living in Houston, Tex. may not be able to receive a radio broadcast signal from a radio station in Seattle, Wash. utilizing a conventional radio receiver.

In accordance with the teachings of the present invention, a user may select an on-line broadcast or radio station as all or a part of the selected audio information. The user may then receive radio broadcasts without having to use a home computer system or conventional radio receiver.

At step 804, a user may select a device that does not require remote communication of information. For example, a user may elect to communicate the selected audio information to device, such as a personal computer, PDA device, MP3 player, etc. coupled via a network connection to the Internet or an Intranet. The user may receive the selected playlist at the determined device for eventual playing. In one embodiment, a user may select a plurality of devices as destination devices for receiving downloads of the selected audio information. For example, the user may want to download the information to a home stereo system, a PDA device, and an automobile stereo. As such, the selected information may be communicated to more than one destination device. In addition, the format of the download may match or conform to the selected destination device(s).

The present invention may be configured in a plurality of ways to communicate desirable audio information to users by allowing users to select desirable audio information and transmitting the desirable audio information to a specified destination thereby allowing a user to receive on-demand customized audio information. Moreover, the download may occur in an off-line environment, allowing a user to enjoy the selected audio information accessed on-line without having to be on-line or utilizing a browsing environment. In one embodiment of the present invention, the method of FIG. 8 may be modified to allow a user to select a "user group" for receiving customized audio information. For example, a "user group" may include users that prefer contemporary jazz wherein a user may request a certain song. Therefore, a virtual request line may be designed for a specific genre of music allowing "members" to transmit audio information to the "group".

In another embodiment of the present invention, the method may be modified to allow a user to select a specific genre to be transmitted to the users device. For example, a user may elect to have random country and western music transmitted to a destination device. The user could efficiently create a radio station format and have the format received at a destination device.

In a further embodiment, a user may select a group of genres to be downloaded to a desirable device. As such, the method may be modified to allow a user to select several different genres to download random music within the specified genres. In another embodiment, a user may elect to download the same music as another individual. For example, a user may want to download the same music as their best friend. Therefore the user could elect to download the same music as their friend or group of friends. In another example, a user may want to listen to the same music that an artist listens to on a specific weekday of evening. For example, a user may want to listen to the same music that Barry White listens to on a Saturday night.

Therefore, the user may select "Barry White's" Saturday night playlist and receive the same playlist Barry White receives on Saturday night. In another embodiment, the method of FIG. 8 may be modified to allow a user to manipulate song post download. For example, a user may want to store, delete, replay, copy, forward, etc. received audio information. Therefore, the method of FIG. 4 may be modified such that a user can manipulate or process the received audio information in a plurality of ways. In one embodiment of the present invention, an on-line radio station may be provided.

**A64**

US 8,688,085 B2

17                                              18

For example, the radio station may be created for transmitting audio or on-line broadcasts. The on-line broadcasters or hosts may create their own format for broadcast. For example, an on-line radio station may be provided that transmits only children's songs.

Prior to conception of the present invention, conventional radio stations were monetarily limited to be capable of transmitting music such as children's songs to conventional radio receivers. The present invention, by providing a medium for transmitting selectable audio information, enables the existence of on-line broadcasting with little or no overhead cost for a host. A user may select an on-line broadcast for on-line or off-line delivery. In another embodiment, on-line broadcast of audio information representing books or novels may be provided to individuals such as the visually impaired. For example, an on-line broadcast station may provide several hours of audio information broadcast representing books or novels to be broadcast with very little overhead.

FIG. 9 illustrates an automobile console having a mount for an electronic device according to one embodiment of the present invention. Console 900 includes a conventional audio system 901 comprised of a receiver 902 and CD player 903. Interface 904 may be coupled to audio system 901 via plug 905 and cable 908, which may be coupled to an auxiliary line into audio system 901. Interface 904 may also include contact 906 for contacting electronic device 907. Cable 908 may be a multiple conductive cable for providing power from the automobiles power system via a protection circuit or fuse 909 for powering electronic device 907. In one embodiment, interface 904 may be operable to recharge electronic device 907 utilizing a power source associated with an automobile.

During operation, electronic device 907 may be mounted within interface 904. Electronic device 907 may also be powered or recharged via power line 910 and communicate with the systems audio system via interface cable or bus line 911. Audio information communicated to electronic device 907 may be transferred to audio system 901 such that a user may listen to selected audio information. For example, a user may have previously selected a plurality of audio files to be transmitted to electronic device 907. Electronic device 907 may communicate the selected audio information to the automobiles audio system that utilizes interface 901 thereby allowing the user to listen to selected audio information. In one embodiment, cable 908 may be custom-installed to audio system 901. For example, the cable may be coupled to an auxiliary line for the system's radio or may be coupled to CD player line 912.

In another embodiment, a radio manufacturer may provide interface 904 as a standard interface integrated into the audio system, thereby allowing communication between electronic device 907, audio system 901 and/or console 900. Electronic device 907 may include a plurality of different types of devices. For example, electronic device 907 may include a PDA device operable to store selected audio information. The information may be either remotely downloaded using an Internet web browser and wireless communication to the PDA device. In another embodiment, selected audio information may communicated to a PDA device via a hard wire coupled to a computer system interfacing with the Internet. In another embodiment, electronic device 907 may include an audio file player operable to play audio files such as MP3s, etc.

The audio files may be remotely or locally communicated to electronic device 907 and upon coupling to audio system 901, the audio files may be transmitted to audio system 901 in a form receivable by audio system 901. Although the disclosed embodiments have been described in detail, it should

be understood that various changes, substitutions and alterations can be made to the embodiments without departing from their spirit and scope.

The benefits, advantages, solutions to problems, and any element(s) that may cause any benefit, advantage, or solution to occur or become more pronounced are not to be construed as a critical, required, or essential feature or element of the present invention. Accordingly, the present invention is not intended to be limited to the specific form set forth herein, but on the contrary, it is intended to cover such alternatives, modifications, and equivalents, as can be reasonably included within the spirit and scope of the invention as provided by the claims below.

While the present invention has been described with respect to a limited number of embodiments, those skilled in the art will appreciate numerous modifications and variations therefrom. It is intended that the appended claims cover all such modifications and variations as fall within the true spirit and scope of this present invention.

What is claimed is:

1. A media system, comprising:
   a media managing system maintaining information about available media content;
   a website provided in association with the media managing system;
   a log-in resource accessible via the website and configured to facilitate a logging in by a user; and
   a portion of the website that is customized for a given user and presented to the given user only after the given user has logged in, the portion configured to present a library of the media content that is available to the given user and a collection of selectable features comprising:
      (1) a browse feature that facilitates navigating through the library for a given piece of the media content based on at least one of a title and an artist; (2) a listen feature that facilitates requesting of a streaming delivery of an audible media that is in the library; and (3) a store feature that facilitates adding of an additional media to the library; and
      an application for use with a wireless handheld device that has a display, the application operable when executed by the wireless handheld device to present a graphical interface that includes at least a partial representation of the portion of the website that is customized for the given user.

2. The system of claim 1, wherein the application is designed for a cellular telephone and operable when executed to direct a processor of the cellular telephone to maintain a user interface comprising a selectable icon associated with a specific media file, to communicate data to a different electronic device that has an associated display to allow the different electronic device to present a selectable representation of the selectable icon on the associated display, and to begin outputting data representing the specific media file from the cellular telephone in connection with a user selecting the selectable representation from the associated display.

3. The system of claim 1, wherein the available media content comprises a plurality of songs having lyric components, the system further comprising an engine that maintains information about the lyric components for the plurality of songs.

4. The system of claim 1, wherein the library includes a selection of available media content that comprises textual content, further wherein the additional media comprises textual media.

US 8,688,085 B2

19                                                                    20

**5.** The system of claim **1**, further comprising a targeted advertising component configured to communicate an advertisement to the given user based at least in part on a demographic of the given user.

**6.** The system of claim **1**, further comprising a network based delivery resource configured to respond to the requesting of the streaming delivery of the audible media by: (1) accessing a list of network locations for at least a portion of the audible media; (2) retrieving the portion from an appropriate network location; and (3) streaming a representation of the portion to the wireless handheld device.

**7.** The system of claim **1**, wherein the collection of selectable features further comprises a watch feature that facilitates a different requesting of a different streaming delivery of a video media that is in the library, the system further comprising a network based delivery resource configured to respond to the different requesting by: (1) accessing a list of network locations for at least a portion of the video media; (2) retrieving the portion from an appropriate network location; and (3) streaming a representation of the portion to the wireless handheld device.

**8.** A media method, comprising:

maintaining a website interface for a network based media managing system that includes a log in region;

maintaining a customized website interface for the network based media managing system that includes a listing of a media collection of a given user, wherein the customized website interface is presentable after the given user logs in;

maintaining an application configured for use with an electronic device that comprises a display, a non-volatile memory, a processing device operable to execute instructions stored in the non-volatile memory, and at least one transceiver, wherein a copy of the application can be executed by the electronic device to present a user interface on the display that comprises at least a portion of the listing of the media collection of the given user;

receiving a request to purchase a piece of media content;

adding the piece of media content to the media collection; and

communicating information representing the piece of media content to the user via the copy of the application.

**9.** The method of claim **8**, wherein the piece of media content comprises an audible media, the method further comprising:

accessing a list of network locations for at least a portion of the audible media;

retrieving the portion from an appropriate network location, and streaming a representation of the portion to the electronic device.

**10.** The method of claim **8**, wherein the piece of media content comprises a video media, the method further comprising:

accessing a list of network locations for at least a portion of the video media;

retrieving the portion from an appropriate network location, and streaming a representation of the portion to the electronic device.

**11.** The method of claim **8**, wherein the piece of media content comprises a textual media, the method further comprising sending the textual media as a file to the electronic device, wherein the electronic device is a wireless handheld device.

**12.** The method of claim **8**, wherein the application is a system level software application and the electronic device is a wireless handheld device.

**13.** The method of claim **8**, wherein the electronic device is a wireless cellular telephone device and the application is an application level software application configured for over the air delivery to the electronic device, wherein the electronic device is a wireless handheld device.

**14.** A media system, comprising:

a network based media managing system that maintains a library of content that a given user has a right to access and a customized user interface page for the given user;

a collection of instructions stored in a non-transitory storage medium and configured for execution by a processor of a handheld wireless device, the collection of instructions operable when executed: (1) to initiate presentation of a graphical user interface for the network based media managing system; (2) to facilitate a user selection of content included in the library; and (3) to send a request for a streaming delivery of the content; and

a network based delivery resource maintaining a list of network locations for at least a portion of the content, the network based delivery resource configured to respond to the request by retrieving the portion from an appropriate network location and streaming a representation of the portion to the handheld wireless device.

**15.** The media system of claim **14**, wherein the network based delivery resource is configured: (1) to recognize that the request indicates a need for a wireless delivery of the content; and (2) to respond to the request by delivering the portion of the content at a given communication rate.

**16.** The media system of claim **15**, wherein the network based delivery resource is further configured to deliver another portion of the content at a different communication rate, wherein a decision to change between the given communication rate and the different communication rate is at least partially based on a buffer fill in the handheld wireless device.

**17.** The media system of claim **14**, wherein the customized user interface page comprises a collection of selectable features comprising: (1) a browse feature that allows a navigating through the library for a given piece of content based on at least one of a title and an artist; (2) a store feature that allows a purchasing of an available content; and (3) a share feature that allows the given user to share a playlist with a different user.

**18.** The media system of claim **14**, wherein the collection of instructions are further configured to direct the processor to maintain a user interface comprising a selectable icon associated with a specific media file, to communicate data to a different electronic device that has an associated display to allow the different electronic device to present a selectable representation of the selectable icon on the associated display, and to begin outputting data representing the specific media file from the handheld wireless device in connection with a user selecting the selectable representation from the associated display.

**19.** The media system of claim **18**, wherein the collection of instructions are further configured to send the request for the streaming delivery of the content in response to the user selecting the selectable representation from the associated display.

**20.** The media system of claim **14**, further comprising a store feature that allows the given user to acquire a right to access a selected content and to add the selected content to the library.

\*    \*    \*    \*    \*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

The undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 13,699 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

The undersigned also hereby certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Book Antiqua type style, with 14-point or larger Franklin Gothic Book type style headings.

As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned has relied upon the word count of this word processing system in preparing this certificate.

Dated: December 18, 2015          By: */s/ Ronald J. Schutz*

Ronald J. Schutz
*Counsel for Plaintiff-Appellant*

# PROOF OF SERVICE

I hereby certify that on December 18, 2015, the foregoing APPELLANT AFFINITY LABS OF TEXAS, LLC'S OPENING BRIEF and ADDENDUM was filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system which pursuant to Federal Rule of Appellate Procedure 25(c)(2) and Federal Circuit ECF-6(A) constitutes service on all parties represented by attorneys who have registered for the CM/ECF system, and that a copy was served on counsel of record for Defendants-Appellees via e-mail:

dhadden@fenwick.com

rranganath@fenwick.com

sshamilov@fenwick.com

Dated: December 18, 2015        By: /s/ *Ronald J. Schutz*

Ronald J. Schutz

*Counsel for Plaintiff-Appellant*